Volume I

Pages 1 - 187

United States District Court

Northern District Of California

Before The Honorable William Alsup

United States of America,      )
                               )
            Plaintiff,         )
                               )
   vs.                         )
                               )
Ivan Cerna, Marvin Carcamo,    )
Angel Noel Guevara, Morris     )
Flores, Guillermo Herrera,     )
Jonathan Cruz-Ramirez,         )
Walter Cruz-Zavala, Daniel     )
Portillo, Erick Lopez,         )      No. CR08-0730 WHA
Walter Chinchilla-Linar,       )
Cesar Alvarado, Wilbert        )
Castillo, Jose Quinteros,      )
Melvin Maldonado,              )
Manuel Franco, Aristides       )
Rafael Montoya, Luis           )
Herrera, Danilo Velasquez,     )
Giovanni Hernandez,            )
                               )
            Defendants.        )
_____)

San Francisco, California
Tuesday, October 12, 2010

**Reporter's Transcript of Proceedings**

**Appearances:**

(Appearances on next page.)

*Reported By:*        *Sahar McVickar, RPR, CSR 12963*
                      *Official Reporter, U.S. District Court*
                      *for the Northern District of California*

(Computerized Transcription by Eclipse)

*Sahar McVickar, C.S.R. No. 12963, RPR*
*Official Court Reporter, U.S. District Court*
*(415) 626-6060*

1    **Appearances:**

2    For Plaintiff:              Melinda L. Haag
                                 United States Attorney
3                                450 Golden Gate Avenue, Box 36055
                                 San Francisco, California  94102
4                        By:     **Wai Wilson Leung, Esquire**
                                 **William Frentzen, Esquire**
5                                **Assistant United States Attorneys**

6    For Defendant
     Ivan Cerna:                 Sugarman & Cannon
7                                44 Montgomery Street, Suite 2080
                                 San Francisco, California  94104
8                        By:     **Christopher Cannon, Esquire**

9    For Defendant
     Marvin Carcamo:             Law Offices of Kourosh Ken Behzadi
10                               2467 Via De Los Milagros
                                 Pleasanton, California  94566
11                       By:     **Kourosh Behzadi, Esquire**

12   For Defendant
     Angel Noel Guevara:         Law Offices of Jennifer Lynn Naegele
13                               P.O. Box 12375
                                 San Francisco, California  94112
14                       By:     **Jennifer Lynn Naegele, Esquire**

15   For Defendant
     Morris Flores:              Law Offices of Mark Rosenbush
16                               214 Duboce Avenue
                                 San Francisco, California  94103
17                       By:     **Mark Rosenbush, Esquire**

18   For Defendant
     Guillermo Herrera:          Law Offices of Martin Sabelli
19                               500 Liberty Street
                                 San Francisco, California  94114
20                       By:     **Martin Sabelli, Esquire**

21   For Defendant
     Jonathan Cruz-Ramirez:      Law Office of John Philipsborn
22                               507 Polk Street, Suite 350
                                 San Francisco, California  94102
23                       By:     **John Timothy Philipsborn, Esquire**

24

25   (Appearances continued on next page.)

1   **Appearances, continued:**

2   For Defendant
    Walter Cruz-Zavala:        Law Offices of Brian Berson
3                              235 Montgomery Street, Suite 625
                               San Francisco, California  94104
4                         By:  **Brian Berson, Esquire**
                               **(Specially appearing for**
5                              **Randy Sue Pollock)**

6   For Defendant
    Daniel Portillo:           Berman, Glenn & Haight
7                              5 Third Street, The Hearst Building
                               Suite 1100
8                              San Francisco, California  94103
                          By:  **Jeffry Glenn, Esquire**
9

10  For Defendant
    Erick Lopez:               Law Office of Peter Goodman
                               400 Montgomery Street, 2nd Floor
11                             San Francisco, California  94104
                          By:  **Peter Goodman, Esquire**
12

13  For Defendant
    Walter Chinchilla-
14  Linar:                     Law Offices of Richard B. Mazer
                               99 Divisadero Street
                               San Francisco, California  94117
15                        By:  **Julie Ann de Almeida, Esquire**

16  For Defendant
    Cesar Alvarado:            Law Office of Mark Stuart Goldrosen
17                             255 Kansas Street, Suite 340
                               San Francisco, California  94103
18                        By:  **Mark Stuart Goldrosen, Esquire**

19  For Defendant
    Wilbert Castillo:          Law Offices of Frank Bell
20                             333 Bradford Street, Suite 270
                               Redwood City, California  94063
21                        By:  **Frank Bell, Esquire**

22  For Defendant
    Jose Quinteros:            Law Offices of Michael Berger
23                             1611 Telegraph Avenue, Suite 1100
                               Oakland, California  94612
24                        By:  **Michael R. Berger, Esquire**

25  (Appearances continued on next page.)

**Appearances, (cont'd.):**

| | |
|---|---|
| 1 | |
| 2 | For Defendant |
| 3 | Melvin Maldonado:    Law Offices of Brian Berson |

For Defendant

Melvin Maldonado:     Law Offices of Brian Berson
         235 Montgomery Street, Suite 625
         San Francisco, California  94104
       **By:  Brian Berson, Esquire**

For Defendant
Manuel Franco:     Law Offices of Geri Lynn Green
         155 Montgomery Street, Suite 901
         Berkeley, California  94104
       **By:  JT Swanson, Esquire**

For Defendant
Aristidis Carcamo:     Law Offices of Shana Keating
         1934 Divisadero Street
         San Francisco, California  941115
       **By:  Shana Keating, Esquire**

For Defendant
Rafael Montoya:     Swanson McNamara & Haller, LLP
         300 Montgomery Street, Suite 1100
         San Francisco, California  94104
       **By:  August Paul Gugelmann, Esquire**
            **(Specially appearing for Ed Swanson)**

For Defendant
Luis Herrera:     Law Offices of James S. Thomson
         819 Delaware Street
         Berkeley, California  94710
       **By:  James S. Thomson, Esquire**

For Defendant
Luis Herrera:     Law Offices of Josh A. Cohen
         633 Battery Street, Suite 110
         San Francisco, California  94111
       **By:  Josh A. Cohen, Esquire**

For Defendant
Danilo Velasquez:     Law Offices of Jennifer Schwartz
         1229 4th Street, Suite 307
         San Rafael, California  94901
       **By:  Jennifer Schwartz, Esquire**

(Appearances continued on next page.)

1   **Appearances, (cont'd.):**

2   For Defendant
    Giovanni Hernandez:      Law Office of Mark Rendon Vermuelen
3                            755 Florida Street, #4
                             San Francisco, California  94110
4                      **By:  Mark Rendon Vermuelen, Esquire**

5   Also Present:            Carol Rhine-Medina
                             Certified Spanish Interpreter
6
                             Daniel Navarro
7                            Certified Spanish Interpreter

8

9

10                          ---o0o---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I **N** D **E** X

**Plaintiff's Witnesses:**

                                                              Page

**Flores, Frank**
**(Sworn)**

Direct Examination by Mr. Leung                                11
Cross-Examination by Mr. Sabelli                              99
Cross-Examination by Mr. Philipsborn                          159
Redirect Examination by Mr. Leung                            171

**Defendant's Witnesses:**

None

---o0o---

```
 1                     E X H I B I T S

 2

 3   Plaintiff's Exhibits:       W/Drawn        Iden.          Evid.

 4   1 (for limited purposes)                                   30

 5

 6

 7

 8   Defendant's Exhibits:       W/Drawn        Iden.          Evid.

 9   C                                          172

10

11

12

13

14                        ---o0o---

15

16

17

18

19

20

21

22

23

24

25
```

```
 1  Tuesday, October 12, 2010                        7:30 A.M.

 2                        P R O C E E D I N G S

 3           THE COURT:  Welcome.  Please be seated.

 4           THE CLERK:  Calling case CR08-730, U.S.A. versus

 5  Ivan Cerna; U.S.A. versus Marvin Carcamo; U.S.A. versus Angel

 6  Noel Guevara; U.S.A. versus Morris Flores; U.S.A. versus

 7  Guillermo Herrera; U.S.A. versus Jonathan Cruz-Ramirez; U.S.A.

 8  versus Walter Cruz-Zavala; U.S.A. versus Daniel Portillo;

 9  U.S.A. versus Erick Lopez; U.S.A. versus Walter

10  Chinchilla-Linar; U.S.A. versus Cesar Alvarez; U.S.A. versus

11  Wilbert Castillo; U.S.A. versus Jose Quinteros; U.S.A. versus

12  Melvin Maldonado; U.S.A. versus Manual Franco; U.S.A. versus

13  Aristides Carcamo; U.S.A. versus Rafael Montoya; U.S.A. versus

14  Luis Herrera; U.S.A. versus Danilo Velasquez; U.S.A. versus

15  Giovanni Hernandez.

16           THE COURT:  Now, appearances.

17           MR. LEUNG:  Wilson Leung for the Government, and

18  William Frentzen also.

19           MR. SABELLI:  Good morning, Your Honor.

20           Martin Sabelli for Guillermo Herrera, who is

21  present.  I am also standing in for Peter Goodman --

22           MR. GOODMAN:  I'm --

23           MR. SABELLI:  Oh, you made it, okay, thank you.

24           MR. GOLDROSEN:  Good morning, Your Honor.

25           Mark Goldrosen for Cesar Alvarez, who is in custody
```

1  being assisted by a Spanish interpreter.

2          **MR. GUGELMANN:**  Good morning, Your Honor.

3          August Gugelmann for Rafael Montoya, who is present

4  in custody.

5          **MR. GOODMAN:**  Good morning, Your Honor.

6          Peter Goodman for Erick Lopez, who is present in

7  custody, also assisted by an interpreter.

8          **MR. ROSENBUSH:**  Good morning, Your Honor.

9          Mark Rosenbush for Morris Flores, who is present in

10  court.

11          **MR. VERMUELEN:**  Good morning, Your Honor.

12          Mark Vermuelen for Giovanni Hernandez.  He is

13  present and being assisted by a Spanish language interpreter.

14          **MR. BERGER:**  Good morning, Your Honor.

15          I'm Michael Berger for Jose Quinteros, who is

16  present in custody and using the interpreter's services.

17          **MR. PHILIPSBORN:**  Good morning, Your Honor.

18          John Philipsborn with Mr. Cruz-Ramirez, who is

19  present.

20          **MR. BERSON:**  Good morning, Your Honor.

21          Brian Berson for Melvin Maldonado.  I'm also

22  specially appearing for Randy Sue Pollack on behalf of Walter

23  Cruz-Zavala.

24          **MR. GLENN:**  Good morning, Your Honor.

25          Jeffry Glenn for Daniel Portillo.  And I'm appearing

1    specially for Frank Bell for Wilbert Castillo.

2                 **MS. NAEGELE:**  Good morning, Your Honor.

3                 Jennifer Naegele for Angel Guevara, who is present

4    and in custody.

5                 **MS. DE ALMEIDA:**  Good morning, Your Honor.

6                 Julia de Almeida for Walter Chinchilla, who is

7    present.

8                 And I'm also specially appearing for Richard Mazer.

9                 **MR. COHEN:**  Good morning, Your Honor.

10                Josh Cohen for Luis Herrera, who is present and in

11   custody and assisted by a Spanish interpreter.

12                **MR. THOMSON:**  James Thomson on behalf of

13   Luis Herrera.

14                **MS. KEATING:**  Shana Keating on behalf of Aristides

15   Carcamo, who is present and in custody being assisted by a

16   Spanish interpreter.

17                **MR. CANNON:**  Good morning, Your Honor.

18                Chris Cannon on behalf Ivan Cerna, who is present

19   and in custody.

20                **MR. SWANSON:**  Good morning.

21                JT Swanson on behalf of Rafael Montoya for

22   Ed Swanson.

23                **MR. BEHZADI:**  Good morning, Your Honor.

24                Ken Behzadi on behalf of Marvin Carcamo, who is

25   present.

```
 1              MS. SCHWARTZ:  Good morning, Your Honor.
 2              Jennifer Schwartz appearing on behalf of Danilo
 3     Velasquez, who is present and in custody.
 4              THE COURT:  All right, anyone not present?
 5              I think my clerk told me everyone was represented
 6     here.  And our interpreters, are you up and running with your
 7     equipment?
 8              INTERPRETER NAVARRO:  I believe so, Your Honor.
 9              THE COURT:  All right, very well, we are here for an
10     evidentiary hearing on the subject of the so-called gang
11     experts.  And I'm ready to start hearing testimony.  I think
12     Officer Flores is our first witness; is that correct?
13              MR. LEUNG:  That's correct, Your Honor.
14              THE COURT:  All right.
15              MR. LEUNG:  May we call him?
16              THE COURT:  I think we'll just get right down to it,
17     unless there is any reason not to.
18              Anyone have a different plan?
19                   (No response.)
20              THE COURT:  All right.  So let's hear from officer
21     Flores.
22                   FRANK FLORES,
23     called as a witness for the Plaintiff, having been duly sworn,
24     was examined and testified as follows:
25              THE CLERK:  Please state your full name and spell
```

```
 1    your last name.

 2              THE WITNESS:  Frank Flores.  Flores is F-l-o-r-e-s.

 3              THE COURT:  Sue, can you give me a notepad so I can

 4    take notes?

 5              All right, let's proceed.

 6              MR. SABELLI:  Your Honor, I'm sorry, I should have

 7    thought about this before:  I don't see Mr. McDonnell and

 8    Mr. Molina in the audience.  If they are here, I would ask that

 9    those be excluded.  I just want to confirm they are not in the

10    courtroom.

11              MR. FRENTZEN:  Your Honor, neither of those

12    individuals are in the courtroom presently.  I'm not sure that

13    the rule applies in terms of experts, but --

14              THE COURT:  So they will stay outside the courtroom.

15              Proceed.

16              MR. LEUNG:  Thank you, Your Honor.

17                        DIRECT EXAMINATION

18    BY MR. LEUNG:

19    Q.  Mr. Flores, are you employed?

20    A.  Yes.

21    Q.  By whom?

22    A.  I'm a detective with the City of Los Angeles, Los Angeles

23    Police Department.

24    Q.  Can I call them the LAPD?

25    A.  Yes, sir.
```

**Flores - Direct / Leung**

1  **Q.** How long have you been with the LAPD?

2  **A.** Just shy of 15 years now.

3  **Q.** What is your present rank?

4  **A.** I'm a detective.

5  **Q.** And how long have you been a detective with the LAPD?

6  **A.** Roughly, a little over four and a half years.

7  **Q.** Prior to achieving the rank of detective, what rank did you

8  hold?

9  **A.** Rank of police officer.

10  **Q.** And roughly for the 11 years prior?

11  **A.** Yes, sir.

12  **Q.** What sort of work do you do?

13  **A.** A majority of my career has been spent in gang

14  investigations and homicides.

15  **Q.** How long have you been working gangs and homicides?

16  **A.** I've been working gangs and homicides since my initial

17  assignment in March of 1999.

18  **Q.** And what are your responsibilities?

19  **A.** My responsibilities have varied, depending on the

20  assignment I worked.  Initially, my first assignment was as a

21  uniform gang officer working gang suppression.

22  **Q.** Can you tell us a little bit about what you did as a gang

23  suppression officer?

24  **A.** Yes.  My first assignment was pretty much in uniform,

25  responding to call for service related to gang activities, the

**Flores - Direct / Leung**

1  field end of it, the initial contact, responding to complaints

2  of gang activities, investigating some of the street crimes,

3  information that was passed along from investigating detectives

4  pertaining to specific crimes and locating wanted suspects.

5  *Q.*  And after your assignment as an officer to the gang

6  suppression unit, what did you do?

7  *A.*  From that assignment, I graduated into a detective,

8  investigative assignment as a police officer.

9  *Q.*  So even though you didn't hold the rank of detective, you

10  were still doing investigatory work?

11  *A.*  Yes, sir.

12  *Q.*  And when was that?

13  *A.*  That began roughly in June of 2001.

14  *Q.*  And could you tell us a little bit about what you did as an

15  investigator?

16  *A.*  Yes.  My duties expanded from that of a uniform gang

17  officer.  It was taking on the full responsibility of

18  investigating the cases and presenting them to the District

19  Attorney or the City Attorney.  It also went further into

20  investigating the homicides.  So we investigated cases from as

21  minor as vandalism to a homicide case.

22          With my Spanish-speaking capabilities, I was

23  involved in several of the interviews pertaining to the

24  homicides and a lot of the crimes that were involved,

25  specifically gangs I investigated related to MS-13, which was

**Flores - Direct / Leung**

1   my initially assigned gang.

2   **Q.**  Now, after you achieved the rank of detective, did your

3   responsibilities change?

4   **A.**  No, my responsibilities kind of increased.  I took on more

5   of a responsibility as far as what I needed to incorporate or

6   put together as the detective assigned to a majority of these

7   cases.

8   **Q.**  What is your present assignment now?

9   **A.**  I'm currently assigned to a FBI, Federal Bureau of

10  Investigation led Hispanic Gang Task Force.

11  **Q.**  And that is in the Central District of California?

12  **A.**  Yes, sir.

13  **Q.**  What sort of responsibilities do you have as a member of

14  this task force?

15  **A.**  My duties are one in the same, investigating gang-related

16  crimes, building on gang intelligence, and monitoring gang

17  activity related to specific gangs that we are assigned or

18  working at the time.

19  **Q.**  Is one of the gangs that you are working on as part of the

20  task force La Mara Salvatrucha?

21  **A.**  Yes, it is.

22  **Q.**  Is that gang also known as MS-13?

23  **A.**  Yes.

24  **Q.**  Now, would it be fair to say that during your roughly --

25  your almost fifteen years as an LAPD officer you spent at least

**Flores - Direct / Leung**

1    11 years working with gangs?

2    *A.*   Yes, sir.

3    *Q.*   And that's from roughly 1999?

4    *A.*   Yes, sir.

5    *Q.*   And again, which gang have you -- which gangs did you start

6    working on?

7    *A.*   Primarily, the way -- the geographical areas in Los Angeles

8    within the Police Department are -- each division where I began

9    in Hollywood working gangs is, you are assigned to the gangs

10   that are prevalent in that area Monticello *(phonetic)* being one

11   of them, which I was assigned because I was a Spanish-speaking

12   officer.

13   *Q.*   Now, during your more than a decade-long career with the

14   LAPD, have you been qualified in State Court to testify as a

15   gang expert?

16   *A.*   Yes, sir.

17   *Q.*   In general, for all gangs, how often?

18   *A.*   I'd say in excess of 60, 70 times.

19   *Q.*   And have you been qualified to testify in State Court as a

20   gang expert on La Mara Salvatrucha, in particular?

21   *A.*   Yes, that's one of the gangs I've been qualified to do.

22   *Q.*   And approximately how often?

23   *A.*   I would say probably in excess of 50, 60 times.

24   *Q.*   Have you been qualified to testify as an expert on MS-13 in

25   Federal Court?

**Flores - Direct / Leung**

1   **A.**  Year.

2   **Q.**  How often?

3   **A.**  I believe I've testified as an expert in Federal Court at

4   least half a dozen times.

5   **Q.**  Could you tell us where?

6   **A.**  In Los Angeles, and Maryland, and in North Carolina.

7   **Q.**  Let's go into your background a little more, then.

8           How far did you get in school?

9   **A.**  Some college.  I didn't complete college.

10          **MR. SABELLI:**  I couldn't hear that answer.

11          **THE WITNESS:**  I completed high school and some

12  college.

13          **MR. SABELLI:**  Thank you.

14  **BY MR. LEUNG:**

15  **Q.**  And that was in Los Angeles, or in the Los Angeles area?

16  **A.**  Los Angeles area.

17  **Q.**  In fact, where did you grow up?

18  **A.**  I grew up in Boyle Heights area, which is also referred to

19  in part as East Los Angeles.

20  **Q.**  When you were growing up, did you -- withdrawn.

21          You indicated that you speak Spanish; is that

22  correct?

23  **A.**  Yes, sir.

24  **Q.**  Are you fluent in Spanish?

25  **A.**  Yes, sir.

**Flores - Direct / Leung**

1   **Q.**  Did you speak Spanish growing up in your household?

2   **A.**  Yes, sir.

3   **Q.**  And how fluent are you?

4   **A.**  Um, I'd say I'm pretty good for street Spanish.  I wouldn't

5   hold a proper conversation in Spanish among educated Spanish

6   speakers, but my Spanish, I would say, is very good.

7   **Q.**  Have you been qualified to work as -- have you been

8   qualified by the LAPD as a Spanish speaker?

9   **A.**  Yes, I have.

10  **Q.**  Have you found your background growing up in East LA as a

11  Spanish speaker useful in your profession as a police officer

12  in LA?

13  **A.**  Yes, very.

14  **Q.**  How so?

15  **A.**  East Los Angeles is probably the home to the oldest

16  Hispanic street gangs in Los Angeles.  Gangs were nothing new

17  growing up.  I understood the culture.  I understood the

18  territory, the gang graffiti.  The mannerisms of the gangs, and

19  the dos and the don'ts of survival living within certain gang

20  territories.

21          So understanding the culture and being able to

22  relate to the people during my assignment as a police officer

23  and a detective, it definitely helped in understanding the

24  people that lived in the community where I was now working.

25  **Q.**  So would it be fair to say that your experience growing up

1   in East LA as a Spanish speaker has given you some insights

2   concerning the gang's impact on the community as well?

3           **MR. SABELLI:**  Your Honor, I'm just going to object

4   that this is a leading question.  I think this is direct

5   examination.  I haven't objected up to now because it's been

6   foundational, but at this point when we get into the opinions

7   and the meat of the qualifications, I would ask that counsel

8   not lead.

9           **THE COURT:**  Well, fair enough, but it's okay to

10  lead.  In fact, it's good to lead up until you get to something

11  in controversy.  Once you get to something that could be in

12  controversy, you got to revert to normal nonleading questions.

13          **MR. LEUNG:**  Your Honor --

14          **THE COURT:**  You can lead in preliminary matters

15  until you get to the key points.  And now, you may not think

16  it's key, but if you think the defense will think it's key,

17  then you got to stop leading.

18          **MR. LEUNG:**  Certainly, Your Honor.  I would consider

19  that a foundational question as well because --

20          **THE COURT:**  Well, if the foundation is in

21  controversy, then there should be no leading on that either.

22          Anything that is in controversy should not -- there

23  should be no leading.  Everything else is fine, in fact,

24  encouraged to lead.

25          **MR. LEUNG:**  I'll keep that in mind, Your Honor.

**Flores - Direct / Leung**

1          **THE COURT:**  All right, thank you.

2   **BY MR. LEUNG:**

3   **Q.**  So let me rephrase that question, then.

4          How, if at all, has your background affected your

5   ability to work as a police officer in Los Angeles?

6   **A.**  It's enhanced my ability to relate to people, in general,

7   people that have come from similar-type neighborhoods where I

8   grew up that were affected by gangs.

9          **MR. LEUNG:**  May I approach the witness, Your Honor?

10         **THE COURT:**  Yes, you may.

11  **BY MR. LEUNG:**

12  **Q.**  Detective Flores, let me show you what has been marked as

13  Government's Exhibit 1.

14         Detective Flores, could you take a look at

15  Government's Exhibit 1, and could you take a look at the first,

16  say, seven pages.

17         Have you seen a copy of this document before?

18  **A.**  Yes, sir.

19  **Q.**  Have you reviewed a copy of this document?

20  **A.**  Yes, sir.

21  **Q.**  What is this document?

22  **A.**  It's a summary of items that I can testify to pertaining to

23  Mara Salvatrucha, in general.

24  **Q.**  Okay.  Did you personally write this summary of your

25  opinions?

Flores - Direct / Leung

1    **A.**  No, sir.

2    **Q.**  However, does Government's Exhibit 1 fairly and accurately

3    reflect the expert opinions that you can render with respect to

4    MS-13?

5            **MR. SABELLI:**  Your Honor, I'm going to object.  He's

6    using language that would apply to tangible or demonstrative

7    evidence, but these are really a collection of hearsay

8    statements.  So to say that pages 1 through 7 accurately

9    depicts somebody's point of view seems to be an improper use of

10   the Rules of Evidence.

11           If this witness has these opinions, he should

12   articulate them here in court, not simply say, hey, there is a

13   document that reflects what I think.  I thought that's why we

14   are here today, Your Honor.

15           **MR. LEUNG:**  Actually, Your Honor, I think

16   Mr. Sabelli's point is off base.  First, the Rules of Evidence

17   aren't necessarily enforced in a pre-trial evidentiary hearing.

18   But more importantly, Your Honor, Mr. Sabelli has been asking

19   me for a detailed list of the opinions of the experts.  We

20   provided him with this detailed list, and he then asked whether

21   we would go off the list, and I told him no.

22           So I want to be sure that we understand what the

23   exact opinions that will be testified to are.  And there is no

24   better way than to go through this exhibit.

25           And as a foundational matter, this item is being

**Flores - Direct / Leung**

1    offered to provide a list of the exhibits -- to provide a list

2    of the opinions for the purpose of this hearing.  I don't

3    understand what Mr. Sabelli's evidentiary objection is.

4            *MR. SABELLI:*  My objection is hearsay.  If Counsel

5    is simply going to have Mr. Flores ratify the list and ask --

6    then he's going to ask him about the opinions, I have no

7    objection, and I'll withdraw my objection.  But if Counsel is

8    going to substitute this list for testimony today, then I

9    object on hearsay grounds.

10           *MR. LEUNG:*  Again, Rules of Evidence are not -- not

11   applicable to a pre-trial evidentiary hearing.  But more

12   importantly, Your Honor, I don't understand what the hearsay

13   objection is.

14           *THE COURT:*  Well, wait a second.

15           How are you planning -- are you going to go through

16   each one of these opinions and list the basis for each one?

17           *MR. LEUNG:*  Yes, Your Honor, we are going to go

18   through each of them, although if it gets repetitive, we may do

19   them in clumps.

20           *THE COURT:*  So the question that you have asked is

21   what?

22           *MR. LEUNG:*  The question I have asked is whether

23   this document, Government's Exhibit 1, is a fair and accurate

24   reflection of Detective Flores' opinions as an expert.

25           *THE COURT:*  And you plan to go into each one of

1   them?

2           **MR. LEUNG:**  Yes, Your Honor.

3           **THE COURT:**  All right.

4           The objection is overruled, but I don't want there

5   to be an implication that I think the Rules of Evidence don't

6   apply to this hearing.  So until there is some authority

7   telling me that I can deviate from the Rules of Evidence just

8   because this is an evidentiary hearing versus a trial, I'm

9   going to stick to the Rules of Evidence.  But nonetheless, I'm

10  okay with the way that you plan to proceed because you are

11  going to go into each one of these with direct testimony

12  anyway.

13          So you're basically authenticating your expert

14  disclosure and saying that the witness read it and is okay with

15  it, with everything in there, right?

16          **MR. LEUNG:**  Correct, Your Honor.

17          And more importantly, the document itself is a filed

18  document with the Court.

19          **THE COURT:**  All right, I understand that.

20          **MR. LEUNG:**  So that's another basis for allowing it

21  in.

22          Your Honor could take judicial notice of the

23  document because it's part of the court record.

24          **THE COURT:**  That doesn't mean it's admissible.  But

25  for purposes of proving up what the document is and the

1    pedigree of the document, I think this is okay testimony.  For

2    that limited purpose, it's okay.

3           But I do think, as you plan to do, we should be

4    getting into each opinion that you plan to elicit at trial and

5    the bases for it.  Because I got to rule on whether or not this

6    witness -- I'll just give you an example that always comes to

7    my mind on this:  If this witness merely attended an event in

8    Las Vegas and heard somebody say MS-13 is the biggest gang in

9    the world, that's not going to be allowed at the trial, that's

10   just repeating hearsay.

11          On the other hand, if he has some true, special

12   expertise that the jury could not be expected to have and that

13   would -- and also would be something beyond the ken, k-e-n, of

14   the ordinary jury, and he has learned that in a way that

15   qualifies him as an expert, then, okay, maybe that would be

16   admissible at trial subject to some other problems that we have

17   talked about in the past.

18          So I'm going to be listening carefully to see on

19   every single one of these opinions whether or not -- from

20   whence it comes.  That's what we are here for.  So you need to

21   elicit each opinion you want to use at trial and the basis for

22   it, and then I got to crank it through and figure out which

23   ones are and are not admissible.

24          So that's what we are here for.

25          Overruled.  Let's continue.

**Flores - Direct / Leung**

1        **MR. BERSON:**  Excuse me, Judge.  Just so we can

2   follow along here, are we talking about this document, the

3   first seven pages of this 18-page document, 2092-3?

4        **THE COURT:**  It's the expert disclosure on

5   Frank Flores.

6        **MR. SABELLI:**  Mr. Berson is correct, the document

7   number is 2092-3.

8        **THE COURT:**  This one says 1884-1.

9        **MR. LEUNG:**  I think it was filed twice at some

10  point, so there are more than one DCN -- I mean ECF numbers.

11        **THE COURT:**  Well, I recognize it anyway.  It looks

12  like the Frank Flores disclosure.

13        Please go ahead.

14        **MR. LEUNG:**  Thank you, Your Honor.

15  **BY MR. LEUNG:**

16  **Q.**  Now, Detective Flores, have you reviewed the first seven

17  pages?

18  **A.**  Yes, I have.

19  **Q.**  And does this document fairly and accurately contain

20  opinions that you expect to render regarding MS-13?

21  **A.**  Yes, with the exception of No. 2.  I believe my estimate

22  has been that MS-13 is also present in about 40-plus states

23  within the United States of America.

24  **Q.**  Okay, we can cover that in more detail in a little bit.

25        But let me ask you, generally speaking, the opinions

1  that you formulated about MS-13, what are the basis of these

2  opinions?

3  **A.**  The basis is the totality of my career, my involvement in

4  working, specifically over the course of my career from 1999,

5  as a uniformed gang officer through the rank of detective to my

6  current assignment on the task force, maintaining the focus on

7  MS-13 through the variety of investigations I've worked from

8  vandalism to homicides; through the use of and conversations

9  and debriefs of witnesses and informants, cooperators, admitted

10  and suspected Mara Salvatrucha 13 gang members, people,

11  residents of the community where Mara Salvatrucha claims

12  territory, personal observations, monitoring of jail phone

13  calls, wiretaps, conversations with other police officers,

14  senior officers who have worked Mara Salvatrucha longer than I

15  have, or prior to my own assignment.  So it comes from a

16  totality of my career and working and focusing primarily on

17  Mara Salvatrucha.

18  **Q.**  Have you also, while not sufficient in itself to qualify

19  you as an expert, have you --

20          **MR. SABELLI:**  I'm going to object as being a leading

21  question from the form of the question.  Seems to be

22  supplementing, so I'm going to object before the question is

23  finished.

24          **MR. LEUNG:**  Can I ask the question before there is

25  an objection?

**Flores - Direct / Leung**

1            **MR. SABELLI:**  Your Honor, if the question involves

2    information that would supplement the answer, then I would

3    object to him finishing the question.

4            **THE COURT:**  Why don't you finish the question, but

5    do so in a nonleading way.

6    **BY MR. LEUNG:**

7    **Q.**  As the Court indicated earlier, attending a lecture would

8    not qualify you as an expert, but have you attended lectures?

9    **A.**  Yes, I've attended various lectures and also taught at

10   various functions.

11   **Q.**  Over the past -- for how long a period?

12   **A.**  Over the course of my career at different functions,

13   different levels, both formal and informal functions.

14   **Q.**  Generally speaking, could you provide us with some examples

15   of some of these functions?

16   **A.**  Yes.  I've taught at the California Gang Investigators

17   Association on at least two occasions.  I've taught for various

18   police officers associations.  I've taught for the California

19   Department of Justice at different venues throughout my career,

20   specifically to Mara Salvatrucha.

21            I've also attended some of these functions as a

22   student, or I've learned and been able to interact with law

23   enforcement agencies, both state and federal, within California

24   and within other states.

25   **Q.**  Have you attended any conferences or lectures involving

```
 1  foreign law enforcement?
 2  A.   Yes.  I've traveled down to El Salvador and was able to
 3  provide training and receive training from the national police
 4  of El Salvador, where Mara Salvatrucha is also a very big and
 5  prevalent gang.
 6  Q.   Now, are your opinions based only on what people told you,
 7  say, gang members or former gang members?
 8  A.   No.
 9  Q.   Let's clarify.  Let's clarify:  What are your opinions
10  based on?
11  A.   My opinions are based on the totality of the circumstances,
12  everything I've come to learn through the course of my career,
13  things that I've been able to validate or test the validity of
14  through other forms as well as the things that I have learned
15  or been able to witness firsthand.
16  Q.   Can you give as an example of how you would verify
17  information that you get from the street?
18  A.   Information that we verify from the street would be through
19  source of investigation, through probation or parole searches
20  where -- and conducting a probation search -- we would go
21  through a gang member's house.
22          And through the recovery of photographs depicting
23  the individual gang hand signs or marking up notebooks or
24  pieces of paper with their own gang and/or gang monikers, we
25  would be able to validate, number one, that that person is, in
```

 1  fact, a member of the gang, and, two, that this person goes by

 2  a particular moniker.

 3  *Q.* Do you simply take what gang members tell you at face

 4  value?

 5  *A.* No.

 6          *MR. SABELLI:* Your Honor, I'm going to object.

 7  Leading.

 8          *THE COURT:* Overruled. That's not so leading.

 9          *THE WITNESS:* No.

10  *BY MR. LEUNG:*

11  *Q.* What do you do in response to information provided, say,

12  from gang members?

13  *A.* Over the course of my career, of course, I've learned that,

14  obviously, everything has to be scrutinized. Everything that

15  is told or I learn, again, I attempt to validate it through

16  different points. It's a process of knowing the individual and

17  figuring out the best way to validate the information that they

18  are providing.

19  *Q.* Again, what means of validation have you employed during

20  the course of your career?

21  *A.* The means of validation from listening to jail calls,

22  wiretaps, personal observations through physical surveillance,

23  through the recovery of evidence, including photographs,

24  notebooks, telephones, through conversations, interviews of

25  witnesses and people in the community, through witnesses and

1   cooperators, as well.

2   **Q.** Let me --

3           **MR. LEUNG:**  Your Honor, has Government's Exhibit 1

4   been formally admitted?

5           **THE COURT:**  It's admitted for purposes of disclosing

6   what his intention is, but it's not admitted for purposes of

7   validating his qualifications to give this testimony, because

8   that's the whole reason we're here.

9                   **(Government's Exhibit 1 was received in**

10                  **evidence for limited purposes.)**

11          **MR. LEUNG:**  Understood, Your Honor.

12          **THE COURT:**  So it's admitted for that limited

13  purpose.  It will be a good way for us to keep track, though,

14  of the opinions, so I'm glad that you have marked it as an

15  exhibit.

16  **BY MR. LEUNG:**

17  **Q.** Detective Flores, could you take a look at Government's

18  Exhibit 1.

19  **A.** Yes, sir.

20  **Q.** Let's go item by item.

21          And could you tell us the basis of the opinion?

22  **A.** Again --

23  **Q.** For instance, Item No. 1, let's begin with that.  It

24  states:

25          "MS-13 originated in Los Angeles in the mid 1980s.

1  Because of the civil war in El Salvador, that was a large

2  influx from that country to the United States, in general, and

3  Los Angeles, in particular.  These immigrants banded together

4  to form their own gangs for self-protection against other

5  gangs."

6              Could you explain to us how you came to have that

7  opinion?

8  **A.**   Yes.  I mean, I believe the activity in the civil war in

9  El Salvador is well documented.  The reaction to the movement

10  of large amounts of people into Los Angeles is well documented.

11  The creation of Mara Salvatrucha is a relatively young gang, so

12  I am privy to a lot of detectives and former gang officers that

13  are still alive and working in the department capacity.  So in

14  conversations and being able to talk to them about the origins

15  of the gang back to the mid '80s is something that I still have

16  immediate access to.

17              Also, in addition to conversations with gang members

18  that were originally, you know, the basis for the formation of

19  the gang when it started, the ability to review some old

20  evidence that was recovered, pointing to old photographs of

21  some of the original members, their style of dress, their

22  original territory, some of the original cliques, items

23  pointing to the origin, the place and the time, which add to my

24  basis for this opinion.

25  **Q.**   Okay.

1              All right, Item No. 2:

2              "MS-13 is not just in California, but in 25 to 35

3      other states, as well as in foreign countries such as

4      El Salvador, Honduras, Guatemala, and Mexico."

5              Now, you indicated earlier you wanted to make a

6      correction; is that correct?

7              **THE COURT:**  Wait.  There was a sentence on number 1

8      I don't think you covered, and maybe I missed it, but it says,

9      "These immigrants banded together to form their own gangs for

10     self-protection against other gangs."

11     **BY MR. LEUNG:**

12     **Q.**  Detective Flores, what is the basis for the assertion these

13     immigrants banded together to form their own gangs for

14     self-protection against other gangs that is forming --

15     **A.**  The basis for this is very similar to the other gangs that

16     formed in Los Angeles along the lines of cultural or race

17     lines.

18             Mara Salvatrucha, the information I gathered through

19     various interviews, various documentation by gang members and

20     even persons in the community, including law enforcement in

21     El Salvador.

22             Along cultural lines in Los Angeles when Mara

23     Salvatrucha or its original members formed the gang, the

24     members of the Salvadorian or Central American community that

25     were nonMexican were victimized by some of the existing Mexican

 1 street gangs along the lines of difference in culture.  So the

 2 gang in the -- similar to other gangs that have formed in

 3 Los Angeles along cultural or racial lines formed as

 4 self-protection from being victimized by the existing Mexican

 5 street gangs at the time.

 6         **MR. PHILIPSBORN:**  Your Honor, objection.  This is

 7 Philipsborn for Cruz-Ramirez.

 8         Relevance and 403 in this sense, and I know you are

 9 going to allow this testimony, but we have yet to tie any of

10 this to activities in San Francisco at the time charged in this

11 case.  And I understand the detective is from Los Angeles, and

12 it's probably good for us to learn about that jurisdiction, but

13 right now this is pretty far afield.

14         So I ask the Court, if the Court is going to receive

15 this, unless further foundation is going to be laid that there

16 is any relevance of these -- this opinion testimony to this

17 particular case, I would ask that the Court take this evidence

18 with that objection in mind.  And we can probably litigate it

19 further at the conclusion of the detective's testimony.

20         **MR. LEUNG:**  Your Honor, isn't the purpose of today's

21 hearing to test the basis for the opinions and not to

22 adjudicate any 403 arguments?

23         **THE COURT:**  Correct.  We'll deal with the 403 point,

24 which is reserved for future resolution, but we got to do this

25 one step at a time.  And the initial step is to figure out what

```
1   the foundation is for these statements.

2            MR. PHILIPSBORN:  I agree, Your Honor, but I'm also

3   assuming that we've heard the foundation and that there is, at

4   least as far as we know, no foundation that leads to

5   San Francisco.  With that understanding, I completely agree

6   with the Court's point.

7            THE COURT:  Well, we will deal with that later.

8            MR. PHILIPSBORN:  Thank you, Your Honor.

9            THE COURT:  Right now, we are operating on the

10  assumption, subject to verification later, that somehow this

11  will become relevant.  But, assuming that it will become

12  relevant, there is still the further question, which we are

13  here today to address, of whether or not there is any

14  foundation for it.

15           MR. PHILIPSBORN:  Thank you, Your Honor.

16           MR. SABELLI:  Focusing on the foundation issue, I'm

17  going to object to the last answer as nonresponsive and ask

18  that it be struck.  I heard Mr. Leung ask the question of what

19  the basis for that opinion was, and I believe the answer was an

20  amplification of that opinion without reference to the bases of

21  the opinion.  So --

22           THE COURT:  Well, it is true.  I think that was a

23  point well taken.  And that the witness has not actually

24  answered what he based it on.  For example, did somebody back

25  then in the mid '80s say to this witness, hey, we are forming
```

```
 1   this gang because we are being victimized by other gangs.  That

 2   would -- that might be the basis.  But, in fact, what he did

 3   was just repeat the opinion with more detail.  So I think that

 4   objection is well taken.  But --

 5                MR. LEUNG:  The --

 6                THE COURT:  Ask follow-up questions.

 7                MR. LEUNG:  Thank you, Your Honor.  The solution

 8   would not be to strike the answer, it would be to --

 9                THE COURT:  Ask for more -- beef it up.

10   BY MR. LEUNG:

11   Q.  Can you beef up your response to the last sentence.

12   A.  Yes, sir.

13                MR. SABELLI:  That's a vague question.

14                THE COURT:  That's my fault.

15                Look, please, what I'm trying to get you to do is

16   explain not what your -- it's okay to explain more about your

17   opinion, but what ultimately you got to do is explain exactly

18   what is the basis for it.

19                So did somebody in MS-13 tell you that at one point,

20   that this is why it was formed?  Did you learn that at a

21   seminar in Las Vegas?  Exactly where did you learn it?  And

22   that's what we are trying to find out.

23                Just go ahead and answer.

24                THE WITNESS:  Yes, sir.

25                THE COURT:  Okay.
```

1              **THE WITNESS:**  Part of those answers are the basis

2    does come from conversations with older Mara Salvatrucha gang

3    members that were originally part of the formation, or at least

4    during the time of the formation of Mara Salvatrucha as a

5    street gang.

6    **BY MR. LEUNG:**

7    **Q.**  But is that the entire basis of that assertion?

8              **MR. SABELLI:**  Objection.  Leading.

9              **THE COURT:**  It is leading, but, go ahead, answer the

10   question.

11             **THE WITNESS:**  No, sir.

12   **BY MR. LEUNG:**

13   **Q.**  What other bases are there?

14   **A.**  Again, along with the debriefs or the personal interviews,

15   it goes to conversations with other law enforcement officers

16   who worked the assignment during the mid '80s that were present

17   during the formation of Mara Salvatrucha as a street gang.

18   **Q.**  Now, how old are you?

19   **A.**  I'm 36.

20             **THE COURT:**  How old were you in the mid '80s?

21             **THE WITNESS:**  I was in my teens, sir.

22             **THE COURT:**  Okay.

23   **BY MR. LEUNG:**

24   **Q.**  Let's move on to Item No. 2.

25             "MS-13 is not just in California, but in 25 to 35

**Flores - Direct / Leung**

 1   other states, as well as in foreign countries such as

 2   El Salvador, Canada, Honduras, Guatemala, and Mexico."

 3          Could you provide the bases of that opinion?

 4   *A.*  Yes, the basis for this is my personal contact and

 5   conversations with law enforcement from not only those

 6   countries, including Guatemala, Honduras, El Salvador, but

 7   other countries in South America and Canada, and also, law

 8   enforcement throughout the United States at some of these

 9   functions where I've had personal conversations, many of which

10   have been followed up by phone calls and e-mails in relation to

11   maintaining contact with current trends and the movement of

12   Mara Salvatrucha throughout the United States.

13   *Q.*  Speaking of current trends, you earlier indicated you

14   wanted to make a correction?

15   *A.*  Yes, sir.

16   *Q.*  And what is that correction?

17   *A.*  I believe my estimates as far as Mara Salvatrucha

18   throughout the United States would be in 40-plus states, not 25

19   to 35, currently.

20          *THE COURT:*  What states are they not in then?

21          *THE WITNESS:*  Primarily, we have, that I'm aware of,

22   primarily the states closest to the East Coast, the West Coast.

23   There are some states within the Midwest where I have not had

24   contact with law enforcement or any report of the MS within

25   those states.

 1              **THE COURT:**  Like what?

 2              **THE WITNESS:**  Generally, it would be somewhere in

 3   Indiana, Montana, the Dakotas, even closer to the West Coast,

 4   Idaho.  It's easier to eliminate the states that I do have, but

 5   generally along the lines of the Midwest.

 6              **THE COURT:**  All right, thank you.

 7              **MR. SABELLI:**  Before we go on to the third opinion,

 8   I'm not sure if Mr. Leung is finished with number 2 --

 9              **MR. LEUNG:**  I'm done with No. 2.

10              **MR. SABELLI:**  Before we go on to No. 3, I think the

11   proper mode of examination here would be for the witness to be

12   asked his opinion on a subject and to articulate it, not for

13   Mr. Leung to read from a document that Mr. Leung or some other

14   lawyer created.  And I would ask that the witness not be

15   looking at Exhibit 1 while he articulates his opinion.

16              **MR. LEUNG:**  That is a ridiculous request, Your

17   Honor.  Mr. Sabelli has been complaining about how we haven't

18   disclosed the opinions, and now we are sticking to script and

19   making sure that the opinions that have been disclosed are the

20   opinions that will be referenced, and now Mr. Sabelli is

21   objecting to that.

22              **MR. SABELLI:**  Your Honor, what I've been asking to

23   do, not here in the courtroom, but through correspondence with

24   Mr. Leung, is to be sure that we have all the opinions in

25   sufficient detail.  And I think that's the proper way to

```
 1   prepare for an examination like this so that we don't waste
 2   time.
 3           Now that we have Mr. Flores on the stand, he is the
 4   expert, he should articulate his opinions as he would like to
 5   articulate them, not as they were drafted by a lawyer.  That is
 6   the proper mode of examination.
 7           I would make that request, Your Honor, and ask that
 8   Mr. Flores not read from the document or look at the document
 9   while he articulates his opinions.
10           MR. LEUNG:  And there is absolutely no basis for
11   Mr. Sabelli's objection, Your Honor.
12           The purpose of the expert disclosure is to allow the
13   parties to identify what specific opinions will be presented.
14   And we've done that.  And now Mr. Sabelli wants to change the
15   rules of the game again.
16           THE COURT:  Look, if this was at trial, Mr. Sabelli
17   would be correct:  You can't give a script to any witness and
18   say, here is your script, stick to the script.
19           So at trial we will not proceed in that manner,
20   Mr. Sabelli would be correct.  But this is not trial, this is a
21   hearing directed to a special purpose, which is to figure out
22   whether or not these opinions have any foundation for them.
23           And for that purpose, it is useful to have the
24   document in front of the witness.  And the -- yes, there is a
25   risk of leading, but it is slight.  And that small risk of
```

1  leading is going to be tolerated in order to facilitate the

2  hearing and get at the main point we are after here, which is

3  what is the basis for these.

4          So I do want to cover each -- all three of these,

5  but -- I'm sorry -- not three, all --

6          **MR. LEUNG:**  Forty-seven.

7          **THE COURT:**  -- of these opinions.

8          But I don't think it's improper for the limited

9  purpose of this hearing to have the witness use, as we all are

10  in this hearing, the items that are in the report.

11          So that objection is overruled.  And you my reask

12  the question, and the witness will now answer it.

13          **MR. LEUNG:**  Thank you, Your Honor.  But let me also

14  clarify one thing.

15  **BY MR. LEUNG:**

16  **Q.**  You reviewed this document, is that correct, the first

17  seven pages?

18  **A.**  Yes, sir.

19  **Q.**  And again, they fairly and accurately reflect your own

20  opinion; is that correct?

21  **A.**  Yes, sir.

22  **Q.**  And were you consulted before the drafting of this, or in

23  the course of the drafting of this?

24  **A.**  Yes, sir.

25  **Q.**  Thank you.

1          Let's turn to Item 3:

2          "There are an estimated 10,000 MS-13 members in the

3    United States, principally located in California, Virginia,

4    Maryland, Texas, Arizona, Washington, and Nevada.  MS13 spread

5    as Central American immigrants spread, usually to follow

6    employment opportunities or to avoid the threat of deportation.

7    MS-13 was established in El Salvador and other countries when

8    gang members in the United States were deported back to their

9    countries of origin."

10          Could you explain to us the bases of that opinion?

11   **A.**  Yes, sir.  I mean, the basis for that opinion is my

12   contact, my interviews, debriefs of gang members, Mara

13   Salvatrucha gang members, specifically, my conversations with

14   law enforcement officers in El Salvador, Central America, other

15   portions where gang members were originally deported where the

16   gang expanded back to Central America.

17          Also, conversations with law enforcement in other

18   parts of the U.S., where they have seen a trend of gang members

19   from Los Angeles, specifically, Mara Salvatrucha gang members

20   moving abroad to other states.

21          And this has been a constant part of my career in

22   the sharing of information and the investigating of specific

23   crimes, where we see the effect of law enforcement methods in

24   one portion or one area of the country affect other portions of

25   the United States.

**Flores - Direct / Leung**

1        **THE COURT:**  Can I ask you a question on this?

2        **THE WITNESS:**  Yes, sir.

3        **THE COURT:**  Where did the 10,000 number come from?

4        **THE WITNESS:**  Those are rough estimates.  I know and

5    I can give a stronger opinion on Los Angeles based on my

6    experience and my privy to gang files.

7        In Los Angeles alone, we probably have well over 6-

8    to 7000 documented MS-13 gang members over the course of the

9    existence of the Mara Salvatrucha.

10       **THE COURT:**  Wait a minute.  Where did the 10,000

11   come from?

12       **THE WITNESS:**  In dealing with law enforcement and

13   understanding the -- somewhat the extent of their gang

14   problems, the numbers that they have, roughly, within their

15   areas.  Again, the 10,000 is only a low estimate, in my

16   opinion.

17       **THE COURT:**  Is that your number or somebody else's

18   number?

19       **THE WITNESS:**  That would be my number, sir.

20       **THE COURT:**  Did you tally up numbers from these

21   jurisdictions or -- I know you say there are 6000 in LA, but

22   did you get tallies for the other 4000?

23       **THE WITNESS:**  My understandings through

24   conversations with law enforcement, again, given that as an

25   estimate only, would be --

 1              **THE COURT:**  No, no, you are not answer -- your

 2      understanding is not the same thing.

 3              Did those other jurisdictions specifically say, we

 4      got 2000 in our jurisdiction, and then you added that on a

 5      list, and then somebody in another jurisdiction said, we got

 6      500?  Is that the way it worked, or did you just sort of pick

 7      numbers?

 8              **THE WITNESS:**  No, sir.  It would be through that

 9      exact method, of talking to law enforcement and understanding,

10      roughly, their estimates and adding them to my own.

11              **THE COURT:**  Okay.  Then I have one other question on

12      this one.

13              The last sentence says, "MS-13 was established in

14      El Salvador," but then you say up in the top it was originated

15      in Los Angeles.  So I don't understand which came first, was it

16      in El Salvador first or was it in LA first?

17              **THE WITNESS:**  The gang originated in Los Angeles.

18      Through law enforcement at the beginning where gang members

19      began to be deported back to their countries of origin,

20      specifically El Salvador, the gang then expanded back to

21      El Salvador.

22              **THE COURT:**  All right, so instead of being

23      established, that word is a little ambiguous, so what you

24      really are saying, it was introduced in El Salvador after

25      people got deported back.  Is that what you're saying?

```
 1                     THE WITNESS:  Yes, sir.

 2                     THE COURT:  Okay.

 3               All right, go ahead, Counsel.

 4   BY MR. LEUNG:

 5   Q.  Just to clarify, again:  How many MS-13 members during the

 6   course of your work with MS-13 since 1999 have you spoken with

 7   over that time?

 8   A.  I can only estimate several hundred.

 9                     MR. SABELLI:  I'm sorry, I couldn't hear.

10               The answer was several hundred MS-13 members?

11                     THE WITNESS:  Yes, sir, in Los Angeles.

12   BY MR. LEUNG:

13   Q.  And how many -- how many members of the community have you

14   spoken with during this same amount of time concerning MS-13?

15   A.  Only being able to give estimates, again, through the

16   course of cases and consensual encounters that I've handled

17   through the course of my career, I would probably estimate a

18   few thousand.

19   Q.  Let me direct your attention to Item No. 4, which states:

20               "The early mannerisms and dress of MS-13 were

21   adopted from hard rock culture, that is, long hair, AC/DC

22   T-shirts, which over the years evolved into the more prevalent

23   Cholo style, for instance, baggy clothing, white T-shirts,

24   shaved or slicked-back hair, muscle T-shirts, sports jerseys,

25   large belt buckles."
```

```
 1              Could you tell us what the basis of that --

 2   A.  The basis for that has been, in part, my personal

 3   experience in observing some of these trends change throughout

 4   the course of my career as well as conversations with officers,

 5   detectives who worked Mara Salvatrucha, specifically during the

 6   closer period of the origin of the gang.

 7   Q.  Item No. 5:

 8              "MS-13 members identified themselves as Sureños,

 9   which is a general term for members of California Latino street

10   gangs who, along with the Mexican Mafia, "La Eme," a prison

11   gang that exercises control in the prisons of Southern

12   California and the street gangs who align themselves with it."

13              Can you tell us what the basis of that opinion is?

14   A.  The basis of that opinion has been my personal experience

15   in debriefs, interviews of admitted and suspected Mara

16   Salvatrucha gang members and my personal observations of

17   observing gang graffiti, where the letters MS and 13 are

18   depicted on various types of graffiti, as well as notebook

19   paper, other items that have been graffitied with MS-13

20   graffiti.

21              The 13th letter in the alphabet representing M is a

22   sign of respect to the Mexican Mafia, which has control of the

23   majority of Southern California Hispanic street gangs, which

24   MS-13 originally is a part of the origin of the Southern

25   California Hispanic street gang.
```

**Flores - Direct / Leung**

1  *Q.*  And again, what is the basis of that information, or that

2  opinion?

3  *A.*  The basis of that opinion is, again, my personal experience

4  involved with the gang, my personal observation, and

5  conversations, debriefs, interviews with admitted and suspected

6  members and people in the community.

7  *Q.*  Item No. 6:

8         "Some common traits of Sureños include adopting the

9  color of blue as their gang color and, to a lesser extent,

10  white and black, usually worn in combination with blue and the

11  number 13 as one of their symbols," that you just referenced

12  earlier.

13         "They also wear sports jerseys, caps, belts, and

14  other clothing that are blue as well as clothing with phrases

15  such as 'South Side' or 'South Pole' to display gang

16  affiliation.

17         "Belt buckles also evince gang affiliation, such as

18  belt buckles with "MS" with the number "13" inscribed therein."

19         What is the basis for this opinion?

20  *A.*  The basis for this opinion is, again, the totality of my

21  experience in working the gang through various types of

22  investigations in the recovery of some of these items, from the

23  persons of admitted or suspected Mara Salvatrucha gang members

24  through the recovery through probation and parole searches

25  where some of these items have been recovered as evidence to a

1    crime or evidence to some type of violation.

2           The color blue is specific to Sureños, as a whole,

3    so those are also items that I have personally recovered from

4    gangs members or I've seen or encountered on the street.

5    Q.   Item No. 7:

6           "The number 13 is significant because it corresponds

7    to the letter M, which is the 13th letter in the alphabet and

8    the symbol of the Mexican Mafia, which is one of the dominant

9    prison gangs in the California prison system.

10          "Out on the street, gangs often fight each other.

11   Once a gang member is sent to prison, however, that person, at

12   least for self-protection, if not for more mercenary, often has

13   to choose sides among many different prison gangs, such as the

14   Aryan Brotherhood, composed of white inmates; the Black

15   Guerilla Family, composed of African-American inmates; the

16   Nuestra Familia, which claims the allegiance of Latinos usually

17   born in the United States and with familial roots in Northern

18   California; and, of course, the Mexican Mafia."

19          What is the basis of this opinion?

20   A.   The basis of this opinion is, again, the totality of my

21   experience working in law enforcement, my personal contact with

22   members who have been debriefed who have explained the

23   association between the Mexican Mafia and Southern California

24   Hispanic street gangs; also the debrief of a one-time admitted

25   and documented Mexican Mafia member who furthered my

1   understanding of this process.  Also, my personal observations,

2   my cross-training with officers from the Department of

3   Corrections and from the Federal Bureau of Prisons.

4   **Q.**  Have you spoken with members of the CDC?

5   **A.**  Yes.

6   **Q.**  And what is the CDC?  I'm sorry.

7   **A.**  CDC is -- now the CDC are the California Department of

8   Correction and Rehabilitation.

9   **Q.**  Okay, Item No. 8:

10          "Sureños align with the Mexican Mafia for protection

11  in prison.  The Mexican Mafia also directs crimes within

12  prison, such as violent attacks and drug dealing as well as

13  directs Sureños outside of prison to engage in illegal

14  activities such as drug trafficking and violence.

15          "A Sureño who proves his loyalty and worth by

16  committing crimes for the Mexican Mafia may be chosen by the

17  made members of the Mexican Mafia, carnales, to become a

18  carnal."

19          And what is the basis of that opinion?

20  **A.**  This is something that I've gained and experienced during

21  the course of my career investigating gangs, in general.  It's

22  an understanding of the process of how the relationship between

23  Southern California Hispanic street gangs, including MS-13,

24  have with the Mexican Mafia.

25          I've also learned the way the gangs operate within

**Flores - Direct / Leung**

```
 1   the system from my training with not only officers from the
 2   California Department of Corrections and Rehabilitation, but
 3   the Sheriff's Department, who runs the majority of our county
 4   jails within Los Angeles, where a lot of these inmates are
 5   housed prior to court appearances where a lot of these
 6   activities take place.
 7              I've also been privy to some videotaped instances of
 8   some of the crimes that are committed for the benefit of the
 9   Mexican Mafia by other Southern California Hispanic street
10   gangs.
11   Q.  Have you investigated the interaction on the street between
12   MS-13 members and Mexican Mafia representatives?
13   A.  Yes, sir.
14   Q.  What is that relationship?
15   A.  The Mara Salvatrucha street gang has the same relationship
16   with the Mexican Mafia as many other Southern California
17   Hispanic street gangs.  They are -- claim their allegiance to
18   the Mexican Mafia, like most other Southern California Hispanic
19   street gangs, and pay homage to the Mexican Mafia by having the
20   number 13 at the end of their title and by paying homage
21   through other means to the Mexican Mafia or other
22   representatives.
23   Q.  What other means?
24   A.  Through money, through property, through committing violent
25   acts on behalf of the Mexican Mafia.
```

1  *Q.*  And again, what is the basis of that opinion?

2  *A.*  Again, learned through various investigations that I've

3  been involved in personally, and through conversations and

4  training received from the California Department of

5  Corrections, Los Angeles County Sheriff's Department, and the

6  Federal Bureau of Prisons personnel.

7  *Q.*  Item No. 9:

8       "Basically, MS-13 is organized into local cliques,

9  like franchises, based on local geography that it inhabits and

10  claims.  For instance, the Normandie clique identifies with

11  Normandie Avenue that runs in Los Angeles, California, while

12  the Hollywood clique associates itself with the Hollywood

13  region of Los Angeles."

14       What is the basis of that opinion?

15  *A.*  The basis of that opinion is the totality of my experience,

16  my personal observations in working Mara Salvatrucha, and

17  working other Southern California street gangs that have a

18  similar type of makeup in the way that they fragment, or they

19  are able to expand their gangs to different parts of the City

20  or different parts of the states by which they identify

21  themselves through cliques or franchise out, in that sense, and

22  take the title of a specific area or specific street which runs

23  through the heart of that claimed territory.

24  *Q.*  Item No. 10:

25       "Like franchises, some of the cliques in Los Angeles

**Flores - Direct / Leung**

1   have transplanted themselves elsewhere.  This happens usually

2   when a member of the original clique moves to a new location

3   and starts an MS-13 clique in the new area.

4               "For instance, gang members of the well known

5   Normandie clique in Los Angeles who were deported back to

6   El Salvador have formed a Normandie clique in El Salvador."

7               What's the basis of that opinion?

8   *A.*  This has come through the totality of my experience in

9   working these gang assignments, through personal conversations

10  with gang members who themselves have been deported and

11  returned to the United States, and through conversations and

12  training with law enforcement in Central America, Guatemala and

13  Honduras where this happens also.  And you have gang members

14  that are either deported or returned to their country of origin

15  and add in the expansion of the gang to that area.

16  *Q.*  And No. 11:

17              "Using the names of existing cliques grants a new

18  franchise borrowed respect of the clique's name is well known,

19  franchising the name, at least nominally subjects the new

20  clique to the oversight of the original clique."

21              What is the basis for that opinion?

22  *A.*  It comes from personal conversations with various admitted

23  and suspected Mara Salvatrucha gang members, various members of

24  law enforcement, through the ability to debrief, and personally

25  observe some of these activity.

1  **Q.**  Item 12:

2            "Of course, entirely new cliques can and are

3  created.  For instance, El Salvador has a locally named clique

4  call the "Tecals," sailor's clique."

5            What is the basis for that opinion?

6  **A.**  The basis for that opinion is through some of my training

7  with law enforcement, specifically, from Central America.  I am

8  fully aware that some of the cliques in Mara Salvatrucha do

9  have an origin originally from other parts, some of the

10 franchising that goes on does not tie back to Los Angeles

11 specifically, but they will start cliques specifically in areas

12 in other parts of Central America.  More localized.

13 **Q.**  Item No. 13:

14            "Cliques are often referred to by their initials,

15 for instance SLSW stands for sailors locals, Salvatrucha west

16 side which is a clique in El Salvador.

17            "NLS stands for both north side locals and Normandie

18 Locals.  PLS stands for Pasadena Local Sureños."

19            What is the basis for that opinion?

20 **A.**  The basis for this opinion is again the totality of my

21 experience in working gangs, working Mara Salvatrucha

22 specifically and dealing with members of these various cliques

23 firsthand and understanding the way they abbreviate their

24 cliques.  Every gang member from Mara Salvatrucha that I've

25 dealt with as a clique that they belong to and will abbreviate

1   depending on the name.

2   **Q.** Item 14:

3          "Each gang has a loose hierarchy, depending on the

4   size of the clique, there is usually a leader called the 'shot

5   caller,' or 'primero palabra,' that is, first word.  Sometimes

6   there is a second in command called the 'segunda palabra,' or

7   'second word.' There may be a third in command called

8   'llavero,' or 'key holder.'  There may also be a treasurer for

9   the clique."

10          And my apologies for my Spanish.  Could you tell us

11  what the basis of this opinion is?

12  **A.** Yes, sir.  Through my personal experience in dealing with

13  the gang over the course of my career, I've come to understand

14  that not all cliques run the same.  There are many things that

15  influence the clique, largely, the age of the clique, how long

16  the clique has been in existence, the number of persons

17  belonging to that clique, and, again, the effect of law

18  enforcement in maintaining or keeping the clique disorganized

19  or organized.

20          So these words are common phrases.  There are some

21  others which help identify, per se, the leaders, or the persons

22  in leadership within that clique.

23  **Q.** And how do you know all this?

24          **MR. SABELLI:** I'm going to object to that last

25  answer as nonresponsive, Your Honor.

1          **THE COURT:**  Overruled.

2          Please continue.

3  **BY MR. LEUNG:**

4  **Q.**  And how do you know all this?

5  **A.**  Again, this is through my personal involvement with dealing

6  with various investigations throughout the course of my career.

7  **Q.**  Which involve what?

8  **A.**  Dealing with Mara Salvatrucha and identifying and working

9  some specific cliques, some larger cliques, and some smaller

10  cliques where I've seen and I've been able to identify the

11  various types of persons in -- that will hold these key titles

12  as palabra, shot caller, llavero, that are identified within

13  the cliques.  So my personal involvement my personal

14  investigations.

15  **Q.**  And what did your personal investigations involve?

16  **A.**  Investigations into criminal activity, investigations into

17  identifying the leadership, the persons that are able to direct

18  or shot call, direct activities within the gang.

19  **Q.**  What sources of information did your investigation rely

20  upon?

21  **A.**  It relied upon the use of wiretaps, the use of monitored

22  jail calls, the use of witnesses, informants, cooperators.

23          **MR. PHILIPSBORN:**  Objection.

24          Vague, Your Honor.  We still haven't had a

25  geographical tie-in here.  What are we talking about?

1           **MR. LEUNG:**  Your Honor, that is the same objection

2     that Mr. Philipsborn raised earlier.  That is not the issue at

3     this particular --

4           **THE COURT:**  Unless he says otherwise, I'm not sure

5     whether to just limit it to LA, where he has his -- most of his

6     experience, or to go nationwide.  And I think probably the safe

7     thing to do is just stick to LA, unless you specifically bring

8     out a larger foundation that could allow it to be used here in

9     San Francisco.

10          So, but the objection is overruled.  The testimony

11    is what it is.

12          Go ahead.

13          **MR. LEUNG:**  Thank you.

14    **BY MR. LEUNG:**

15    **Q.**  Item 15:

16          "Members ascend to leadership within a clique based

17    on their reputation as gang members; that is, someone who is

18    feared and respected and who comes recommended by past

19    leadership or by others who are feared and respected typically

20    become leaders.  Respect comes from demonstrating

21    aggressiveness and courage, usually by engaging in violence

22    against rival gang members or even the police, or representing

23    the gang through acts of daring and bra -- that should be

24    bravado -- wow, I think bravura might -- is that a word --

25    which embraces -- which enhances the reputation of the gang as

 1    a whole."

 2              Detective Flores, what is the basis for this

 3    opinion?

 4    **A.**  The basis for this opinion is my involvement in

 5    investigating the gangs, as a whole, through the totality of my

 6    experience in working the gang, through the debrief and the

 7    interview of various admitted Mara Salvatrucha gang members,

 8    through my monitoring of specific jail calls, wiretaps, where

 9    they talk about persons that have done good, that have respect

10    because they have acted on behalf of the gang by attacking

11    rivals, things of that nature, that help a person rise within

12    the ranks and help themselves be identified as a person that is

13    a significant person to the clique or the gang, as a whole.

14    **Q.**  And again, do you rely on any one source for your opinions?

15    **A.**  No, sir.

16    **Q.**  Item No. 16:

17              "A clique leader is supposed to enforce discipline,

18    uphold the rules of the gang, and make sure that his members

19    adhere to the rules.  He leads meetings and is supposed to make

20    sure members pay dues as well as representing the gang in the

21    conduct of criminal activities, especially violence against

22    rivals."

23              What is basis for that opinion?

24    **A.**  The basis for that opinion is, again, the totality of my

25    experience in working Mara Salvatrucha through the debrief of

**Flores - Direct / Leung**

1    cooperators, victims, and admitted members who help identify or

2    who have helped identify the process of the responsibility of

3    clique leaders.

4              I've also observed of some of these activities,

5    which has varied from clique to clique, depending on the

6    structure and the organization of the individual clique, how

7    harshly or how strictly the rules are enforced, depending on

8    the clique.

9    **Q.**  Item 17:

10             "Typically, MS-13 meetings begin with a roll call

11   followed by announcement of news about the clique, especially

12   about any ongoing feuds.  Any disciplinary reactions, sometimes

13   referred to as 'court,' against members is also addressed and,

14   if necessary, administered.  Gang dues are also collected, and

15   use of gang money and property is also discussed.  Planned

16   criminal activity, such as retaliation against rivals, is also

17   discussed."

18             What is the basis for this opinion?

19   **A.**  The basis for this opinion, again, is the totality of my

20   experience in working gangs, or working Mara Salvatrucha, as a

21   whole; through personal conversations and debriefs of admitted

22   and suspected Mara Salvatrucha gang members, victims, who I've

23   identified as some of these activities that go on, and -- at

24   some of these meetings, specifically, in relation to who is

25   present, who was not present, and the disciplinary process,

1  which, in part, at times has led to more serious crimes for

2  persons identified that were cooperating with law enforcement,

3  as well as items that are discussed in relation to rivalries

4  and other activities which are pertinent for the gang to exist.

5  *Q.*  What other sources of information, if any, did you have to

6  verify this opinion?

7  *A.*  Other sources that I've used or dealt with are other law

8  enforcement in other corresponding geographical areas, as well

9  as beyond the cooperators and the people that live within the

10  community, some of which are privy to firsthand some of these

11  activities that go on.

12  *Q.*  Item 18:

13          "Different cliques communicate with each other to

14  help each other survive, usually in feuds against common

15  rivals, as well as to ensure that MS-13 cliques are aware of

16  each other's affairs.  Meetings of the leadership of different

17  cliques, sometimes called 'generales,' are periodically

18  convened."

19          What is the basis of this opinion?

20  *A.*  The basis for this opinion, again, is the totality of my

21  experience in working Mara Salvatrucha over the course of my

22  career, in understanding through debriefs and interviews

23  various members of various ranks within Mara Salvatrucha, the

24  process by which some of these general meetings are conducted

25  for the sake of their maintaining their existence, in large

**Flores - Direct / Leung**

1    part, when they are dealing with larger issues affecting the

2    overall gang as a whole, or in identifying potential

3    cooperators within the gang.

4            *MR. GUGELMANN:*  Your Honor, I apologize; it seems

5    that a few of the defendants are having difficulty with their

6    headsets.

7            *THE COURT:*  All right, let's pause and have the

8    interpreters fix that.

9                    **(Interpreters address technical**

10                   **difficulties.)**

11           *THE COURT:*  Is it working now?

12           *THE INTERPRETER:*  I believe so, Your Honor.  I

13   believe the problem is fixed.

14           *THE COURT:*  All right, we'll continue on until

15   9:00 o'clock, and then take a 15-minute break at that point.

16           Please continue on.

17           *MR. LEUNG:*  Thank you, Your Honor.

18   *BY MR. LEUNG:*

19   *Q.*  Item No. 18:

20           "Different cliques communicate with each other to

21   help each other survive, usually in feuds against common

22   rivals, as well as to ensure that MS-13 cliques are aware of

23   each other's affairs.  Meetings of the leadership of different

24   cliques, sometimes called 'generales,' are periodically

25   convened."

**Flores - Direct / Leung**

1      What is the basis of that opinion?

2  **A.**  The basis of that opinion is the totality of my experience

3  in working La Mara Salvatrucha throughout the course of my

4  career, in talking specifically to admitted and suspected

5  Mara Salvatrucha gang members of different ranks and positions

6  within the gang who have helped identify and explain the

7  reasons some of these general meetings are held.

8  **Q.**  Besides debriefing gang members, what, if anything else,

9  underlies this opinion?

10  **A.**  Also been privy to certain conversations through wiretaps

11  or jail monitor calls, as well as some surveillance video that

12  I've been privy to.

13  **Q.**  Item 19:

14      "At generales, issues and problems common to the

15  cliques are addressed, such as identifying common enemies,

16  responding to law enforcement, and sharing intelligence.

17  Informants and infiltrators are also a concern at all levels of

18  organization."

19      What is the basis for this opinion?

20  **A.**  Again, this is the totality of my experience in law

21  enforcement, and working Mara Salvatrucha exclusively almost

22  throughout the course of my career, in talking with --

23  conversations with cooperators, admitted and suspected Mara

24  Salvatrucha gang members through the observation of some

25  surveillance video being prevalent to some audio-taped calls,

**Flores - Direct / Leung**

1   through wiretaps or jail phone calls during which some of these

2   reasons for these meetings are discussed and some of the

3   activities that go on in these meetings are also discussed.

4   *Q.*   Item 20:

5           "New members to MS-13 are initiated by being 'jumped

6   in,' that is, a ritual beating the initiate by members of the

7   gang for a set period of time, usually to the count of 13

8   seconds, although time varies from clique to clique.  This

9   ritual is to reinforce the initiate into the world into which

10  he is entering, a world of violence and toughness.

11          "The initiate joins a gang through violence and can

12  only leave the gang through violence, or, in the worst case,

13  death.  The ritual beating also establishes the bond between

14  gang members and sets the expectation for them that they will

15  have to fight for each other and together."

16          What is the basis for this opinion?

17  *A.*   The basis for this opinion is the totality of my

18  experience, my investigations into MS-13, through my debriefs

19  of many admitted members who had proudly talked about their

20  initiation process, something they hold significant in their

21  life, much like I do my graduating from the police academy

22  process, that generally they are not shy about talking about

23  their jumping in.

24          Also, through videotape, recorded surveillance,

25  through recorded phone calls, through wiretaps, through jail

**Flores - Direct / Leung**

1  calls.  Also some of these events have been captured through

2  some of the photographs that we have recovered through various

3  investigations, search warrants, probation or parole compliance

4  checks.

5  *Q.*  So you have seen videos and photographs of jumping-ins?

6  *A.*  Yes, sir.

7  *Q.*  Item 21:

8         "Members of MS-13 are expected to devote their lives

9  to the gang and to make the gang a priority.  They are supposed

10 to engage in violence to benefit the gang and enhance the

11 gang's reputation."

12         *THE INTERPRETER:*  Could you slow down and repeat --

13         *MR. LEUNG:*  Certainly.  My apologies.

14         "The notion of benefits includes making money for

15 the gang, usually through illegal activities, but can be

16 something as simple as representing the gang, that is,

17 bolstering the notoriety of the gang by engaging in feats of

18 daring, such as fighting against more numerous rivals or

19 shooting at rivals in rivals' territory."

20         What is the basis for that opinion?

21 *A.*  Again, this is the totality of my experience that I've come

22 to through the extent of my career, through my involvement in

23 numerous times of related investigations, through wiretap

24 conversations, recorded phone calls where they have talked

25 about some of the activities, through debriefs and interviews

**Flores - Direct / Leung**

1   of admitted members and associates where some of these

2   activities are identified and even spoken about.

3           And some have been identified through other types

4   and forms of investigations which have tied back to attacks on

5   rivals to help maintain the gang's territory or expand the

6   territory.

7   *Q.*  During the course of your 15-year career, roughly 15-year

8   career and your 11 years working gangs, have you ever

9   investigated a case involving violence that was motivated by

10  retaliation?

11  *A.*  Yes, sir.

12  *Q.*  What proportion, given your best estimate, as you sit here

13  today?

14  *A.*  Based on all the cases that I have investigated, from

15  vandalism to murder, at least where I can just give an estimate

16  as far as retaliation being some part of the motive, would be

17  anywhere between 15 and 20 percent.

18          **MR. SABELLI:**  Your Honor, I'm going to object on due

19  process grounds in the sense that this appears to be a new

20  opinion that wasn't part of this list of opinions.  So if this

21  is a new opinion which Counsel intends to proffer at trial, I

22  want to be clear about that now, and I want to object to that

23  being an added opinion.

24          **MR. LEUNG:**  I think it's an additional basis, Your

25  Honor, to explain the existing opinion which talks about

1  rivalries.

2         *MR. SABELLI:*  My understanding was that the last

3  question and answer were about the percentage of MS crimes that

4  somehow had involved a retaliatory motive; that seems not to be

5  focused on the bases of any opinion, but to be a new opinion,

6  in and of itself.

7         *MR. LEUNG:*  Actually, the last phrase of Item 21

8  says, "bolstering the notoriety of the gang by engaging in

9  feats of daring, such as fighting against more numerous rivals

10 or shooting at rivals in rivals' territory."

11        *THE COURT:*  So what was the point that you just

12 elicited that fits within that?

13        *MR. LEUNG:*  The point is, it creates an additional

14 basis for that opinion, that's it, because Detective Flores has

15 investigated retaliatory crimes.

16        *MR. SABELLI:*  I believe that he just testified that

17 something like 20 percent of crimes he investigated, if I heard

18 him correctly, involved some sort of retaliatory motive.  That

19 seems to me to be a new opinion, Your Honor.

20        *THE COURT:*  We'll deal with that later.  It is what

21 it is.

22        Continue on.

23 *BY MR. LEUNG:*

24 *Q.*  Item 22:

25        "Members of MS-13 rarely successfully leave the gang

**Flores - Direct / Leung**

 1   because leaving the gang meanings making an enemy of the gang.

 2   Leaving the gang is perceived as disrespecting or betraying the

 3   gang.  Those who effectively leave the gang typically uproot

 4   their lives and relocate."

 5           What is the basis of that opinion?

 6   *A.*  The basis for this opinion is my involvement throughout my

 7   career investigating gangs, in general, including MS-13, and

 8   talking to members who have thought about leaving the gang and

 9   understanding what they're turning away from, and members who

10   have, in fact, left the gang successfully.  Also in talking to

11   gang members, in general, through debriefs, through interviews

12   as far as their opinions on members that are thinking about

13   leaving the gang or who would possibly leave the gang, what

14   their opinion would be about such a person.

15           So this would be throughout the basis of interviews

16   and personal conversations with admitted and suspected gang

17   members and associates.

18   *Q.*  Besides gang members, what, if anything else, have you

19   looked to to confirm this?

20   *A.*  Well, also through my personal observations, through my

21   personal involvement with gangs, persons that I have seen

22   successfully leave the gang, what they have had to do to, in

23   fact, leave the gang, the process they have had to go through

24   to completely remove themselves from the area where the gang

25   exists and cut off all ties to that gang to be able to

1  successfully leave.

2          Also in dealing with other members of the community,

3  gang intervention-type groups, again, giving the opinion based

4  on the totality of all my personal involvement, personal

5  conversations, interviews, debriefs with community gang members

6  and gang members themselves.

7  **Q.**  Item 23:

8          "MS-13 uses graffiti to identify its territory, to

9  communicate with each other, to antagonize rivals, and to

10  instill intimidation and fear in rivals and in the community.

11  The graffiti reminds people of MS-13's existence and presence.

12  Graffiti are advertisement for the gang and enhance their

13  notoriety."

14          What is your basis for this opinion?

15  **A.**  The basis for this opinion, again, has been the totality of

16  my experience in law enforcement and working gangs and working

17  MS-13, specifically, as well as my personal observations

18  throughout my career in observing gang graffiti being one of

19  the constants throughout my career, specifically, Mara

20  Salvatrucha, in addition to conversations, debriefs of

21  suspected and admitted Mara Salvatrucha gang members who have

22  also identified some of the reasons why the graffiti:  To mark

23  and expand the territory, to issue challenges against rival

24  gangs, or put rival gangs on notice for encroaching on their

25  territory, all based on interviews, personal observations, and

**Flores - Direct / Leung**

 1    things that I've learned throughout my career throughout

 2    various investigations.

 3    *Q.*   There is an assertion here that graffiti instills

 4    intimidation and fear in rivals and the community; how do you

 5    know that?

 6    *A.*   Through, again, personal conversations with people in the

 7    community that live within some of these claimed territories,

 8    the effect that they, themselves, have related to me, when they

 9    step out of their house and they observe, you know, a large

10    graffiti wall across from where they live, or some of the

11    people to be able to identify the fact that they do live within

12    a MS-13 gang neighborhood because they see the graffiti all

13    over the place.

14              *THE COURT:*   Mr. Leung, No. 23 says, "Items 10 on the

15    demonstrative exhibit list will be shown as a demonstrative."

16              *MR. LEUNG:*   That would be at trial, Your Honor.

17    This is just pictures of MS-13 graffiti.

18              We were not prepared to show the demonstratives

19    because we thought this hearing was strictly for the purposes

20    of establishing --

21              *THE COURT:*   Well, wouldn't he need to show a

22    foundation for each of the items shown to the jury?

23              *MR. LEUNG:*   Those items would come in through other

24    witnesses.

25              *THE COURT:*   Oh, so you are going to get those in

Flores - Direct / Leung

1   anyway?

2               **MR. LEUNG:**  Right.

3               **THE COURT:**  All right.

4               **MR. LEUNG:**  They are like photographs.

5   *BY MR. LEUNG:*

6   *Q.*  Item No. --

7               **THE COURT:**  It's now 9:00 o'clock; it's time to take

8   a short 15-minute break.  We will -- can we do it in 15

9   minutes, or do we need more time than that -- all right, 15

10  minutes.

11                  **(Recess taken at 9:00 a.m.)**

12                  **(Proceedings resumed at 9:27 a.m.)**

13              **THE COURT:**  Let's go back to work.

14              Let's go ahead, please, thank you.

15              **MR. LEUNG:**  Thank you, Your Honor.

16                  **DIRECT EXAMINATION, CONTINUED**

17  *BY MR. LEUNG:*

18  *Q.*  Detective Flores, there has been a request from counsel for

19  us to repeat a question and answer, so let me do that first.

20              How many MS-13 members during your entire career

21  have you interviewed, approximately?

22  *A.*  I would estimate several hundred, some members repeatedly

23  on different cases, but at least a few hundred.

24  *Q.*  And how many civilians have you interviewed in connection

25  with MS-13 over the years?

1  **A.**  In connection to various types of encounters, consensual,

2  some brief, some more extensive as part of investigations, I

3  would estimate roughly over 2000.

4          Let me direct your attention now to Item No. 24.

5  That is on page 4, of Exhibit 1.

6          Do you see that?

7  **A.**  Yes, sir.

8  **Q.**  It states.

9          "Typical MS-13 graffiti include MS-13 signs, symbols

10  and phrases.  For instance, the letters "MS" by itself, or in

11  combination with the number 13, sometimes written in Roman

12  numerals, or "MS Trece," or "Sureños Trece," "La Mara

13  Salvatrucha," "the devil's pitchfork or the devil horns hand

14  sign, called "la garra," which looks like the Texas A & M hand

15  sign; a clock with hands on 1 and 3 for 13, El Salvador, the

16  Salvadorian flag, are all signs, symbols and phrases.

17          "Likewise, "sur," which is short for Sureño, is

18  often seen.  Also, "eme ese," Spanish for the letters, "M" and

19  "S," are also drawn as MS-13 graffiti tattooed onto members or

20  worn or possessed by gang members.

21          "The teardrop tattoo typically means that someone

22  has killed for the gang.  Other MS-13 symbols used in graffiti

23  and tattoos include prison towers to signify confinement,

24  gravestones with the letters "RIP," or the phrase, "en paz de

25  scanse," to signify the death of a gang member, gun, knives,

1   and other weapons and demonic symbols, such as a skeletal hand

2   making the devil's horn hand sign."

3           What is the basis of this opinion?

4   **A.**   The basis of the opinion is the -- encompassing the

5   totality of my experience working in combination with items of

6   evidence that I've personally seen on graffiti walls,

7   graffitied items, such as backpacks, notebooks, walls, tables,

8   where I've personally seen some of this graffiti in all forms

9   as MS, MS Trece, referencing Sureños, La Mara Salvatrucha, also

10  at times decored *[verbatim]* with the devil's pitchfork, the

11  hand sign, which is only common to the University of Texas, not

12  Texas A & M, and often referred to as la garra.

13          Some of these symbols, again, I've seen repeatedly

14  during the course of my career.  Also, some of these symbols

15  I've seen tattooed on members of their personal bodies, whether

16  it's the hand sign or the words Mara Salvatrucha in combination

17  with the letters "MS," "MS-13," or referencing Trece, or

18  Sureños, all in different combinations.

19  **Q.**   Item No. 25:

20          "Not all MS-13 members have tattoos.  Over the

21  years, the gang has gotten, if not more sophisticated, then at

22  least more sensible.  As the police have been investigating the

23  gang more, the gang realized that its member's tattoos, which

24  they used to proudly display to demonstrate their affiliation

25  and spread the representation of the gang have been a

 1   detriment.  It makes them obviously identifiable.  So tattooing

 2   has diminished over the years, or is less obvious.  Members now

 3   often avoid tattoos or get smaller ones in less obvious

 4   places."

 5          What is the basis of this opinion?

 6   **A.**  The basis of this opinion is the totality of my experience,

 7   my personal observations in dealing with Mara Salvatrucha gang

 8   members, also in conjunction with my communication with law

 9   enforcement in other countries, in particular, El Salvador,

10   acknowledging that law enforcement efforts in those countries

11   affect trends that we see as well in the United States and

12   Los Angeles.

13          In reference to their enforcement in El Salvador, a

14   tattoo or a readily identifiable tattoo could be grounds for an

15   arrest there or be used to identify or validate a gang member

16   in El Salvador, especially tattoos that are readily visible in

17   the face, hands, or neck area.

18          And as part of that, a crackdown in Central America

19   and also in Los Angeles, where those are also similarly

20   identifiable gang markings, I've seen -- personally noticed a

21   trend where I've seen that trend taper back, where gang members

22   are less likely or at a less common rate tattooing themselves

23   in highly visible areas.

24   **Q.**  Item 26:

25          "MS-13 and their rivals carry out their rivalry via

1   graffiti.  They seek out and deface each other's graffiti and

2   cover rivals' graffiti with their own."

3           What is the basis of that opinion?

4   **A.**  The basis of this opinion is, again, the totality of my

5   experience, my personal observations in working various types

6   of assignments and throughout different cases investigating

7   various vandalism cases which have led to shootings and/or

8   homicides as part of retaliation, stemming back to a simple

9   disrespect over graffiti, graffiti where either a rival gang

10  came in and disrespected Mara Salvatrucha by crossing out their

11  gang graffiti, or Mara Salvatrucha going into rival territory

12  and crossing out their graffiti.  So it is always a constant

13  that I've seen throughout my career to identify and to initiate

14  conflict.

15  **Q.**  And you've seen this graffiti battle?

16  **A.**  Yes.

17  **Q.**  Item 27:

18          "Another common symbol which is often tattooed on

19  gang members is a cluster of three dots in a triangular

20  formation.  This tattoo is known as the "mi vida loca," or, my

21  crazy life tattoo.  It signifies adoption of the gang

22  lifestyle, one built on fear, intimidation and violence, and

23  upholding the gang's reputation and one's own reputation in the

24  gang."

25          What is the basis of this opinion?

**Flores - Direct / Leung**

1   **A.**  The basis for this opinion is the -- just the total of my

2   experience working gangs, my observations, not only working

3   MS-13, but working Hispanic street gangs, as a whole.

4           Three dots is common to most Hispanic street gangs

5   in Southern California to identify mi vida loca, or, in

6   English, my crazy life.  And the three dots are, in a sense,

7   through conversations, through debriefs of various members with

8   that tattoo, it's acceptance of the lifestyle that they've

9   chosen.

10  **Q.**  Item No. 28:

11          "Certain slang terms or profanities are commonly

12  used as put-downs by MS-13 members for their rivals.  "Mierda

13  seca" is one, and refers to dried feces.  "Putos" is a

14  profanity used to refer to homosexuals."

15          What is the basis of this opinion?

16  **A.**  The basis for this opinion is the totality of my

17  experience.  I've observed the use of these words in Spanish

18  and English as a disrespect to cross out gang graffiti, used

19  verbally to disrespect members of Mara Salvatrucha by rival

20  gang members.  So it's a personal involvement through various

21  investigations, through personal contacts with admitted and

22  rivals of MS-13 gang members.

23  **Q.**  Have you seen these words written in graffiti?

24  **A.**  Yes, sir, very commonly.

25  **Q.**  And have you heard them used?

1    *A.*  Yes, sir.

2    *Q.*  Item 30:

3            "It is customary for MS-13 members to mourn the

4    death of one of their own with a memorial at the site of death.

5    Usually, the memorial consists of a photograph of the deceased

6    with written messages and with gang symbols to show that during

7    his life he was part of the gang."

8            What is your basis -- what is the basis for this

9    opinion?

10   *A.*  The basis for this opinion has been my involvement in

11   working gangs throughout my career, my personal observations in

12   observing some of these makeshift shrines, through various

13   investigations, not only specifically to MS, but as well as

14   other Hispanic street gangs where this is common, to praise or

15   acknowledge the death of one of their own gang members.

16   *Q.*  Item No. 31:

17           "MS-13 gang members use hand signs to communicate.

18   The hand signs state their allegiance to the gang.  One hand

19   sign is the Devil Horns gesture.  Another is forming the

20   letters "M" and "S" with the hands."

21           What is the basis for this opinion?

22   *A.*  The basis of this opinion is the totality of my experience

23   in working Mara Salvatrucha, personal observations in observing

24   some of these hand signs depicted in photographs and videotaped

25   surveillance which has been recovered through various

1    investigations depicting either them displaying the hand sign

2    as a gesture to one another, or displaying it in the sense of

3    when they greet each other to identify themselves to one

4    another in a handshake fashion.

5    *Q.*  And, I'm sorry; have you seen gang members flash these hand

6    signs, personally?

7    *A.*  Yes, I've seen them flash them personally on several

8    occasions.

9    *Q.*  How so?

10   *A.*  Part of my assignment is working in a plainclothes capacity

11   where I'm not readily identified.  I'm -- I've been out on

12   patrol or monitoring certain areas on surveillance or just in

13   driving around the neighborhood where I've observed these

14   activities take place, gang members identifying themselves to

15   each other or potential persons that they don't recognize in or

16   about their known neighborhood.

17   *Q.*  And when you are in plainclothes, are you in a vehicle?

18   *A.*  Yes, sir.

19   *Q.*  What kind of a vehicle?

20   *A.*  Plainclothes vehicles, generally rental vehicles, vehicles

21   that we are able to switch out on occasion.

22   *Q.*  For what purpose?

23   *A.*  For the purpose of not being readily identified as law

24   enforcement.

25   *Q.*  Item No. 32:

**Flores - Direct / Leung**

1          "in the world of gangs, identifying one's self with

2     a particular gang is expected.  MS-13 members take pride in

3     their gang identity.  Without their gang affiliation, they

4     would be dismissed as mere "paisas," ordinary criminals.  Their

5     gang membership ostensibly boosts their standing on the

6     streets, makes them part of a selective, elicit organization,

7     that is, selective in its membership and that has its own

8     specific rituals and rules."

9          What is the basis of that opinion?

10    **A.**  The basis of this opinion is the totality of my experience

11    in working gangs, working Mara Salvatrucha, specifically,

12    during various debriefs and conversations with admitted members

13    in a consensual encounter and during debriefs, where even at

14    times, despite the fact that they were debriefing, they

15    explained a sense of pride and belonging to the gang and being

16    a part of something in that fashion.

17    **Q.**  Item number 33:

18          "Someone who is not a member of MS-13 who displays

19    MS-13 gang symbols, has a gang tattoo or flashes gang signs,

20    runs a risk of retaliation.  An outsider misappropriating MS-13

21    symbols and mannerisms is deemed to be disrespecting the gang."

22          What is the basis for this opinion?

23    **A.**  The basis is the totality of my experience in working Mara

24    Salvatrucha, through various conversations, interviews,

25    debriefs, admitted Mara Salvatrucha gang members.

1      Again, their belonging to the gang is a sense of

2   pride; somebody claiming or displaying something, that they

3   would see that as a sign of disrespect to the gang and to

4   themselves, something that would cause them or force them to

5   react.

6   *Q.*  Item No. 34:

7          "One of MS-13's models is some variation of the

8   words, "matar, violar, controlar," which means to kill, to

9   rape, and to control, or "rifa" and "controla," which means to

10  rule and to control.  These mottos manifest the gang's desire

11  and intent to dominate others through violence and

12  intimidation."

13         What is basis of this opinion?

14  *A.*  The basis for this opinion is my entirety of my career in

15  working Mara Salvatrucha through various debriefs and

16  interviews of gang members, interviews of people that live in

17  the community, that have lived in the community for an

18  extensive period of time, who have been witness to some of

19  these activities, who I've talked to as witnesses, I've talked

20  to as victims in relation to the words, the verbiage.

21         I've also heard some of these comments, some of

22  these words used during the recorded conversations, wiretaps,

23  jail calls, as well as some of these words etched or graffitied

24  on walls or documents, papers, backpacks, pretty much anything

25  they can write on.

1          **MR. PHILIPSBORN:**  Objection.  Vague, Your Honor.

2          Request the Court direct Counsel to clarify the

3    difference between the debriefs and the interviews, because

4    that phraseology keeps cropping up.  And so there is also a

5    lack of foundation for the distinction that's being made.

6          **THE COURT:**  Do you mean something different between

7    debrief and interview?

8          **THE WITNESS:**  Yes.  A debrief would be something

9    maybe nonspecific, something where a gang member would like to

10   cooperate, is in the process of cooperating.

11         An interview would be specific to a specific crime,

12   something specific that I'm inquiring about in relation to a

13   crime that I'm investigating.

14         And then there are different types of encounters.

15   Some are consensual, which could be 2 seconds, 3 seconds, 10

16   seconds long in brief.  Some as long as a few minutes,

17   depending on the location, the time, and the person's sense of

18   comfort in talking to me.

19         **MR. PHILIPSBORN:**  Thank you, Your Honor.

20         **THE COURT:**  All right.

21         Let's continue on.

22   **BY MR. LEUNG:**

23   **Q.**  Item No. 35:

24         "In Los Angeles, much of the rivalry between MS-13

25   and other gangs is over control of territory in which to

1    distribute drugs or control taxation of drug dealers; however,

2    feuds can ignite over other issues, such as control over

3    extortion victims.  Of course, gang activity is also the cause

4    of violence:  An MS-13 member will attack a rival of a gang

5    simply because of their different allegiances."

6              What is the basis for this opinion?

7    *A.*  The basis for this opinion is the totality of my experience

8    in working Mara Salvatrucha and working gangs, in general,

9    investigating various crimes which have stemmed from rivalries,

10   stemmed from the extortion, from the collection of money, the

11   perceived encroachment on territory by a rival gang, the

12   various motives that come with some of the cases that I've

13   worked, as well as personal conversations, interviews, and

14   debriefs of witnesses and Mara Salvatrucha gang members and

15   members of rival gangs.

16   *Q.*  And when you mean "witnesses," do you mean victims or other

17   witnesses?

18   *A.*  Victims and witnesses to some of those crimes.

19   *Q.*  Are there any other bases for this opinion?

20   *A.*  In general, the totality encompasses a lot of these

21   investigations, and in some part in dealing and communicating

22   with law enforcement abroad and throughout the United States

23   and as well as -- well into Central America.

24   *Q.*  Item No. 36:

25              "MS-13 members often speak or write in a symbol

1  code.  For instance, they will switch the letters of a name or

2  pronounce the syllables of a name in reverse order; thus,

3  Flores will be spelled or pronounced "Resflo."

4          What is the basis of this opinion?

5  **A.**  The basis for this opinion has been my totality of my

6  experience in working Mara Salvatrucha gangs, in general.  Some

7  of these simple codes I've overheard myself on recorded

8  conversations, through wiretaps or jail calls.

9          Specifically, in the event of my name, I've heard my

10  name specifically referred to as "Resflo."  In this instance,

11  this is something that is common to substitution of words for

12  particular items, to speak in code to represent -- for example,

13  one cheese pizza would represent one ounce of methamphetamine.

14  It would be an example of a slang term, or a substitution of a

15  word for something criminal.

16  **Q.**  Item No. 37:

17          "MS-13 members often use other code words.  For

18  instance, the word "girls" is often used for guns.  Carrying

19  this further, a girl's name is also used to refer to guns.

20  Meaning is often based on context."

21          What is the basis of this opinion?

22  **A.**  The basis for this opinion, again, tying back to, in part,

23  No. 36; it's the totality of my experience in working Hispanic

24  street gangs, working with Mara Salvatrucha, specifically,

25  where I've overheard or been privy to some of these words

```
 1   through wiretaps, through jail phone calls.

 2              I've also debriefed various individuals, suspected

 3   and admitted Mara Salvatrucha gang members and associates who

 4   have helped decipher some of these words, or explain some of

 5   these words.  Also, in communicating with law enforcement

 6   abroad, some of these words are widely used through Mara

 7   Salvatrucha or other Hispanic street gangs.
```

**Q.**  So these words have turned up in other jurisdictions?

**A.**  Yes.

**Q.**  And just to clarify, the word "girls," is that English or
Spanish?

**A.**  In the sense that I've heard it on the wiretaps referred to
in Spanish as niñas, or niña.

**Q.**  Could you explain what you have heard in the past, by way
of example?

**A.**  For example, you could hear an example of a gun referred to
as a "niña," "una niña de nueve años," a girl of nine years
old, referring to a gun, .9 millimeter caliber.

**Q.**  Item No. 38:

            "In some ways, MS-13, as a whole, is supposed to
operate in an almost feudal capacity.  Local cliques collect
money from its members for the use of the clique.  Typically,
it could be to purchase drugs, guns, and sometimes for gang
functions, like parties.  Money is also used to provide bail
for incarcerated members or to pay for lawyers for arrested

1    members.  For those members in jail or prison, gang money is

2    also collected and placed in commissary accounts.

3            "Ideally, any money left over is sent to El Salvador

4    to help out gang members there, members who are hiding from law

5    enforcement or who are in prison.  What may be a relatively

6    small amount of United States dollars go quite far in

7    El Salvador and Central America."

8            What is the basis for this opinion?

9        MR. GOLDROSEN:  Your Honor, I object.

10           This question, much like the others, involves

11   multiple opinions, and so when the Government characterizes

12   this as this opinion and we get an answer, the answer doesn't

13   specify what aspects of the officer's training and experience

14   go to the opinions that are stated within each -- within

15   each --

16       THE COURT:  Well, that may be.  But if it turns out

17   at the end of the day there is not sufficient foundation for

18   some of these statements, and there -- they are just not going

19   to be allowed.  And the burden is on the Government here to

20   show that, so I'm not -- the Government is proceeding in a

21   reasonable way.

22           But it is true, Mr. Leung, if you omit a sentence,

23   then you are just out of luck.  So, in other words, if the

24   foundation is not adequate for one sentence in a long

25   paragraph, that is going to be grounds to knock it out.  So you

```
 1   need to be careful, as the witness goes through this, to make

 2   sure that adequate foundation is being laid for each opinion.

 3            MR. LEUNG:  May I proceed?

 4            THE COURT:  And I have the same concern about these

 5   demonstrative exhibits, that, yes, you may be showing them at

 6   trial through other witnesses, but if you are going to be

 7   eliciting testimony from this witness, you haven't shown any

 8   foundation for any demonstrative exhibit.

 9            So you proceed in the manner you want, but Counsel

10   is raising a decent point.  But I'm letting you make the record

11   that you want.

12            MR. LEUNG:  Thank you, Your Honor.

13   BY MR. LEUNG:

14   Q.  Detective Flores, take a look at Item 38.  What is the

15   basis for all the assertions set forth in 38?

16   A.  The basis is the totality of my experience in working La

17   Mara Salvatrucha, specifically, and being able to validate this

18   information through interviews and debriefs of Mara Salvatrucha

19   gang members, by the ability to overhear some of these

20   conversations through wiretaps, through jail-recorded phone

21   conversations, where they specifically go to the conversation

22   as far as where some of these monies go to, specifically, and

23   where they are directed to.

24   Q.  Then what about the assertion, "what may be a relatively

25   small amount of United States dollars goes quite far in
```

1   El Salvador and Central America"?

2   **A.**   Specifically, in dealing with law enforcement in Central

3   America, understanding the economy and, you know, the hard

4   nature of living there, that even a small amount of money goes

5   a long ways as opposed to the cost of living here in the United

6   States, just understanding in general that through my contacts

7   with law enforcement in Central America and El Salvador,

8   specifically.

9   **Q.**   Item No. 39:

10          "Like any organization, cliques typically keep

11  records of its membership and dues.  These are usually very

12  simple, like a name with a number next to it denoting the

13  amount paid."

14          What's the basis for this opinion?

15  **A.**   The basis for this opinion has come through personal

16  experience, through personal conversations, and at times privy

17  to some of these records that have been recovered through

18  various investigations, some of them being very simple in terms

19  of a name and a number next to the person, indicating the

20  person was present, the person paid a particular amount.

21          So this has come through conversations with admitted

22  and suspected Mara Salvatrucha gang members.  It's come through

23  some of the recovery and my ability to review some of the

24  evidence pointing to these activities on some of the cases I've

25  worked and some of the cases that I've been privy to.

**Flores - Direct / Leung**

1   **Q.**   Item 40:

2              "MS-13 members also keep newspaper clippings of

3   their gangs, crimes and exploits.   These are prized as

4   trophies.   The gang is part of their lives, and they are proud

5   of the activities of the gang, especially if these are infamous

6   crimes."

7              What's the basis for this opinion?

8   **A.**   The basis is the totality of my experience throughout my

9   career, in various investigations that I've been a part of.

10             Some of these newspaper clippings, some of these

11  "trophies," quote/unquote, have been recovered through various

12  investigations, through search warrants, through probation,

13  parole compliance checks, where a person leaves some of these

14  newspaper clippings or trophies from various crimes.

15  **Q.**   Item 41:

16             "MS-13 members commit acts of violence and other

17  crimes to demonstrate their courage and commitment to the gang.

18  Doing so increases their standing in the gang."

19             What is the basis for this opinion?

20  **A.**   The basis is the totality of my experience in working

21  gangs, the numerous debriefs, interviews I've done of gang

22  members, both from Mara Salvatrucha and persons in the

23  community in the nature of understanding the way a person is

24  recognized or is able to rise within the ranks of the gang

25  itself by becoming noticed or becoming somebody significant,

1   which has come out through debriefs, which has also been talked

2   about on wiretaps or jail-recorded phone calls which I've been

3   privy to as well.

4   **Q.**  Item 42:

5           "Incarcerated gang members have figured out ways to

6   communicate with the outside, speak over the telephone, usually

7   using code" -- "usually using code.  They also get personal

8   visits with friends and family and girlfriends who convey

9   messages.  Coded letters are often used as well.

10          "Also, El Salvadorian prisons are not particularly

11  strict, so members often sneak in cellular telephones to use.

12  This also happens sometimes in the United States."

13          What is the basis of this opinion?

14  **A.**  The basis of this opinion has come over the course of my

15  career, where technology has evolved, the size of telephones.

16  The ability to community has also evolved.  And I've seen this

17  in relationship to Hispanic street gangs, or gangs, in general.

18          Specific to La Mara Salvatrucha, I've debriefed and

19  been involved with various interviews, debriefs of members who

20  have described the way they have communicated through visits,

21  through coded phone conversations which are allowed through

22  some facilities, also through the abuse of, at times, legal

23  mail, through third parties, also in speaking to law

24  enforcement abroad, specifically, law enforcement in Central

25  America, understanding that the severity and the propensity for

1  corrupt employees at some of those facilities is a lot higher

2  than here in the United States, so they see a higher degree of

3  phones being smuggled into some of those facilities and some of

4  the looser restrictions in the ways that members are able to

5  communicate with persons outside, which has all come from

6  conversations, debriefs, communication with law enforcement

7  abroad, and interviews of suspected and admitted Mara

8  Salvatrucha gang members and associates.

9  Q.  Item 43:

10         "A kite, or a filter, is a little note on which

11  messages are written.  They are often hidden in small items or

12  even inside the body and passed around in prison or passed on

13  to a visitor, who delivers it to someone outside of prison."

14         What is the basis of this opinion?

15  A.  This opinion is based on the totality of experience in

16  working Hispanic street gangs, working La Mara Salvatrucha,

17  specifically; during debriefs of persons that have been caught

18  with some of these notes, or some of this contraband, which is

19  considered contraband, and identifying and being able to

20  firsthand see some of these notes and what it includes and what

21  it identifies, which is passed along through visits, through

22  court appearances, through various movements when individuals

23  are moved around.

24         All this information has been explained to me

25  through my contacts in law enforcement, who work in a jail or

1  prison capacity, as well as debriefs and interviews of Hispanic

2  gang members and Mara Salvatrucha gang members as well.

3  **Q.**  Item No. 44:

4          "MS-13 has rules that are supposed to be followed by

5  all of its members, though there are local variations and

6  adherence varies.  For instance, all members are supposed to be

7  "jumped in," and violation of rules is supposed to be punished,

8  often by a "13," that is a beating for 13 seconds."

9          What is the -- let's break this up.

10          What's the basis for that opinion?

11  **A.**  The basis for this opinion is the totality of my experience

12  in working Mara Salvatrucha, in the debriefs, the interviews of

13  various gang members, and the ability at times to be privy to

14  some of these conversations, which have indicated or talked

15  about some of these activities that go on through wiretaps,

16  through jail phone calls, as well as some of the videotapes

17  that I've been able to see as well throughout my career.

18  **Q.**  Besides videotapes, have you seen jumping-ins in other

19  forms?

20  **A.**  I have never personally witnessed a jumping in.  The only

21  form I've witnessed it or seen it documented is through some

22  photographs.

23  **Q.**  Let's go on to the next part:

24          "The principal rule is that a member does not

25  cooperate with law enforcement.  Snitching is a capital

**Flores - Direct / Leung**

1  offense.  Even talking to law enforcement about something that

2  does not implicate the gang is considered a sin."

3           What is the basis of that assertion, of that

4  opinion?

5  *A.*  The basis for that is the totality of my experience in

6  working various crimes, including murders, which have resulted

7  as a direct result of persons being tagged as an informant or

8  identified as a snitch or somebody that's been cooperating with

9  law enforcement.

10           I've gathered that through my personal experience.

11  I've also gathered that through conversations, debriefs of

12  admitted and suspected Mara Salvatrucha gang members in

13  reference to what they feel about somebody that is cooperating,

14  or may be cooperating.

15           Also, in relation to my communication with law

16  enforcement abroad, where my understanding that these rules are

17  very general, very widely spread throughout the Mara

18  Salvatrucha gang, as a whole.

19  *Q.*  Have you heard discussions by gang members -- among gang

20  members talking about snitches and killing snitches?

21  *A.*  Yes.

22  *Q.*  In what form?

23  *A.*  The form of identifying or asking somebody to look at

24  further or go talk to a particular person to figure out whether

25  or not a person might be cooperating; a type of investigation

**Flores - Direct / Leung**

```
1   where the gang, itself, will ask for certain paperwork as far

2   as to see what a person is charged with, asked to see their

3   paperwork, ask to see another individual's paperwork, try to

4   get reports or documents as part of cases through members that

5   are fighting cases in custody to identify whether or not a

6   person is, in fact, a potential witness or has been identified

7   as a cooperator against the gang or individual members

8   themselves.

9   Q.  Just to clarify, what is -- what do you mean by

10  "paperwork"?

11  A.  Paperwork:  Court documents, police reports, documents that

12  would be filed in connection with a specific case which would

13  identify, obviously, the nature of the case, the facts in

14  evidence, the witnesses, identify what the case is about.

15          And then this is all coming from, again, my personal

16  involvement in some of these cases as a witness, as an

17  investigator as well as personal conversations with gang

18  members, themselves.

19  Q.  Have you heard conversations that were recorded among gang

20  members about this topic?

21  A.  Yes, in reference to a particular person potentially being

22  a snitch or a rat, yes.

23  Q.  Let's move on to the next assertion:

24          "In addition, members are supposed to attend gang

25  meetings, pay dues, and represent the gang.  Representing the
```

1    gang well" -- excuse me.  Let me re-read that.

2              "In addition, members are supposed to attend gang

3    meetings, pay dues, and represent the gang well.  Representing

4    the gang well in the gang world means demonstrating courage and

5    dominance, which means commission of violence.  A member

6    enhances his reputation with audacious acts of violence, such

7    as fighting rivals when outnumbered, not backing down when

8    challenged by anyone, or hunting for rivals in rivals'

9    territories.

10             "An MS-13 member cannot allow himself to be

11   disrespected without retaliating.  He cannot back down from a

12   fight or challenge, whether from a rival gang member or from a

13   "paisa."  MS-13 members must retaliate when challenged or

14   disrespected, or else they will be perceived as weak."

15             What is the basis for this opinion?

16   A.  The basis for that opinion, again, the totality of my

17   experience and working Mara Salvatrucha, working Hispanic

18   street gangs.  Belonging is a sense of pride, a sense of

19   respect, and through these debriefs, the expression of somebody

20   disrespecting their gang or disrespecting themselves not only

21   falls upon them as an individual, but upon the gang.  So they

22   are forced to react, to take action.

23             And as a pattern that I've seen throughout my

24   experience, when you see the younger members that have just

25   been jumped into the gang, their propensity to have to prove

**Flores - Direct / Leung**

1   themselves and want to prove themselves to some of the older

2   members is a lot higher than some of the members that have been

3   in for some period of time.

4            So you see a proving stage in order to develop their

5   own verification and to try to gather some rank within the

6   gang, which has come through, again, my personal involvement in

7   the investigations, my personal debrief on some of these

8   investigations of individual members, of members of rival

9   gangs, as well, as well as my communication and my coordination

10  with law enforcement, not only in Los Angeles, but in other

11  parts of the United States and in Central America.

12  *Q.*  Item No. 45:

13           "There are also other rules, some specific to local

14  cliques.  In Los Angeles, where the principal rivals to MS-13

15  is the 18th Street gang, an MS-13 member is not supposed to use

16  the No. 18 or 8."

17           What is the basis for this assertion -- for this

18  opinion?

19  *A.*  The basis for this opinion is the totality of my experience

20  in working Hispanic street gangs, in particular, Mara

21  Salvatrucha, throughout numerous debriefs, conversations,

22  consensual encounters, where during these encounters Mara

23  Salvatrucha gang members specifically won't say or use the

24  number 8, 18, or will use it in a derogatory fashion when they

25  come across it.

**Flores - Direct / Leung**

```
 1              Also through probation, parole search warrants, I've
 2    noticed some documents where you may come across, again, the
 3    word 18 or the number 8 or 18, you'll see it crossed out as a
 4    disrespect to that gang.
 5              Also through these debriefs and through the course
 6    of my experience in law enforcement, I know through my
 7    communication with law enforcement abroad and elsewhere that
 8    18th Street is the chief rival gang to Mara Salvatrucha.
 9  Q.  Item 46:
10              "Violations of gang rules can bring on a wide
11    variety of punishments, depending on the severity of the
12    transgression and the strictness of the clique's leadership.
13    Sometimes for minor infractions it can be a fine.  For
14    something more serious, it can be a beating by other members.
15    The worst offenses result in a green light, that is, death.
16    The gang members are authorized to kill you.  The most serious
17    capital offense is to cooperate with law enforcement, that is,
18    betraying that gang."
19              What is the basis for this opinion?
20  A.  The basis for that opinion is the totality of my experience
21    in working Mara Salvatrucha, working Hispanic street gangs, the
22    disrespect that is seen by a person that commits certain types
23    of offenses.  It is incumbent on the shot caller to divvy out
24    the appropriate punishment as they deem necessary.
25  Q.  And by "offenses," what do you mean violation of the gang's
```

1  rules?

2  **A.**  The offenses could include, and this is stuff that I've

3  gathered through conversations with gang members, themselves, a

4  violation could be as small as not attending a specific meeting

5  without an appropriate excuse, or a pass, losing a gun, using

6  drugs that weren't intended for personal use, showing cowardice

7  in the face of a rival gang, failing to carry out a specific

8  mission or task dictated by a shot caller, or the extreme,

9  where they have identified somebody as potentially cooperating

10  with law enforcement.

11  **Q.**  And again, what are the sources upon which you've based

12  this opinion?

13  **A.**  The sources have been based on my personal involvement in a

14  lot of these cases where persons that have been identified as

15  cooperating with law enforcement, some have been killed or

16  targeted for death.  Also through -- privy through some

17  conversation recorded through wiretaps or jail phone

18  conversation where they've spoken about certain persons

19  identified as rats or certain persons targeted for specific

20  punishment for not attending meetings or for losing guns or

21  certain property seen as valuable to the clique or the gang, as

22  a whole.

23  **Q.**  Item No. 47:

24          "The word "chavala," plural, "chavalas," is slang

25  for a little girl, and it is a term of disrespect that MS-13

**Flores - Direct / Leung**

1  members often use to refer to their rivals.  Whenever an MS-13

2  member encounters a chavala, he is supposed to take some sort

3  of action.  He is supposed to at least challenge a rival to a

4  fight if" -- "or to try to kill the rival."

5          What is the basis for this opinion?

6  *A.*  The basis for this opinion has come through the extent of

7  my career, my personal involvement in working with Mara

8  Salvatrucha, encompassing a lot of investigations where I've

9  worked where a lot of these crimes have stemmed from a

10  confrontation from a simple question, where are you from, and

11  the person happens to be from a rival gang, and the violence

12  ensues.

13          A lot of it also has come from debriefs,

14  conversations with admitted members, rival gang members of

15  MS-13, and some conversations, some wiretap conversations which

16  included talk about confrontations with rivals and what persons

17  or some of the members are required to do.

18  *Q.*  All right.

19          Generally, then, all the opinions expressed herein,

20  what is the basis for them all, in general?

21  *A.*  The basis, in general, is the totality of my 11 years in

22  working gangs, in addition to my -- my life growing up in the

23  City of Los Angeles.

24  *Q.*  How have you found your background to be useful in your

25  police work?

**Flores - Direct / Leung**

1 **A.** My background is useful in the sense that beyond being able

2 to speak Spanish and communicate and sympathize with a lot of

3 people that live within a similar community that I grew up in,

4 as well as understanding the nature of the Hispanic street

5 gangs, which Mara Salvatrucha being one of them, has a lot of

6 similar traits to other Hispanic street gangs in Los Angeles.

7 **Q.** What sort of understanding do you bring based on your

8 background?

9 **A.** Just the understanding of some of the language, some of the

10 verbiage, the ability to communicate, to set some type of

11 rapport with a lot of gang members, themselves, throughout my

12 career, which has helped me develop a better understanding and

13 a better way to open rapports with other gang members.

14 **Q.** How about with the community?

15 **A.** Yes, along the lines of my connection to community is the

16 basis for which, you know, I'm employed, who I serve, is to

17 communicate with them and try to resolve problems through my

18 abilities and, you know, through my assignment as best that I

19 can in serving and protecting their safety and addressing the

20 problems and the issues at hand.

21 **Q.** What sort of approach do you take to speak with members of

22 the communities and with gang members?

23 **A.** Specifically, I don't confront them in public.  I don't

24 identify them readily in public, where somebody can report back

25 or a gang member can personally observe me talking to a

1   specific witness or community member where they might be

2   intimidated to even talk to me, even being seen with me by mere

3   fact that they may be retaliated against just for the

4   appearance of cooperating.

5              So throughout my career, I've used a lot of methods

6   to communicate, open up dialogue with some of these people

7   through phone conversations, through meeting at undisclosed

8   locations to talk, or just simply, you know, a wave or a hand

9   gesture as I drive through certain communities identifying

10  places where gang members may be associating or hanging out.

11  *Q.*  Detective Flores, are you aware that there was an ICE-led

12  federal investigation of MS-13 in the Northern District of

13  California?

14  *A.*  At some point I learned that there was an MS-13 case in

15  Northern California.  I didn't know, specifically, what was

16  going on with it.

17  *Q.*  Did you participate in this investigation at all?

18  *A.*  No.

19  *Q.*  Were you consulted in any way during the course of the

20  investigation preindictment?

21  *A.*  No.

22  *Q.*  Have you reviewed --

23          *MR. SABELLI:*  Your Honor, I'm going to object in

24  term of vagueness, because in this case there was an FBI

25  investigation and then an ICE investigation; I'm not sure

**Flores - Direct / Leung**

1    whether Mr. Leung's question focuses on both the ICE and the

2    FBI investigations or just the latter.

3    *BY MR. LEUNG:*

4    *Q.*  The question was, are you aware of an ICE-led investigation

5    in the Northern District of California?

6    *A.*  Yes, I became aware at some point, but not until recent.

7    *Q.*  Well, let me -- all right, have you reviewed a list of the

8    defendants in the Northern District of California case?

9    *A.*  Yes.

10   *Q.*  Do you know any of them?

11   *A.*  No, not personally.

12   *Q.*  Do you have any investigatory facts relating to any of

13   them?

14   *A.*  No.

15           **MR. LEUNG:**  May I confer with my --

16           **THE COURT:**  All right, while you do that, you

17   skipped No. 29.

18           **MR. LEUNG:**  Oh, thank you, Your Honor.

19   *BY MR. LEUNG:*

20   *Q.*  Going back to Item 29, Detective Flores:

21           "The term "marero" in El Salvador is a general word

22   for a gang member, but here in the United States, it usually

23   refers to an MS-13 member."

24           What is that opinion based on?

25   *A.*  Based on the totality of my experience in working gangs, my

**Flores - Cross / Sabelli**

```
 1   communication with law enforcement in Central America, and,

 2   specifically, in El Salvador, where marero is a common term in

 3   identifying gangs, as a whole, as a slang term for gangs.

 4            But also, acknowledging that when that term -- I've

 5   heard that term used here in the United States, or specifically

 6   in Los Angeles, that that term is more specific to Mara

 7   Salvatrucha, or MS-13.

 8   Q.  As opposed to other Hispanic gangs?

 9   A.  As opposed to any other Hispanic street gangs.  That's

10   solely, in the terms that I've heard it only -- or identifying

11   or referring to Mara Salvatrucha.

12            MR. LEUNG:  No further questions, Your Honor.

13            THE COURT:  All right.

14                       CROSS-EXAMINATION

15   BY MR. SABELLI:

16   Q.  Good morning, sir.

17   A.  Good morning.

18   Q.  Do you understand you are here to talk about the bases of

19   your opinions?  Fair?

20   A.  Yes, sir.

21   Q.  Okay.  I want to start with an opinion that you articled

22   this morning, it's the first one on Government's Exhibit 1.

23   And that has to do with the origins of MS-13.

24   A.  Yes, sir.

25   Q.  Do you remember you offered your opinion on that?
```

**Flores - Cross / Sabelli**

1   *A.* Correct.

2   *Q.* You talked about the bases of it?

3   *A.* Yes, sir.

4   *Q.* And Judge Alsup even followed up and asked you to clarify

5   something in Exhibit 1.  Do you remember that?

6   *A.* Yes, sir.

7   *Q.* Okay.  And you clarified that MS-13 originated in the

8   United States and then was introduced into El Salvador through

9   people who were deported from the United States.

10  *A.* Correct.

11  *Q.* And this opinion was based upon information that you had

12  from gang members who had been around when MS was started?

13  *A.* Correct.

14  *Q.* From police officers that had been around doing that time?

15  *A.* Correct.

16  *Q.* And also from evidence that you had personally seen related

17  to the time when MS-13 first originated?

18  *A.* Correct.

19  *Q.* Okay.  All that -- I got that right?

20  *A.* Yes, sir.

21  *Q.* Okay.

22          Now, fair to say that that information that you had

23  from the old gang members, from the police officers, and from

24  the evidence you had, all of that existed back, let's say, in

25  2004?

**Flores - Cross / Sabelli**

1    **A.**  In part, that -- some of that information would exist.  I

2    believe there had been one or two video documentaries that I've

3    seen where they've talked to Mara Salvatrucha gang members.

4    I'm not sure when those were taped or recorded, but those are

5    other items that I've watched or listened to as far as --

6    **Q.**  When you say "video documentary," are you talking about

7    something you saw on TV or at a film festival, something like

8    that?

9    **A.**  Something on TV or cable.

10   **Q.**  Okay.

11            And do you remember the names of those videos?

12   **A.**  There was one documentary with Alex Sanchez.  I believe it

13   was -- I don't know if it was through PBS.

14   **Q.**  And Alex Sanchez, by the way, he is one of the defendants

15   in the LA MS-13 case, right?

16   **A.**  Correct.

17   **Q.**  And you are the lead investigative agent?

18   **A.**  I'm the co-case investigator.

19   **Q.**  Okay.

20            And what you're telling us is that you saw a

21   documentary that had Alex Sanchez in it that discussed the

22   origins of MS-13?

23   **A.**  Right.

24   **Q.**  And that's one of the bases of your opinion?

25   **A.**  That's part of the basis, along with the totality of my

1   experience and my conversations with law enforcement that

2   worked the areas that were firsthand witnesses to the origin --

3   originating of the gang as well as conversations and debriefs

4   of other MS-13 gang members that go back to the origin of the

5   gang as well.

6   **Q.**  Okay.

7            And so you told the judge today in very clear terms,

8   MS originated in Los Angeles and was introduced in LA -- I'm

9   sorry, in El Salvador as a result of deportees from the United

10  States?

11  **A.**  Yes, in part.

12           **MR. SABELLI:**  Your Honor, may I approach the

13  witness?

14           **THE COURT:**  Sure.

15                **(Handing exhibit to witness.)**

16           **MR. LEUNG:**  I'm handing the witness what I've marked

17  as Exhibit C.  I don't have a copy for all counsel.  I have

18  given a copy to the United States, and I have a copy for the

19  Court.

20           If I may hand it up through your clerk, please?

21                **(Handing exhibit to clerk.)**

22  **BY MR. LEUNG:**

23  **Q.**  Can you please look at Exhibit C, Mr. Flores.

24  **A.**  Yes, sir.

25  **Q.**  Could you tell the Court what Exhibit C is, please.

1    **A.**   Exhibit C looks like a copy of a court order pertaining to

2    a gang injunction against the Mara Salvatrucha street gang.

3    **Q.**   Okay.

4              Is this a declaration that you drafted rather than a

5    court order?

6    **A.**   I believe it incorporates a court order and a declaration

7    as well that I provided, or was drafted by the City Attorney

8    and I signed.

9    **Q.**   Okay.   So this Exhibit C is a declaration that you

10   personally signed; is that correct?

11   **A.**   Correct.

12   **Q.**   Under penalty of perjury?

13   **A.**   Correct.

14   **Q.**   After having reviewed it?

15   **A.**   Yes, sir.

16   **Q.**   Because you thought everything in there was absolutely

17   true?

18   **A.**   Yes, sir, to the best of my ability, yes, sir.

19   **Q.**   And you knew that this declaration was going to be used by

20   a judge in the State of California to decide whether or not a

21   gang injunction should issue?

22   **A.**   That's correct.

23   **Q.**   So you realized this was an important document?

24   **A.**   Correct.

25   **Q.**   Okay.

**Flores - Cross / Sabelli**

1           And in this document, you discuss your opinions

2    about Mara Salvatrucha, or at least some of them; is that

3    correct?

4    *A.*   Correct.

5    *Q.*   And one of the opinions you give has to do or relates to

6    the origin of MS-13; is that right?

7    *A.*   Correct.

8    *Q.*   Because you routinely give these opinions about the origin

9    of MS-13.

10   *A.*   Yes, sir.

11   *Q.*   And fair to say that when you drafted or -- did you draft

12   this declaration?

13   *A.*   No, sir.

14   *Q.*   When you reviewed and signed this declaration, you did it

15   because you thought this was a true document?

16   *A.*   That's correct.

17   *Q.*   Realizing the importance of the document.

18   *A.*   Yes, sir.

19   *Q.*   And fair to say that the judge to whom you submitted this

20   declaration received your opinion about the origin of MS-13?

21   *A.*    In part, I believe, he may or may not have.  I'm not sure

22   what was going through the judge's mind.

23   *Q.*   I would ask you to look at page 7 at paragraph 20.

24           Can you find that, sir?

25   *A.*   Yes, sir.

**Flores - Cross / Sabelli**

1  **Q.**  You informed the California state judge to whom you

2  submitted this application that --

3          **MR. SABELLI:**  Quoting from paragraph 20 on page 7 of

4  Exhibit C.

5          I believe the Court has a copy, Your Honor?

6          **THE COURT:**  Yeah.

7  **BY MR. SABELLI:**

8  **Q.**  "MS is a predominantly violent turf-based criminal street

9  gang.  The gang originated in El Salvador and migrated to the

10  United States in the late 1970s and early 1980s."

11          That is what you submitted to the judge in LA; is

12  that correct?

13  **A.**  That's correct, sir.  That is what was submitted, but

14  that's incorrect.

15  **Q.**  That's an opinion you gave to base a judicial order with

16  respect to whether or not a gang injunction would issue, and

17  you're telling us you signed it and it was just plain wrong?

18  **A.**  I believe there is a misunderstanding there as far as the

19  origins, the members that originated -- created Mara

20  Salvatrucha were from El Salvador that came here to the United

21  States during the late '70s and early '80s.

22  **Q.**  Sir, you would agree with me that the phrase, or the

23  sentence:  "The gang originated in El Salvador and migrated to

24  the United States in the late 1970s and early 1980s" is a very

25  clear sentence?

**Flores - Cross / Sabelli**

 1   **A.**  It's clear in the sense of reading it, but understanding

 2   the context of what I know and what I've been consistent with,

 3   and the entirety of my career, yes, I understand it's --

 4   **Q.**  Now, let's talk about the sources of another opinion -- or

 5   let's talk about some of the sources, generally, okay?

 6            I think I understood you correctly, and thank you,

 7   Counsel, for having this repeated because I didn't hear it the

 8   first time:  I believe you told Judge Alsup that over the years

 9   you have interviewed a few hundred MS gang members?

10   **A.**  Correct, some repeatedly.  So, I mean, those can vary.  The

11   amount of interviews conducted overall, but specific

12   individuals, several hundred, yes.

13   **Q.**  Do you remember testifying in a trial in North Carolina

14   this year?

15   **A.**  Yes, sir.

16   **Q.**  And you testified as an expert in that trial?

17   **A.**  That's correct.

18   **Q.**  And that is the -- that was the trial of a man named Umaña

19   *(phonetic)*?

20   **A.**  Yes, sir.

21   **Q.**  Who has since received the death penalty?

22   **A.**  My understanding, yes, sir.

23   **Q.**  Okay.

24            And you were the Government's expert in that case?

25   **A.**  That's correct.

**Flores - Cross / Sabelli**

1    *Q.*   That was in April of this year?

2    *A.*   Yes, sir.

3    *Q.*   And one of the things that counsel asked you about in that

4    case was, like here today, the sources of your opinions.

5    *A.*   Yes, sir.

6    *Q.*   You were asked repeatedly about the sources of your

7    opinions.

8    *A.*   Depending on the context.  I can't recall exactly what was

9    asked, but --

10   *Q.*   Well, for example, you were asked how many Mara Salvatrucha

11   members you personally have interviewed?

12   *A.*   Right.

13   *Q.*   And would it be fair to say that your answer under oath in

14   April of this year to a judge and a jury in a death penalty

15   case in North Carolina, was that you had interviewed well in

16   excess of 2000, either admitted or suspected members of Mara

17   Salvatrucha?

18   *A.*   That's correct.

19   *Q.*   So as I understood you say today, it was a few hundred.

20   *A.*   Specific members that have admitted Mara Salvatrucha, when

21   you factor in the suspected, that does increase the numbers.

22   *Q.*   I'm sorry, so is it your testimony today that when you

23   answered Mr. Leung's question, you were only talking about

24   admitted members?

25   *A.*   Correct.

**Flores - Cross / Sabelli**

1  **Q.** Okay.

2  **A.** Dealing with specific -- as far as admitted, specific Mara

3  Salvatrucha gang members given an estimate of several hundred

4  in relation to adding in the suspected that would factor in the

5  additional numbers.

6  **Q.** Did -- perhaps you can correct me:  Did you at any point

7  during the testimony today, under direct examination by

8  Mr. Leung, attach any importance or talk about the difference

9  between an interview of a suspected member versus an admitted

10 member?

11 **A.** No.  I don't believe that was asked, sir.

12 **Q.** He didn't ask about it?

13 **A.** Not that I recall, specifically.

14 **Q.** Did you talk about it?

15 **A.** No.

16 **Q.** Did you raise it as something that is important with

17 respect to whether or not an interview carries more or less

18 weight with you?

19 **A.** No, it was not asked, and it was not addressed.

20 **Q.** Are you telling us that an interview of a -- an admitted

21 member is more or less valuable than an interview of a

22 suspected member?

23 **A.** It could be, depending on the circumstance of what I know

24 about the suspected member.

25 **Q.** It might be or it might not be?

**Flores - Cross / Sabelli**

1   *A.*  It could be, depending on the individual circumstance.

2   *Q.*  We can't generalize about whether an interview of a

3   suspected gang member is more or less valuable than an

4   interview of an admitted gang member?

5   *A.*  No.  Each event is its own situation where you take the

6   totality of the circumstances that factor into the totality of

7   my experience and my opinions.

8   *Q.*  So that -- that distinction between an admitted gang member

9   and a suspected gang member isn't, in and of itself, something

10  that tells you whether or not an interview is valuable or not?

11  *A.*  No.

12  *Q.*  Now let's talk about your expertise, generally, for a

13  moment.  As I understand it, you have three years of community

14  college?

15  *A.*  Yes, sir, roughly.

16  *Q.*  And no academic training regarding gangs?

17  *A.*  No official academic training, correct.

18  *Q.*  As I understand it, you don't have any academic training

19  regarding how to interview people, let's say, in psychology or

20  sociology?

21  *A.*  No, the majority of my training has come on the job,

22  learned through --

23  *Q.*  Well --

24  *A.*  -- experienced detectives who have performed the jobs and

25  duties through extensive years that I've been privy to and, in

**Flores - Cross / Sabelli**

1  fact, being a student and learning throughout my career as a

2  uniformed officer, through my assignments as a detective,

3  through my assignment in relation to the task force.

4  *Q.* Officer Flores, my question wasn't about the majority of

5  your training, my question is this, and I'll repeat it:

6          You have no academic training in psychology or

7  sociology with respect to how to interview people; is that

8  correct?

9  *A.* That's correct.

10 *Q.* Have you published any papers regarding MS-13?

11 *A.* No, sir.

12 *Q.* Have you published any papers regarding any Hispanic or

13 Latino gang?

14 *A.* No.

15 *Q.* Regarding any gang whatsoever?

16 *A.* No.

17 *Q.* Now, I noticed on your resume that you belong to a number

18 of "gang associations," let's call them, not gangs, but gang

19 investigator associations?

20 *A.* That's correct.

21 *Q.* Have you published in a -- any papers or any articles

22 within the context of those organizations?

23 *A.* No, other than providing training at some of these specific

24 functions for those associations, nothing that I've published

25 officially.

**Flores - Cross / Sabelli**

1   **Q.**   Okay.   And when you have done training with those

2   associations, have you prepared any PowerPoints or

3   presentations that have been included in the materials?

4   **A.**   Primarily photographs that I've used to explain certain

5   trends or activities, but nothing official in the form of

6   context or handouts.

7   **Q.**   Putting aside the photographs, have you -- have you

8   developed any written materials as a lecturer or trainer at any

9   point during your career, not materials you've received, but

10  materials you, yourself, have developed?

11  **A.**   No, nothing that's been handed out or used widely, no.

12  **Q.**   Okay, but you have developed materials that you yourself

13  have used?

14  **A.**   Only in the sense of a PowerPoint and putting together

15  photographs to identify trends and being able to use them as a

16  focal point to develop conversation during some of these

17  training sessions.

18  **Q.**   Have those PowerPoints been disclosed or provided to

19  Mr. Leung or the United States?

20  **A.**   No.

21  **Q.**   How about to the U.S. attorney in the Central District, who

22  is your attorney in the Sanchez case?

23  **A.**   No.

24  **Q.**   Let's talk about your Spanish for a moment.

25          I think you said you're pretty fluent?

**Flores - Cross / Sabelli**

1    A.   Yes, sir.

2    Q.   Okay.  Are you able to converse -- are you able to have a

3    sustained conversation in Spanish?

4    A.   Yes, sir.

5    Q.   Okay.  All right.

6              Are you able to understand slang words in

7    Salvadorian Spanish?

8    A.   Yes, sir.

9    Q.   And I assume that you picked that up through your

10   experience on the street?

11   A.   Yes, sir.

12   Q.   Okay.  All right.

13             Can you tell us what the meaning of the word, or the

14   phrase Mara Salvatrucha is?  How was it originated?  What's the

15   etymology?

16             THE COURT:  Spell that for the court reporter.

17             MR. SABELLI:  Sure.

18             It's M-a-r-a, space, S-a-l, v-a-t-r-u-c-h-a.

19             I had planned on being good and going through the

20   other ones a little bit better, but I thought that one she

21   might have.

22   BY MR. SABELLI:

23   Q.   Can you tell us the origin of that?

24   A.   Yes.  Through the course of my career, there have been a

25   couple of slight variations in the meaning of that phrase, or

**Flores - Cross / Sabelli**

1    the word Mara Salvatrucha.  Mara is a widely used word in

2    Central America to describe a large group of people, or a mob.

3    It's a derogative [verbatim] -- the origin goes back to the

4    Marabunta ant, a fiery ant known in Central America, which

5    is -- also goes to the slang term of a large group of people or

6    a mob.

7            Salva, the origins of the Mara Salvatrucha street

8    gang go back to predominantly a Salvadorian community which

9    originated the gang.

10           It has a second context, which I'll cover after

11   this.  So Salva, tying back to the origin, or some of the

12   origins of the original members of Mara Salvatrucha being

13   Salvadorian.  And then trucha being a slang term, widely used

14   among Hispanic street gangs as a form of a -- kind of a

15   warning, trucha, look out.  Putting into context together of

16   the word, Mara Salvatrucha, meaning a gang, Salvadorians look

17   out.

18           Salva has also been used in the context of the

19   origin of the gang being for self-protection,

20   self-preservation, being used for "save," putting those words

21   together being we are the saviors, look out, as a warning to

22   the rival gangs or the gangs that existed when Mara Salvatrucha

23   originated for self-preservation, self-protection against the

24   existing Mexican street gangs.

25   *Q.*  Your testimony is that the word or the phrase trucha,

**Flores - Cross / Sabelli**

1    t-r-u-c-h-a, is a widely used term on the street to mean

2    something like look out?

3    **A.**   Yes.  It's -- also goes back to identifying a particular

4    fish, but widely spread in Hispanic gang terms, trucha could be

5    a warning sign like Mr. Leung, trucha, meaning law enforcement

6    is coming about or something's coming, kind of a heads up.

7    **Q.**   And you personally have heard that?

8    **A.**   Yes.

9    **Q.**   What about the phrase, klavar, K -- let's spell it with a

10   K, could be with a C, -l-a-v-a-r; what does klavar mean?

11   **A.**   Klavar means to nail.  It can also be used as klaval.  In

12   different terms, different contexts, it could be used to -- "te

13   la vas a clavar" --

14                    **(Court reporter clarification.)**

15        **MR. SABELLI:**  "te, t-e, la, l-a, vas, v-a-s, clavar,

16   c-l-a-v-a-r.

17        **THE WITNESS:**  Again, all of these terms are used in

18   the slang, slang terms.  It could be used to hide a note, to

19   secrete a note, to secrete an item.  Could be a weapon, could

20   be contraband.

21        Clavar can also be used in reference to having sex

22   with a female, or asking, "la vasa clavar," are you going to

23   nail her.  So it's something that can have different meanings,

24   depending on the context.

25

**Flores - Cross / Sabelli**

 1    *BY MR. SABELLI:*

 2    *Q.*  Thank you.

 3              Now, let's talk a little bit about your relationship

 4    to MS-13.  I understand that you have pretty much focused your

 5    career on MS-13 for the last 11 years; is that fair?

 6    *A.*  Roughly, the majority of my time has been spent working

 7    MS-13.  I have, during a period of time, handled investigations

 8    involving other gangs as well.  Los Angeles is a very heavily

 9    populated gang area, so although a majority of my time, even

10    more recently, the entirety of my time has been focused on

11    MS-13, my duties have included working and staying up on trends

12    on other gangs as well.

13    *Q.*  So as I understand it, from the time you first came into

14    the LAPD, you went through the rotation everybody's got to go

15    through, the patrolmen -- patrol person, right?

16    *A.*  Correct.

17    *Q.*  And then almost immediately you were placed into a gang

18    suppression unit?

19    *A.*  Roughly, well after my second year.

20    *Q.*  After you went through the mandatory rotation?

21    *A.*  Correct.

22    *Q.*  You specialized in a gang suppression unit?

23    *A.*  Yes.

24    *Q.*  And that was about 1999?

25    *A.*  Yes.  That was after -- actually, that was probably three

 1  years into my career.  I had worked a year in vice prior to

 2  going into working gangs.

 3  **Q.**  All right.

 4       And you personally feel, whether it's true or not,

 5  that's another issue, I'm not asking you to speculate about

 6  other people, but you feel that the MS gang or some of the MS

 7  cliques in LA have a personal vendetta against you?

 8       **MR. LEUNG:**  Objection, Your Honor.  Personal

 9  feelings aren't really at issue.

10       **MR. SABELLI:**  Your Honor, the witness' credibility,

11  bias, and motive have absolutely to do with every time a

12  witness testifies.

13       **THE COURT:**  Well, at trial that's probably a good

14  point, but we are here to find out about foundation,

15  principally, and I think this sounds like an opportunity to

16  generate impeachment material for trial.  And I don't think we

17  ought to be going down that path.  You got to stick to

18  foundation, this just goes to bias.

19       **MR. SABELLI:**  That is my intention, to stick to

20  foundation.  I've attempted to do so and I will do so, but I

21  will say that Your Honor's going to have to make a choice at a

22  certain point whether or not to believe the foundation as

23  articulated by this witness, and I would like the Court to have

24  all the information necessary to understand this witness'

25  possible bias and interest and motive in testifying here today.

1        **THE COURT:**  How long will this take?

2        **MR. SABELLI:**  Less than two minutes.

3        **MR. LEUNG:**  Your Honor, the purpose of this hearing

4   is specifically to lay a factual foundation for the opinions

5   that were long ago disclosed to the defense.  At this point,

6   Mr. Sabelli is just taking the opportunity to go on a fishing

7   expedition to develop, as the Court pointed out, impeachment

8   material.

9        I note that there are attorneys from LA here as well

10  who are sitting, I think, for this purpose, to see what fruits

11  fall from the tree that Mr. Sabelli is shaking.

12       **THE COURT:**  Where are they?

13       **MR. LEUNG:**  I believe the fellow in the blue suit

14  and blue shirt.

15              **(Pointing to an individual in the rear of**

16              **the courtroom.)**

17       **MR. SABELLI:**  Mr. Flores is a lot bigger than me, I

18  don't intend to shake him that way.

19       **THE COURT:**  This sounds like impeachment material

20  that is not going to be very useful on the immediate question.

21  I think you ought to stick to the immediate question.  So I'm

22  going to sustain that objection.

23       **MR. SABELLI:**  Thank you, Your Honor.

24  BY MR. SABELLI:

25  *Q.*  Let's turn to your connection, if any, with this case

**Flores - Cross / Sabelli**

 1   United States v. Cerna.  You understand that that is the title

 2   of this case?

 3   *A.*  Yes, sir.

 4   *Q.*  Okay.

 5            Now, I understand that you were not involved in this

 6   San Francisco investigation in any way.

 7   *A.*  Correct.

 8   *Q.*  Does that include both the FBI investigation, back in the

 9   time frame of 2004 and 2005, as well as the ICE investigation,

10   which postdated the FBI investigation?

11   *A.*  Actually, sir, I wasn't aware who was lead in the case,

12   specifically.  I knew at some point that there was some kind of

13   MS case going on in San Francisco, the Northern California

14   area, but not specific to who, what, nor any specifics to the

15   individuals that they were investigating other than MS-13.

16   *Q.*  Could you, sitting here today, tell us the name of the

17   clique that these gentlemen allegedly belong to?

18   *A.*  The cliques that I've heard of that I'm aware of were in

19   operation up here in San Francisco were in relation to the 20th

20   Street and Mission, some in relation to a clique that is --

21   also has some connections to Los Angeles, Pasadena clique and

22   relation to a localized clique of, in part, that name here.

23   But outside of that information, privy to none.

24   *Q.*  My question is this:  Do you know which clique is allegedly

25   at issue in this case?

**Flores - Cross / Sabelli**

1   *A.*  No, sir.

2   *Q.*  Now, one of the areas of your expected testimony, as I

3   understand it from the direct examination, would be the

4   international structure of MS; is that right?

5   *A.*  Correct.

6   *Q.*  Now, as I understand it you, don't have any familiarity

7   with the clique that is allegedly on trial here.

8   *A.*  Correct.

9   *Q.*  So if you were to give an opinion about the internal

10  structure of MS in this case, you would simply be applying your

11  knowledge from LA to San Francisco.

12  *A.*  I would be giving my opinion based on the totality of

13  information that I've gathered, not only specifically from LA,

14  but from other areas, other contacts in law enforcement outside

15  of Los Angeles and well into Central America, but specific to

16  those areas and what I've learned as a whole outside of

17  San Francisco.

18  *Q.*  The internal structure of the MS clique, if it exists,

19  could be different from the internal structure you know about,

20  and you wouldn't know about it because you are not familiar

21  with San Francisco.

22  *A.*  That's correct, there could be some variation, of course.

23  *Q.*  Well, it could be completely different and you wouldn't

24  know about it.

25  *A.*  Potentially, yes, sir.

**Flores - Cross / Sabelli**

1   **Q.**  And the same is true with the Local Rules in San Francisco;

2   they could be completely different from the local rules in LA,

3   and you wouldn't know about it.

4   **A.**  That's a possibility.  Understanding the way the gang runs

5   as a whole, the nature of the cliques that I've investigated

6   that I've been in contact with, understanding that even from

7   law enforcement contacts and communication on the East Coast, a

8   lot of the cliques are run generally along the same lines with

9   following, generally, the same rules.  But that would be in

10  retrospect with law enforcement contacts, communication Back

11  East or in Central America as well.

12  **Q.**  You're talking generally about the way cliques are

13  organized or generally about the rules that cliques follow,

14  right?

15  **A.**  Specific to MS-13, yes, sir.

16  **Q.**  And to borrow your terminology, there could be variations?

17  **A.**  There could be some variations.  There are variations even

18  within Los Angeles, depending on the outlying factors of the

19  clique, the size, the time in existence, the law enforcement

20  effect on the individual clique members that are in or out of

21  custody, all those factor in cliques, whether they are from

22  Los Angeles or Maryland or El Salvador.

23  **Q.**  And you wouldn't know what those variations are because you

24  are not familiar with this case?

25  **A.**  Correct.

**Flores - Cross / Sabelli**

1   *Q.*  Have you reviewed any investigation or prosecution

2   materials related to this case?

3   *A.*  No, sir.

4   *Q.*  Okay.

5           I notice that in the -- in Exhibit 1 that Mr. Leung

6   went over with you there was reference to some photographs.

7   *A.*  Correct.

8   *Q.*  Have you seen those photographs?

9   *A.*  No, sir.

10  *Q.*  So those are incorporated in your -- in that summary of

11  your opinions, but you haven't seen them?

12  *A.*  No, sir.  To have an individual opinion on those photos, I

13  would have to review them, specifically.  But like I explained

14  before, I've been privy to investigations, search warrants

15  where I've recovered search warrants of varying types where

16  members are displaying hand signs or graffiti has been

17  memorialized on videos --

18  *Q.*  When you looked at that Exhibit 1 that Mr. Leung asked you

19  to look at, and you said hey, everything here comports or is

20  consistent with my view, you didn't point out for us that you

21  hadn't seen those photographs.

22          *MR. LEUNG:*  Objection, Your Honor.

23          As stated earlier on the record, that is a trial

24  issue.

25          *MR. SABELLI:*  This is not a trial issue.

 1          **THE COURT:**  I don't agree with that.  You are

 2    supposed to lay out everything he is going to say at the trial.

 3    And if he is going to be shown a gruesome photograph at trial

 4    with gang signals in there, that should be in this report, this

 5    summary.

 6          **MR. LEUNG:**  The demonstratives were listed in the

 7    report with specific reference to Bates numbers.

 8          **THE COURT:**  But he's never even seen the

 9    demonstratives, so how are we go to know that he can back up --

10    or what he would propose to say on those demonstratives?

11          **MR. LEUNG:**  Your Honor, those demonstratives will

12    come in through other foundational witnesses.

13          **THE COURT:**  Yes, perhaps so, but that doesn't mean

14    his opinions about them come in.

15          **MR. LEUNG:**  His opinions won't be based on those

16    demonstratives, rather, those demonstratives were the example

17    of those opinions that were independently collected.

18          **THE COURT:**  I don't agree with that mode.  I'll give

19    you an -- I'll let you reopen your examination and show him

20    each demonstrative, if you want to do that, but I do not agree

21    that you can do that on the fly at trial, in terms of his

22    opinion.

23          **MR. LEUNG:**  In that case, I would like to ask for a

24    break later on and print out these demonstratives, which we

25    identified by Bates number to the defense long ago, and do that

**Flores - Cross / Sabelli**

1    on redirect.

2              **THE COURT:**  I will let you do that on redirect,

3    but --

4              **MR. SABELLI:**  We have no objection.

5              **THE COURT:**  But if -- I'm sorry, Mr. Sabelli.

6         What?

7              **MR. SABELLI:**  I don't have any objection.  I would

8    rather have it laid out now than on the fly at trial.

9              **THE COURT:**  All right, we'll continue on with your

10   examination, and we'll come back to the demonstratives.

11             **MR. SABELLI:**  So I'll reserve this area, then,

12   until --

13             **THE COURT:**  Please do.

14             **MR. SABELLI:**  Thank you.

15   **BY MR. SABELLI:**

16   **Q.**  Continuing on with the issue, or the area of your

17   connection to this case in San Francisco, are you aware of

18   whether or not the case in San Francisco is based upon any

19   informant testimony?

20             **MR. LEUNG:**  Objection.  This is a question about the

21   investigation in San Francisco?

22             **THE COURT:**  Well --

23             **MR. LEUNG:**  I don't see the relevance to Detective

24   Flores' expert opinion.

25             **MR. SABELLI:**  I can answer that at sidebar.  I would

**Flores - Cross / Sabelli**

1    rather not do that in front of the witness.

2           **THE COURT:**  I'm going to overrule the objection

3    because the Government itself went to some trouble to

4    demonstrate the extent to which he was or was not plugged into

5    the investigation up here.  This is a reasonable follow-up

6    question.  I don't see the relevance yet, but soon the scales

7    will probably fall from my eyes, Mr. Sabelli, so you may I

8    continue.

9           Objection overruled.

10          **MR. SABELLI:**  Judges often say that, Your Honor,

11   when I sit down, and I'm done with the cross-examination.

12               **(Laughter.)**

13   *BY MR. SABELLI:*

14   *Q.*  Mr. Flores, I take it you are not familiar with whether or

15   not this -- the San Francisco investigation was based upon

16   informant testimony?

17   *A.*  I'm not aware of the entirety of what the case is based

18   upon, but I know that at least there has been use of some

19   informant or informants, but specifically to the basis or the

20   knowledge or what's being said or done about the case, I have

21   no idea.

22   *Q.*  Are you familiar with either one, and I'm not using their

23   names, but are you familiar with either of or any of the

24   informants that may be used by the prosecution in the

25   San Francisco case?

```
 1              MR. LEUNG:  Objection.  Your Honor.

 2              This is straying far from the purpose of this

 3   hearing.

 4              MR. SABELLI:  It is not, Your Honor.

 5              THE COURT:  This is within the scope of what you

 6   brought up yourself.  So the objection is overruled.

 7              Go ahead.

 8              THE WITNESS:  Yes, I am familiar with one.

 9   BY MR. SABELLI:

10   Q.  One, and not more than one?

11   A.  Correct.

12   Q.  As an expert, are you familiar with whether or not this

13   person would be in a position to articulate his or articulate

14   any testimony or give testimony about the structure of MS-13 in

15   San Francisco?

16   A.  I'm not aware whether the person can or cannot,

17   specifically --

18   Q.  Are you aware --

19   A.  -- to what he knows about San Francisco.

20   Q.  I'm sorry, I cut you off.

21   A.  No, specifically, what his knowledge is about San Francisco

22   I'm not -- or can't recall exactly what he does or does not

23   know.

24   Q.  And with respect to this informant, do you know whether or

25   not this person is in a position to give testimony about what
```

1  the rules are for MS in San Francisco at a given point in time?

2  **A.**  I'm not aware of what he can or cannot say.  I only know my

3  interaction with this informant was in relation to activities

4  or potential knowledge that he may have had or was tied into

5  our case in Los Angeles.

6  **Q.**  Okay.  And that's because this informant --

7           **MR. SABELLI:**  Your Honor, I take it I'm permitted to

8  use his name now that it's public record.  Does the Court have

9  any order about that at this point?

10           **THE COURT:**  Is that true?  Is it public record?

11           **MR. LEUNG:**  I believe so, Your Honor.

12           **MR. SABELLI:**  He's testified in the Nochez trial.

13           **THE COURT:**  If that's the one you are referring to,

14  yes, you may go ahead.

15  **BY MR. SABELLI:**

16  **Q.**  We're talking about -- do you know a man by the name of

17  Jaime Martinez.

18  **A.**  Yes, sir.

19  **Q.**  Also known as SF 1218?

20  **A.**  Yes, 1218.

21  **Q.**  And the reason you are somewhat familiar with him is that

22  SF 1218, or Jaime Martinez, has said he has information related

23  to the Sanchez case?

24  **A.**  In part --

25           **MR. LEUNG:**  Objection, Your Honor.

```
 1              MR. SABELLI:  Your Honor, this goes to the sources

 2    of this witness and whether or not this witness has any idea

 3    about the credibility of his sources.

 4              This Court is going to have to make an assessment

 5    about the source and the uses of sources, and that's what I'm

 6    going to now.

 7              THE COURT:  Well, I think you ought to know, this

 8    sounds too much like you are trying to get evidence for the

 9    fellow in LA to use down there, and I'm not going to allow

10    that.

11              You ought to ask a preliminary question whether this

12    witness based any of his opinions on what that 1218 said.  And

13    if he says, yes, then I'll let you follow up.  If he says, no,

14    he doesn't base his opinions on that.  Then I think that's the

15    end of it.

16              MR. LEUNG:  Thank you, Your Honor.

17    BY MR. SABELLI:

18    Q.  In your opinions in the LA case, did you base them at all

19    on what SF 1218 told you?

20    A.  No.

21    Q.  Not at all?

22    A.  No, I mean, the basis of everything we have learned in

23    Los Angeles, this was in addition to what we already knew or

24    had information about.  But specifically to say that I learned

25    or our case was based on him is not true.
```

**Flores - Cross / Sabelli**

1    *Q.*  I didn't ask that question.

2          What I'm asking you is this:  With respect to the LA

3    case, and I'm going to come to the San Francisco case in a

4    moment:  With respect to the LA case, when you learned this

5    information from San Francisco 1218, did that support your

6    opinions about the Los Angeles case?

7          *MR. LEUNG:*  Objection, Your Honor.

8          Why are we asking about opinions in the Los Angeles

9    case?

10         *THE COURT:*  Sustained.

11         *MR. SABELLI:*  May I respond?

12         *THE COURT:*  Yes.

13         *MR. SABELLI:*  This goes to the witness'

14   self-proclaimed ability to assess the reliability of an

15   informant and validate informant information.  We heard

16   repeatedly this morning, and I can represent to the Court that

17   having read many of this man's transcripts, what he says he

18   does is to compare and validate information that he's gotten

19   from informants.

20         In this case, we have an informant, 1218,

21   Jaime Martinez who is part of the LA investigation, who is

22   being used in the LA investigation against Mr. Sanchez; I want

23   to know whether or not this witness knows that Mr. Martinez

24   encouraged Ana Ramos to lie.

25         And the reason that that is important is that if

**Flores - Cross / Sabelli**

```
 1    this man doesn't know that information, if he doesn't even know

 2    when the Government has it, then he cannot be in a position and

 3    cannot proclaim that he can assess the reliability of any

 4    informant.

 5              THE COURT:  That's too far afield for today's

 6    purpose.

 7              Maybe -- I'm just saying maybe at trial that would

 8    be allowable, but that's too far afield for today's purpose.

 9              The objection is sustained to this line of

10    questions.

11              MR. SABELLI:  Thank you, Your Honor.

12    BY MR. SABELLI:

13    Q.  Let's talk a little bit about the scope of your opinions

14    about the existence of a gang and the structure, or existence

15    of MS-13 and the structure of MS-13, okay?

16    A.  Okay.

17    Q.  All right.

18              Now, you understand that in a RICO case the

19    existence of the gang and the structure of the gang are

20    elements of the crime?

21    A.  Yes, sir.

22    Q.  Now -- and that's because you are one of the lead agents in

23    the LA case?

24    A.  Yes, sir.

25    Q.  And other cases?
```

**Flores - Cross / Sabelli**

1   **A.**  Other cases I've investigated throughout the course of my

2   career where I've established, there is some structure to Mara

3   Salvatrucha, which is divided up by cliques or identified by

4   clique names in particular areas, which is widespread into the

5   United States and to Central America at well.

6   **Q.**  Okay.

7   **A.**  That's come through the totality of my experience in

8   working gangs or working Mara Salvatrucha, as a whole.

9   **Q.**  Let's just get down to brass tacks on this one, okay?

10          Is there any way you can testify as an expert in

11  this case without telling the jury in this case that MS-13 is a

12  gang?

13          **MR. LEUNG:**  Objection.

14          **THE COURT:**  What is the objection?

15          **MR. LEUNG:**  That question would seem to ask a legal

16  question of the detective.

17          **THE COURT:**  I think it's a fair question.

18  Overruled.

19          Please answer.

20  **BY MR. SABELLI:**

21  **Q.**  Do you understand the question?

22  **A.**  I'm not sure I understand your question completely, but

23  referring --

24  **Q.**  Let me ask it again.  I don't want you to answer a question

25  you don't understand.

**Flores - Cross / Sabelli**

1   A.  Sure.

2   Q.  All right.

3           Is there any way you can testify in this

4   San Francisco case and not tell the jury that MS-13 is a gang?

5   A.  It would -- possibly.  I mean, classify it as a criminal

6   organization, a gang is generally the term that I've come to

7   know it, because by definition it is a gang.  Substituting any

8   word to fit that, is a possibility, but knowing what I know

9   about the organization about Mara Salvatrucha, it is, by

10  definition, a gang.

11  Q.  So I take it the answer to that question is, no, you could

12  not testify as an expert in this case without telling the jury

13  that Mara Salvatrucha is a gang?

14  A.  Sir, by definition it is a gang, but if ordered by the

15  Court to refer to it as a criminal organization or by other

16  word or descriptor that the Court chooses, I mean, I would do

17  so.

18  Q.  How about the structure of MS-13, the internal structure of

19  MS-13, could you testify as an expert in this case and not tell

20  the jury what that internal structure of MS-13 was?

21  A.  Specifically to -- in general terms, I could specify that

22  the gang has leaders that are referred to by a variety of slang

23  terms, that some cliques are more organized than others.  But

24  my specific knowledge in terms of the cliques here in

25  San Francisco I would not know, specifically.

**Flores - Cross / Sabelli**

1  *Q.*  And you would agree with me that if you characterize an

2  organization or a group as having leaders and having differing

3  levels of organization, you are testifying that that group has

4  a structure?

5  *A.*  In terms of -- that would be the opinion of the listener,

6  or the person hearing that testimony, to either understand

7  that, and classify that as such or not.

8  *Q.*  Well, they would understand it because that's what you

9  would be telling them, you would be telling them that MS has

10  leaders, and MS, depending on the clique, has differing levels

11  of organization.

12  *A.*  Correct, I mean, in telling them these factors, but in the

13  end, the opinion or the decision would be the -- to the

14  listener.

15  *Q.*  Could you testify in -- as an expert in this case without

16  telling a jury that MS uses violence as a means of achieving

17  its objectives?

18  *A.*  No, sir, it's been my experience that the gang does use

19  violence as a mean of completing its objectives.  I mean, it is

20  a violent gang, and that's been my experience, so by saying

21  it's not, I'd be lying.

22  *Q.*  Could you testify as an expert in this case without telling

23  a jury that MS commits murders, extorts monies -- money, sells

24  drugs or intimidates witnesses?

25  *A.*  I could tell them that they are involved in these

1   activities as well as others.  Specific to what's going on

2   locally, I could not tell them.

3   **Q.**  So your testimony --

4   **A.**  But in general terms, I can tell them what's been my

5   experience in terms of what I've been personally involved in,

6   what I've shared with law enforcement and what I've been told

7   by law enforcement abroad, experiences I've had with other

8   particular gang members that are well traveled.  But specific

9   to what is going on here in San Francisco, I could not.

10  **Q.**  If you testify as an expert in this case, am I correct, is

11  it a fair statement, that you would, of necessity, have to

12  mention what you consider a fact that MS commits murders,

13  extorts monies, sells drugs, or intimidates witnesses?

14  **A.**  The fact that they are involved in those types of

15  activities, yes.

16  **Q.**  Let's turn to your methodology, the way that you process

17  the information you get from your sources.  We'll turn to your

18  sources in a little while.

19          Is there a specific analytic procedure or method or

20  information gathering you have applied consistently throughout

21  the years in which you -- in which you have acquired your

22  information regarding MS-13?

23  **A.**  Yes, sir.  It's been more of just a personal style of

24  common sense and being able to validate all the information

25  that I get, whether it's verbal or it's something that, you

**Flores - Cross / Sabelli**

 1  know, is given to me in the form of some type of evidence,

 2  which may be ambiguous.

 3          It's being able to find a way to validate that

 4  through other hard evidence, through other statements, through

 5  wiretaps, through conversations with law enforcement from other

 6  divisions or other agencies, or even in talking to law

 7  enforcement abroad in Central America.

 8          Depending on the circumstance, there are different

 9  methods or methods that I would go to to try to validate

10  information.  Some would be a lot easier than others, but it

11  would depend on the circumstance.

12  *Q.*  Okay.  So let me see if I understand it.  That was a long

13  answer, and I want to see if I understand it.

14          You are telling us that the primary method you have

15  is to gather information through interviewing people, and that

16  you then try to validate that?

17  *A.*  Interviews is one source of -- way of receiving

18  information.  Wiretaps, conversations with law enforcement,

19  conversations with people in the community, personal

20  observations through surveillance, through other

21  investigations, crime reports, through persons and

22  conversations with people in the community.  There are varying

23  types of sources to validate information or gather

24  intelligence.

25  *Q.*  Would you agree with me that the primary method you use as

**Flores - Cross / Sabelli**

1    an expert is to gather information by interviewing people?

2    *A.*   Talking to people in general is, yes, a large portion of

3    that.

4    *Q.*   All right.  And when you say "large portion," you mean

5    large portion of your information gathering?

6    *A.*   Correct.  I mean my knowledge as a whole in talking to

7    people.

8    *Q.*   Okay.

9              And within that, one of the types of interviews that

10   you have consists of interviews that we could call custodial

11   interviews, meaning people who are in custody?

12   *A.*   Correct.

13             Detention, custodial, yes, sir.

14   *Q.*   Certainly, when somebody is in detention or in custody and

15   you are talking to them, they know you are a police officer?

16   *A.*   Correct.

17   *Q.*   Fair to say, though, that generally speaking in the

18   communities that you work in LA, most people know that you are

19   a police officer?

20   *A.*   Generally, yes, sir.

21   *Q.*   Most -- almost everybody you talk to on the street, they

22   know you are a police officer?

23   *A.*   If I'm talking to -- speak to somebody, I identify myself,

24   yes.

25   *Q.*   Okay.  So even if they don't already recognize you, you

**Flores - Cross / Sabelli**

1  identify yourself?

2  *A.*   Yes.

3  *Q.*   And you are so well recognized in the community that you

4  take pains not to corner people and talk to them on the street

5  because they might get in trouble or they might be nervous?

6  *A.*   Correct.

7  *Q.*   And I believe you told us about that earlier during direct

8  examination?

9  *A.*   Yes, sir.

10  *Q.*   Okay.  So even in your noncustodial interactions with

11  people, people are aware that you are a police officer?

12  *A.*   Yes, sir.

13  *Q.*   And I take it that many of the people are aware that you

14  are -- many of the MS members, in particular, are aware that

15  you have a particular concern with gangs?

16  *A.*   That my assignment is working gangs, yes, I think they are

17  aware of that.

18  *Q.*   And in your experience, many of the people you talk to seem

19  to already know that, to know that you are investigating gangs?

20  *A.*   Gang members, themselves, they know that that is our

21  specific assignment, and the nature of our assignment is to

22  inquire about gangs, or their particular gang.

23  *Q.*   And focusing on this information gathering through

24  interviewing, both in the custodial and in the noncustodial

25  context, in those contexts, you can derive information about

**Flores - Cross / Sabelli**

 1   any of the subjects we've talked about this morning.

 2   **A.**   Correct.

 3   **Q.**   Okay.  And so I'm assuming, and correct me if I'm wrong,

 4   the people who you interview in that context could take the

 5   witness stand, like you, and give their view of what the rules

 6   are of MS-13?

 7   **A.**   They could give their perspective on the rules, depending

 8   on the member, their time, their knowledge of the gang, how

 9   long they've been involved.  Those would all be factors in what

10   they know or how much they know.

11   **Q.**   An MS member needs to know the rules, or he could be

12   punished?

13   **A.**   Correct.

14   **Q.**   An MS member needs to know the rules or he could be killed

15   for transgressing a rule?

16   **A.**   Correct.

17   **Q.**   In your experience, MS members tends to know the rules of

18   MS?

19   **A.**   Yes.

20   **Q.**   Particularly people who are high up in the organization,

21   right?

22   **A.**   Correct, they know who is generally in charge, or who is

23   the person of some weight within the gang.

24   **Q.**   Because those folks are people who tend to be leaders,

25   whether they are all the way up at shot callers or not, those

**Flores - Cross / Sabelli**

1    folks not only need to obey the rules to avoid getting hurt,

2    but they also have to enforce the rules?

3    *A.*    Depending on what is dictated by the individual shot caller

4    or the clique.

5    *Q.*    So somebody who is, let's say, a long-term member of MS-13,

6    that person would be in a position to testify about the rules

7    of MS-13 in his or her locality?

8    *A.*    That person can, depending on their involvement in the

9    gang, whether or not potentially they may have spent a long

10   period of time in custody and may be out of the loop, per se,

11   on the clique's activities.  So depending on the factors, they

12   could be.

13   *Q.*    So assuming that somebody hasn't been in custody for a long

14   time, has been a member of a clique, has been jumped in and

15   been a member of a clique for, let's say, six months to a year,

16   that person would be in a position to testify about the

17   internal rules of MS-13 in his or her locality?

18   *A.*    Correct.  And again, factoring in the -- you know, the size

19   of the clique, how active the clique is, depending on the

20   clique's activity, as a whole, whether or not the clique is

21   active, conducting meetings, or has enough members on the

22   street to have some of these meetings.

23   *Q.*    And the same is true, for example about what happens at

24   meetings:  Somebody who is a member who has attended meetings

25   could testify about what those meetings are like?

1   **A.**  Correct, depending on what kind of business is conducted at

2   a specific meeting.

3   **Q.**  Right.

4   **A.**  Or whether or not somebody is, per se, disciplined during a

5   meeting or whether or not it was just a meeting that -- where

6   information was shared, depending on what type of business was

7   conducted.

8   **Q.**  I'm not asking about what is happening at the meetings, I'm

9   just talking about -- I'm asking you about whether or not an MS

10  member who has been in a clique for 6 to 12 months would be in

11  a position to testify about what happens at meetings.

12  **A.**  Correct.  I mean, they can, depending on again certain

13  factors yes.

14  **Q.**  It's a rule that you have to go to meetings unless you get

15  a pass?

16  **A.**  Correct, or you are incarcerated, obviously.

17  **Q.**  Okay.

18          Now, turning to, just generally, the opinions you

19  have given about the connection between cliques in varies

20  cities, I understand that you are mostly focused on LA, but I'm

21  talking about the connections between different cities, there

22  are some MS members who are aware of cliques in other cities

23  than the one that they belong to?

24  **A.**  Correct.

25  **Q.**  Okay.  And, in fact, there are some MS members who are in a

**Flores - Cross / Sabelli**

1   position where they are in a national leadership position,

2   according to you?

3   **A.**   Correct.

4   **Q.**   And one of those, for example, is one of the informants in

5   the Los Angeles case, Mr. Piñeda?

6   **A.**   Correct.

7   **Q.**   And in part, your opinions --

8

9          **MR. SABELLI:**   That is Jorge Piñeda, P-i-ñ-e-d-a.

10   **BY MR. SABELLI:**

11   **Q.**   And your opinions in the LA case are based in part upon

12   what Mr. Piñeda has told you?

13   **A.**   No, I have not had any personal conversations with

14   Mr. Piñeda.

15   **Q.**   Would you agree that Mr. Piñeda would be in a position to

16   testify about the relationship, if any, between the

17   San Francisco clique and the LA clique?

18          **MR. LEUNG:**   Objection, Your Honor.

19          **THE COURT:**   Why are we getting into the LA thing?

20          **MR. SABELLI:**   Your Honor, because one of the

21   questions the Court has posed to us is, is this expert being

22   used as a shortcut for factual testimony that could be given by

23   an informant.   And the point I'm making to the Court, I'm

24   trying to make to the Court, obviously not doing very well at

25   it, is that there are Government informants who could testify

**Flores - Cross / Sabelli**

1   and whose credibility could be tested by the jury who could

2   testify to exactly the same things that this gentleman,

3   Mr. Flores, is being proffered for.

4           In other words, Mr. Flores -- or Mr. Leung wants

5   Mr. Flores to give an opinion about the relationships between

6   cities and how many people belong to MS and those sorts of

7   things, those can be testified to by Mr. Piñeda or other

8   Government informants.  And the jury can look them in the eyes

9   and say, is this person telling the truth or not.  And we don't

10  have to have that kind of opinion cloaked in the mantel of an

11  expert.

12          **MR. LEUNG:**  And that is precisely not the subject of

13  this hearing, Your Honor.  This hearing is to evaluate

14  Detective Flores' opinions, as disclosed to the defense.  It is

15  not, as Mr. Sabelli keeps trying to do, injecting 403 arguments

16  or 702 arguments.

17          **MR. SABELLI:**  Your Honor, I would like to quote from

18  the Court's order at line 22.  This is document 2288 --

19          **THE COURT:**  Go ahead.  What is it?

20          **MR. SABELLI:**  It's the order re:  Pre-trial

21  evidentiary hearing re: proposed gang experts.

22          **THE COURT:**  Yes?

23          **MR. SABELLI:**  "Therefore, we will follow the Mejia

24  framework" --

25          That's M-e-j-i-a.

**Flores - Cross / Sabelli**

1          Specifically, each proffered opinion" -- and

2     "opinion" is in quotations -- "by each expert will be examined

3     to ensure that the opinion is actually based on specialized

4     knowledge that assists the jury," comma, "is not being offered

5     as a shortcut for factual evidence," comma, "and is simply not

6     a repetition of hearsay."

7          What I'm pointing out is that some of these larger

8     issues, in addition to maybe just plain sometimes being wrong,

9     like the origins of MS-13, some of these general issues can be

10    testified to by Government informants available to Mr. Leung.

11         *MR. LEUNG:*  And that's not covered in the Court's

12    order, Your Honor.

13         *MR. SABELLI:*  I've just --

14         *MR. LEUNG:*  The availability of alternative evidence

15    is not an issue, it's not in the order.

16         *MR. SABELLI:*  Your Honor, I understand the Court to

17    be asking us, is this a shortcut for factual evidence --

18         *THE COURT:*  Well, look, I agree that at the end of

19    the process the Mejia framework asks that question, but I know

20    enough about the case to know that the Government has firsthand

21    witnesses that can come in and testify to how the meetings were

22    conducted, and so forth, so that we don't need expert testimony

23    to cover those points.  I -- let me pause.

24         Does the Government disagree with what I just said?

25         *MR. LEUNG:*  Your Honor, we would disagree with the

1   conclusion that we can cover those points only through

2   cooperators, but that's a separate issue.

3          **THE COURT:**  That's a separate issue.

4          **MR. LEUNG:**  There are cooperators.

5          **THE COURT:**  Right now, you have witnesses that can

6   come in and speak from firsthand memory as to how the structure

7   operated.  You don't need an expert to do that.  That doesn't

8   mean the expert is not admissible, but it may be a factor.

9          So I think on this one it's just argumentative,

10  Mr. Sabelli, to say, well, the informant can come in and tell

11  us about that part, so therefore -- that goes to -- I didn't --

12  I went on in that order to say, "to this end the Government

13  will have an opportunity to demonstrate that its gang expert

14  testimony qualifies for presentation to the jury."

15         And I suppose I could have been clearer, but I think

16  that what we ought to do from this witness is get the

17  foundation for his opinions rather than ask the question, well,

18  okay, whether you have that opinion or not, wouldn't a

19  percipient witness also be able to testify to those points.

20  That's just an argumentative point, and we don't need to take

21  time up with that.

22         I understand that they have percipient witnesses.

23         **MR. SABELLI:**  I agree with that, generally, I just

24  wanted to make that point, which was not in the record up to

25  now in this case, having to do with witnesses that are

```
 1   available from outside of San Francisco to testify about some

 2   of the nonSan Francisco issues that this man is being proffered

 3   for.

 4          So I don't intend to take any time with respect to

 5   the folks here, informants available with respect to the

 6   San Francisco case, I'm simply trying to lay a record so the

 7   Court understands that there are alternative nonexpert

 8   witnesses who can testify --

 9          THE COURT:  So your point is that even in LA there

10   would be a fact cooperator who could come in to make the same

11   points?

12          MR. SABELLI:  Yeah.  And with respect to any

13   potential ties between San Francisco or LA that the Government

14   intends to prove, that could be proffered through, or proven up

15   through nonexpert, that is, lay testimony.  And I simply wanted

16   the Court to be aware of that.

17          This seemed like the witness who was able to do

18   that, and so I took a couple of minutes to do that.  But I've

19   made --

20          THE COURT:  But you were asking about San Francisco,

21   though, that's why I -- weren't you?

22          What was the name of the fellow you were asking

23   about?

24          MR. SABELLI:  I first asked about Martinez, but that

25   was a while ago.  And now I was asking about a gentleman by the
```

1   name of Piñeda.

2            **THE COURT:**  Is he in LA or here?

3            **MR. SABELLI:**  In LA.

4        **MR. LEUNG:**  And the question was, did Detective --

5   and one of the preliminary questions was, did Detective Flores

6   rely on Piñeda for any of his opinions, and the answer was, no.

7   That should answer the question.  That should settle the line

8   of inquiry.

9            **THE COURT:**  Is that correct?  Why isn't that

10  correct?

11       **MR. SABELLI:**  Your Honor, first of all, I'm

12  flabbergasted to hear the answer.  And I think in the

13  post-trial briefing -- the post-hearing briefing we'll address

14  this point.

15           But for the Court's information, there are two

16  principal informants in LA, Comandari, C-o-m-a-n-d-a-r-i, and

17  Mr. Piñeda, they are the bull work of the LA case.  And so for

18  an expert here to back off of relying on them is somewhat

19  surprising.  And I think the Court will not accept that

20  representation as true once we are able to brief this issue and

21  bring in all the evidence and put it in context.

22       **MR. LEUNG:**  Mr. Sabelli's claim unfortunately relies

23  on assumptions that are simply incorrect.

24           For purposes of today's hearing, Your Honor, the

25  witness has testified that he did not rely on Piñeda, and that

**Flores - Cross / Sabelli**

```
 1   should end the inquiry.

 2          THE COURT:  I think that ought to end the inquiry

 3   for our purposes.  If you have contrary evidence, I guess you

 4   can bring it out.  But if he didn't rely on it, end of story;

 5   isn't that true?

 6          MR. SABELLI:  Well, Your Honor, the purpose of this

 7   hearing is to determine what the source is, what the bases of

 8   this person's opinion are.  That doesn't mean we need to accept

 9   his representations as being comprehensive or in all cases

10   true.

11          Sometimes he might be wrong:  He was wrong about an

12   opinion where MS originated.  Or, he might have other motives

13   for not acknowledging that somebody is a source of an -- for

14   one of his investigations or opinions.

15          In any case --

16          THE COURT:  But there is a limit to the amount of

17   time we can invest in this.  And we are going to be here

18   tomorrow, for sure, but I just question the value of -- all

19   right, I'm going to give you one more minute on Mr. Piñeda and

20   LA, and then we are going to move to something else.

21          MR. SABELLI:  Your Honor, I hate to say this --

22          THE COURT:  If one minute won't work, then skip it

23   altogether.

24          MR. SABELLI:  No, no, no, I was done with it.  I was

25   already done with it.
```

 1            **THE COURT:**  Then let's move to a new to issue.

 2            **MR. SABELLI:**  I'm just answering the relevance

 3    objection.

 4            **THE COURT:**  All right.

 5    **BY MR. SABELLI:**

 6    **Q.**  Okay, shifting gears and focusing on this issue of

 7    validation that you brought up, as I understand it, you get

 8    information, perhaps through an interview, and you have to

 9    validate that information somehow; is that right?

10    **A.**  Correct.

11    **Q.**  That's what I understood you to be saying; is that correct?

12    **A.**  Yes, sir.

13    **Q.**  Okay.

14            Can you give us an example of any opinions that

15    you've held as an expert that you have at some point withdrawn

16    or reversed or revised in light of this validation process that

17    you go through?

18    **A.**  I don't understand your question, sir.

19            Specifically to somebody -- a tattoo or something

20    specific?

21    **Q.**  Any opinion about any subject.

22    **A.**  There have been trends that have changed in the factor of

23    gang members tattooing themselves where at the beginning of my

24    career it was something that was very prevalent, that they were

25    very outward about putting tattoos on identifiable places of

1    their bodies to the point now where it's not as common.  So the

2    opinion on that has changed, as an example.

3    *Q.*  So the example that we talked about earlier with the -- the

4    origins of MS in El Salvador versus the United States, that

5    wasn't an opinion you changed, that was just something that was

6    wrong in the declaration?

7    *A.*  Correct, sir.

8    *Q.*  Okay.

9    *A.*  I think it was simply a misunderstanding there.

10   *Q.*  Okay.

11          Are you familiar with something called a Cal Gang

12   database?

13   *A.*  Yes, sir.

14   *Q.*  And that is a database that law enforcement officials can

15   belong to?

16   *A.*  That is a tool that some law enforcement agencies belong to

17   and utilize, yes, sir.

18   *Q.*  Okay.  And one of the things you can do is submit names or

19   identities of gang members into that database?

20   *A.*  Correct.  It is kind of a pointer system, where, in fact,

21   some information is uploaded from arrests, stops, photographs

22   that are taken by participating law enforcement agencies.  But

23   it is a tool that, basically, it is as good as the inputter.

24   *Q.*  It's a tool that's as good as the inputter?

25   *A.*  Correct.

**Flores - Cross / Sabelli**

1   **Q.**   The person that put information into it?

2   **A.**   Correct.

3   **Q.**   Have you personally used the Cal Gang database?

4   **A.**   Yes, I've used it in my career.

5   **Q.**   Have you taken information from it?

6   **A.**   I've resourced it as a resource, again.  But even

7   information that I've gathered through there, I've made it a

8   point to validate, either through actual hard police reports or

9   field interview cards, a ticket, because, again, at times it is

10  only as good as the person that is inputting the information.

11  **Q.**   Have you input names of gang members into the Cal Gang

12  database yourself, personally?

13  **A.**   Yes, for a period of time I have.

14  **Q.**   Have you ever been wrong and gone back and taken somebody's

15  name out?

16  **A.**   Not necessarily an individual, but, for example, a moniker

17  that a person will initially identify themselves as, for

18  example, Dopey, and through a series of validating, you find

19  out that the person's true name is Bashful, and that is

20  something that would be added or corrected.

21  **Q.**   Have you ever -- back to my question:

22         Have you ever taken somebody out of the database

23  where you personally put into it because you were wrong and

24  that person wasn't a gang member?

25  **A.**   No.  There is a validation process, again, for even

**Flores - Cross / Sabelli**

1  inputting a person into the system.

2  *Q.*  Does that mean that you have never been mistaken in your

3  opinion about gang members that you have identified, that you

4  personally have input into the Cal Gang database?

5  *A.*  Correct.  I mean, in my opinion, anybody that I have

6  inputted I've gone through the validation process, which is

7  part of the protocol for even utilizing the Cal Gang system.

8  *Q.*  Has anybody ever brought to your attention from another

9  jurisdiction, or even the LAPD, hey, you labeled this guy a

10  gang member but he's not?  Has that ever happened?

11  *A.*  No.  I believe the only experiences I've had are similar to

12  a moniker or a particular clique where the person was wrong in

13  relation to these types of mistakes or errors, but

14  understanding that sometimes gang members do change their

15  monikers willingly or do change their association with

16  particular cliques, they will move to a different area and

17  become part of that clique or go ahead and get jumped into that

18  clique.

19  *Q.*  Focusing on this idea of potential error in your opinions

20  or identification of gang members, or both, are there any times

21  you can tell us that somebody, whether it's a colleague in the

22  LAPD or a colleague in one of the gang associations you belong

23  to has told you that one of your opinions is wrong?

24  *A.*  I've had different encounters with different law

25  enforcement agencies where we may have a different opinion,

**Flores - Cross / Sabelli**

 1    obviously, to the extent of even the origin of the name, Mara

 2    Salvatrucha, which is the two meanings that I explained

 3    earlier.  But obviously, different perspectives, you may have a

 4    variation of opinion, but not necessarily a conflict.

 5    *Q.*  Can you give us any examples of any times that you have

 6    conflicted with or been in disagreement with somebody else who

 7    you considered to be a gang expert regarding MS-13?

 8    *A.*  Not that I can recall, specifically.  I know there have

 9    been other experts that have given different opinions, but none

10    where I've personally come into conflict with.

11          I guess they base their opinion based on what they

12    know, and I base my opinion on what I know and what I have

13    learned in my career and my dealings with Mara Salvatrucha

14    throughout my career.  I understand that people can have

15    different opinions, and it's just that.

16    *Q.*  Let's talk a little bit about the sources you use,

17    identifying the sources you've used over the years to form the

18    bases of the opinions that you've articulated today, okay?

19    *A.*  Great.

20    *Q.*  Okay.

21          Now, do you maintain a list or a database of the

22    individuals that you have interviewed over the years?

23    *A.*  No, sir.

24    *Q.*  Is there anywhere that I can go to, representing a client

25    that I represent, and say I want to try to figure out if

1    Mr. Flores is accurately summarizing or synthesizing or

2    validating what he has heard from people?  Is there anywhere

3    that I can go to find out about who the people are that you

4    have talked to about any opinions in Exhibit 1?

5    A.   Probably no specific place, no, sir.

6    Q.   Pardon?

7    A.   No specific place that I know of.

8    Q.   You don't have a list or a database that I can use to

9    correlate, hey, Opinion No. 1 was based upon these interviews

10   in this case?

11   A.   No.  My experience comes from, again, the totality of --

12   the entirety of my career, my knowledge, observed information,

13   evidence, interviews, surveillances.  It's a totality that I

14   rely on and what I utilize to form my opinion.

15   Q.   Have you kept notes of the interviews you've done over the

16   years?

17   A.   No, not specific to general conversation about gangs if

18   it's been something directly related to an investigation that

19   was incorporated in that investigation.

20   Q.   Okay.

21            And those would be, for example, in police reports?

22   A.   They could be, yes, sir.

23   Q.   Okay.  So if you were able to say, hey, Opinion No. "X," or

24   letter "X," or whatever it is, 23, let's say, just an example,

25   that was based in part on this investigation, you could go back

**Flores - Cross / Sabelli**

1  and give us the police reports that are a part -- that underlie

2  that opinion?

3  *A.*  No, sir.  Again, at no individual point in the document can

4  I point to one singular person.  Again, this is a combination

5  of experience that I've gathered throughout my career.  It

6  doesn't go back to one specific source or one specific place or

7  one specific time.

8  *Q.*  Well, are you telling us in that whole list in Exhibit 1

9  you can't think of any particular investigation that is the

10  basis for any particular opinion?  Is that right?

11  *A.*  Perhaps I can go back.  I mean, it's a possibility, if you

12  are asking.

13  *Q.*  Have you tried to do that?

14  *A.*  No.

15  *Q.*  Has anybody asked you to do that?

16  *A.*  No.

17  *Q.*  In other words, what your approach here today is to support

18  your opinions -- and by the way, you knew this hearing was

19  about the bases of your opinions?

20  *A.*  Correct.

21  *Q.*  And your approach is to say with respect to each one of

22  those opinions on page 1 through 7 in Exhibit 1 is that is all

23  based on the totality of my experience?

24  *A.*  Correct.

25  *Q.*  And you haven't done any work in this case or any other

**Flores - Cross / Sabelli**

1    case to point specifically to any investigations or

2    conversations or anything that underlie any specific opinion?

3    *A.*   No, sir.

4    *Q.*   I'm correct?

5    *A.*   You're correct.

6    *Q.*   Okay.

7    *A.*   With the understanding that this is something that

8    incorporates almost 11 years of my career in investigating, you

9    know, many, many crimes, many, many interviews, many, many

10   contacts, field interviews, conversations with law enforcement.

11   It incorporates a great deal of communication and time, hours,

12   and resources that were utilized.

13   *Q.*   And what I'm asking you, is there any way that I,

14   representing my client, trying to cross-examine you at trial

15   can have any meaningful understanding of what the bases of your

16   opinions are with respect to these 11 years of everything sort

17   of in one pot, right?  Am I getting that right?

18              *MR. LEUNG:*  Objection, Your Honor.

19              This is bordering on argument.

20              *THE COURT:*  Haven't we gone over this?  Why are we

21   repeating it?

22              *MR. SABELLI:*  I don't think we've gone over it at

23   all, Your Honor.

24              *THE COURT:*  You asked this very question about your

25   client and going to the sources and verifying the procedure,

**Flores - Cross / Sabelli**

1    right?

2            What am I missing?  Seems like you asked this

3    question.

4            **MR. SABELLI:**  What I have not articled clearly,

5    then, Your Honor, is, I'm trying to ask this witness whether or

6    not he can point to specific sources for specific opinions.

7            What he said so far, Your Honor, is, for example,

8    just taking an -- Opinion No. 1:  I base that opinion on

9    conversations I've had with people in addition with old former

10   gang members who are around when MS started, with police

11   officers, and with evidence that I saw.

12           What I'm asking him now, is, hey, do you have any

13   list of the gang members that you spoke to with respect to

14   Opinion 1.  My understanding is, no.  I've asked, do you have

15   any notes; the answer is no.

16           And so what I'm trying to understand from this

17   witness is whether or not there is any way that I can look at,

18   scrutinize, understand what the specific bases are for the

19   opinion, apart from the general statement that I talked to some

20   people sometime ago.

21           **THE COURT:**  I thought you said that on every single

22   one of these opinions that was true.

23           **THE WITNESS:**  In part, yes, sir.

24           **THE COURT:**  What?

25           **THE WITNESS:**  In part, yes, sir.

**Flores - Cross / Sabelli**

1          **THE COURT:**  What is the rest of the part?

2          **THE WITNESS:**  The part, again, through

3    conversations, through other validation processes, evidence --

4          **THE COURT:**  That's what counsel is trying to find

5    out.  He is trying to find out, can you point to anything

6    specific on any of these opinions as the backup for any of

7    these opinions?

8          **THE WITNESS:**  No, not specifically right now.

9    **BY MR. SABELLI:**

10   **Q.**  And not only can't you do that, but you can't tell us

11   whether those conversations were custodial conversations or

12   noncustodial conversations.

13   **A.**  Correct, I can't tell you, specifically, a place in time

14   for each individual contact or communication.

15   **Q.**  That wasn't my question.

16         My question was:  You can't tell us whether a

17   particular opinion is based upon custodial or noncustodial

18   interviews.

19   **A.**  Correct.

20         **THE COURT:**  We are going to need to take a break

21   soon, but I want you to rest at a point that you want to rest.

22         **MR. SABELLI:**  This is a good point.

23         **THE COURT:**  We'll take a 15-minute recess at this

24   time.

25         I remind the witness he is on examination; I don't

**Flores - Cross / Sabelli**

 1  think he should be talking to the Government while he is on

 2  cross-examination.

 3          Thank you.

 4          **THE CLERK:**  Court is in recess.

 5                  **(Recess taken at 11:20)**

 6                  **(Proceedings resumed at 11:45 a.m.)**

 7          **THE COURT:**  Mr. Sabelli, please continue.

 8          **MR. SABELLI:**  Your Honor, I have concluded my

 9  portion of the questioning --

10          **THE COURT REPORTER:**  I'm sorry, please come up to

11  the podium.

12          **MR. SABELLI:**  I'm sorry.

13          I have concluded my portion of the questioning.

14  Mr. Philipsborn, I think, is going to ask some questions.  I

15  have finished mine for now, reserving, of course, the area that

16  Mr. Leung has reserved for himself, as well.

17          **THE COURT:**  Mr. Philipsborn?

18          **MR. PHILIPSBORN:**  Thank you, Your Honor.

19                  **(Technical difficulties with sound in the**

20                  **courtroom.)**

21          **THE COURT:**  All right, this is the reason that I'm

22  so opposed to this fancification with taxpayers' dollars -- we

23  are going to go on with just the old-fashioned way.  I should

24  have just remained silent.

25          Mr. Philipsborn, keep your voice up.  And the

**Flores - Cross / Sabelli**

1   witness, keep your voice up.

2           And then the interpreters are on an independent

3   system, right?

4           **INTERPRETER NAVARRO:**  Yes, Your Honor.

5           **THE COURT:**  So the defendants --

6           **INTERPRETER BASKER:**  Can we stop for a minute?

7           One of the defendants is having trouble hearing, and

8   we need to establish --

9           **THE COURT:**  All right, go ahead and get the

10  interpreters on line now.

11          Melinda, are you ready back there?

12          **INTEPRETER BASKER:**  Yes.

13          **THE COURT:**  The interpreter is saying we are ready

14  to go.  Please, everyone, remain quiet.

15          And Mr. Philipsborn, we are going to go back on the

16  record.  If it doesn't -- if it doesn't work and everyone can't

17  hear, then we will have to stop and do it a different way, but

18  let's try it the old-fashioned way.

19          And Sue, please leave the sound system just off.

20          **THE CLERK:**  It is.

21          **THE COURT:**  I can hear fine here.  I want to make

22  sure that everyone else listens carefully.

23          All right, go ahead, Mr. Philipsborn.

24          **MR. PHILIPSBORN:**  Thank you, Your Honor.

25          **THE COURT:**  Okay.

| | |
|---|---|
| 1 | **CROSS-EXAMINATION** |
| 2 | *BY MR. PHILIPSBORN:* |
| 3 | *Q.*  Good morning, detective.  My name is John Philipsborn, I |
| 4 | represent Mr. Cruz-Ramirez.  I have just of a few additional |
| 5 | questions. |
| 6 |         To begin, I would like to again cover the basis for |
| 7 | your opinions by asking you about your connection with an FBI |
| 8 | task force that you mentioned at the beginning of your |
| 9 | examination. |
| 10 |         Did you -- are you relying on a review of any |
| 11 | documents produced by the FBI in connection with the expression |
| 12 | of opinions here today? |
| 13 | *A.*  I don't understand your question, sir.  Specifically -- |
| 14 | specific documents or -- |
| 15 | *Q.*  Intelligence reports from the FBI. |
| 16 | *A.*  Generally, the intelligence that's developed as part of the |
| 17 | task force is a conjunctive collaboration, meaning if there is |
| 18 | an FBI present -- |
| 19 |         *THE COURT REPORTER:*  You have to slow way, way down |
| 20 | for me. |
| 21 |         *THE WITNESS:*  So it's not something that is unique |
| 22 | to the FBI.  Again, if it's an interview, generally, there is a |
| 23 | task force member from LAPD there as well. |
| 24 | *BY MR. PHILIPSBORN:* |
| 25 | *Q.*  Are any of your opinions or any of the opinions that you |

**Flores - Cross / Philipsborn**

```
 1   have expressed here today or that are reflected in the

 2   seven-page statement that you reviewed with Mr. Leung the

 3   product of your review of intelligence reports, whether

 4   gathered by the FBI or any other agency that is a member of the

 5   consortium that you are working with now?

 6   A.  I'm not sure I understand your question completely, sir.

 7   Q.  Do you know what an intelligence report is?

 8   A.  Correct, but, I mean, does it encompass statements?

 9   Interviews?  I am not sure what intelligence -- there are

10   intelligence bulletins, per se, that I'm aware of.

11               THE COURT:  May I make a suggestion?

12               Break it into two parts.  First ask whether he's

13   ever even read one of those, and then, second, if he has read

14   them, whether they have informed any of his opinions.

15          MR. SABELLI:  Thank you, Your Honor.

16   BY MR. PHILIPSBORN:

17   Q.  So, using your nomenclature, have you reviewed any

18   intelligence bulletins pertinent to MS-13?

19   A.  Yes, I have.

20   Q.  What was the origin of those intelligence bulletins?

21   A.  Some of those bulletins were developed by analysts, but

22   they didn't factor into my understanding, or my opinion.  A lot

23   of the bulletins are sometimes out of date or kind of late

24   on -- something that I've already learned or come to know, so,

25   to me, at times it's old information.
```

Flores - Cross / Philipsborn

1   **Q.**  Did you rely in any way on intelligence bulletins in

2   forming or expressing any of the opinions that you have

3   expressed here today?

4   **A.**  No, sir.

5   **Q.**  You talked about debriefing; do you recall that, sir?

6   **A.**  Yes, sir.

7   **Q.**  And the de -- and "debriefing" is a word that is -- that is

8   used in conjunction with an interview or a meeting with

9   somebody who may be cooperating with law enforcement?

10  **A.**  Correct.

11  **Q.**  Debriefings can be informal, meaning no record is kept of

12  them, correct?

13  **A.**  Correct.

14  **Q.**  Debriefings can be more formal in that notes are kept of

15  them, correct?

16  **A.**  Correct.

17  **Q.**  And debriefings can be even more formal than that in that

18  tape recordings can be made of them, correct?

19  **A.**  Yes, sir, that's possible.

20  **Q.**  Now, when you mentioned the word "debriefing," as you did

21  several times earlier today, were you referring to all types of

22  debriefings, in other words, completely informal, no notes, no

23  record, up through tape-recorded debriefings?

24  **A.**  That's correct.

25  **Q.**  You mentioned interviews, "interviews" meaning a discussion

**Flores - Cross / Philipsborn**

 1   between a police officer and a potential source of information,

 2   could be a community member, could be a victim, could be a

 3   person who plays any number of roles, correct?

 4   *A.*   Correct, the interview could be anything formal or

 5   informal, but, again, more specific to a particular crime or

 6   some type of activity that I may be investigating.

 7   *Q.*   Now, there may be meetings you have with a source of

 8   information, meaning, let's say, a witness to a crime that you

 9   make no notes of, correct?

10   *A.*   Depending on the type of crime, that could be.  Sources of

11   information can also be anonymous persons that have called the

12   police station to report on activities, so, yes.

13   *Q.*   There are also occasions on which, by department policy,

14   you will actually make a report of an interview with a source,

15   correct?

16   *A.*   Correct.

17   *Q.*   And, in fact, there are department policies of the

18   Los Angeles Police Department that regulate your practice and

19   your profession, correct?

20   *A.*   Correct, in reference to handling of the documentation of

21   informants, yes.

22   *Q.*   Well, in reference, also, to the production of interview

23   reports, correct?

24   *A.*   Correct, if they are deemed pertinent to the investigation,

25   they are documented.

**Flores - Cross / Philipsborn**

 1   *Q.*  Okay.

 2   *A.*  And collected as part of the investigation.

 3   *Q.*  Now, at other times during your direct testimony, you

 4   referred to wiretaps; do you recall that?

 5   *A.*  Yes, sir.

 6   *Q.*  These would have been wiretaps that would have been

 7   acquired formally through a court process that resulted in a

 8   court order; is that correct?

 9   *A.*  That's correct.

10   *Q.*  Would they also be one-party consent tape recordings made

11   pursuant to the California Penal Code?

12   *A.*  Yes.  I can't think back to a specific one-sided recording

13   or consensual that I can direct my opinion based upon that,

14   but, yes, I have done that.

15   *Q.*  Okay.

16        And jail calls, again, just so we explain your

17   nomenclature, jail calls would be calls that originated from a

18   jail and that would have been tape-recorded; is that correct?

19   *A.*  Yes.

20   *Q.*  Okay.

21        Now, let's take one of your opinions.  And if you

22   have your document in front of you, I would like to direct you

23   to page 2, paragraph 9, as an example.

24        This is a paragraph in which you talk about MS-13 as

25   organized in the local cliques, like franchises, based on local

1    geography that it inhabits and claims, right?

2    A.  That's correct.

3    Q.  Now, that statement was first based on, as you put it, the

4    totality of your professional experience as a police officer,

5    correct?

6    A.  Correct.

7    Q.  And is it based on any specific source of information that

8    we've covered here today; a debrief, an interview, a jail call,

9    or a wiretap?

10   A.  I'm not sure I understand your question.

11   Q.  Well, other than the totality of your experience, what else

12   is -- what other basis or reason for the opinion contained in

13   the first sentence of paragraph 9 do you have?

14   A.  Well, again, it is based on conversations, self-admissions,

15   personal observations of graffiti, which depict not only the

16   gang name, but the monikers within certain territories;

17   conversations, interviews, debriefs of suspects, witnesses,

18   community members to go with personal observations over the

19   years.

20   Q.  And to follow up on something that you discussed with

21   Mr. Sabelli, to be clear, were you asked if you could point to,

22   let's say a specific debrief or series of debriefs, that

23   provide the basis or reason for this opinion -- as you sit here

24   today you couldn't do so, correct?

25   A.  No, sir.

**Flores - Cross / Philipsborn**

1   *Q.*  Okay, meaning, no, I couldn't do so, right?

2   *A.*  That's correct.

3   *Q.*  Okay.

4         And were I to ask you the same question with respect

5   to wiretaps, you couldn't point to a specific wiretap or

6   specific series of wiretaps that form the basis of reasons for

7   that opinion, correct?

8   *A.*  I may be able to do so with some time, the ability to

9   research, but presently, no.

10  *Q.*  Okay.

11        And again, for us to be able to understand the basis

12  of this opinion, other than the totality of your professional

13  experience as a police officer, if I were to ask you about your

14  ability to point to a specific jail call or series of jail

15  calls as the basis or reason for that statement, you couldn't

16  actually provide a specific reference, correct?

17  *A.*  No, sir, not currently.

18  *Q.*  Okay.

19  *A.*  But with the understanding that beyond a simple jail call,

20  there are other things that obviously factor into the opinion:

21  Conversations, self-admissions from members, themselves,

22  admitting to their clique and their membership in MS-13 that I

23  also couldn't pull but would factor into the overall opinion,

24  which is why I say it's kind of a collective of my experience

25  over the course of the time that I've been involved in working

1  gangs.

2  *Q.*  But, in order for us to understand in a detailed way the

3  basis for any opinion that you have expressed here today, we'd

4  really have to have the ability to unload all of the knowledge

5  you have somewhere in your head, correct?

6              *MR. LEUNG:*  Objection, Your Honor.

7          *THE COURT:*  What's the objection?

8          *MR. LEUNG:*  It's just argument, Your Honor.

9          *THE COURT:*  Well, it's a summary -- no, it's a

10  fair -- fair question.  Overruled.

11          Please answer.

12          *THE WITNESS:*  Sir, I think probably the only way

13  would be if I had a camera over my shoulder the entirety of my

14  career to be able to turn over to you, would be the only

15  complete way.

16  *BY MR. PHILIPSBORN:*

17  *Q.*  Okay.  Thank you, sir.

18          Moving on to another area, you and Mr. Sabelli also

19  discussed briefly your views of MS-13, generally, and I wanted

20  to ask you about those.

21          When you first came on the force, the STEP Act was

22  on the books, correct?

23  *A.*  Correct, it is.

24  *Q.*  And a STEP Act is a -- is an acronym or a shorthand for a

25  piece of California legislation, correct?

**Flores - Cross / Philipsborn**

 1  *A.*  Correct.

 2  *Q.*  The Street Terrorism Enforcement and Prevention Act,

 3  correct?

 4  *A.*  Yes, sir.

 5  *Q.*  And it contains Penal Code sections that as a gang

 6  investigator you are very familiar with, correct?

 7  *A.*  Some I am, yes, sir.

 8  *Q.*  And just for the record, one of those sections, the lead

 9  section, the longest, is Penal Code section 186.22, correct?

10  *A.*  Correct.

11  *Q.*  Now, when you make reference to what a gang is, one of

12  the -- one of your frames of reference are the contents of

13  California law; in other words, California law actually

14  defines, for a California law enforcement officer, what a gang

15  is, correct?

16  *A.*  Correct.

17  *Q.*  I'd like to move on to another topic.

18        In the course of your professional duties in

19  Los Angeles, did you become familiar with Dogtown?

20  *A.*  Dogtown is a gang that I am familiar with.  I've never

21  investigated or worked or that I can remember talked to a

22  member of Dogtown, but I am familiar with the gang and its --

23  and its connection to Los Angeles.

24  *Q.*  How about Barrio Elmwood?

25  *A.*  I'm familiar with the name, as well, in the similar sense

**Flores - Cross / Philipsborn**

1    as Dogtown.

2    *Q.*   How about Blythe Street, B-l-y-t-h-e?

3    *A.*   Yes, sir, I'm familiar with it.

4    *Q.*   Okay.  Los Angeles gang?

5    *A.*   Yes, sir, connected to the valley end of Los Angeles.

6    *Q.*   You mentioned in your -- in your statement of written

7    opinions, 18th Street; 18th Street actually is thought by law

8    enforcement in Los Angeles to have several different

9    territories in Los Angeles County, correct?

10   *A.*   Correct.

11   *Q.*   North Side Redondo:  Ever heard of it?

12   *A.*   I've heard of the gang.

13   *Q.*   Okay.  The point being that somebody who, like you, is a

14   law enforcement officer who has a particular focus in

15   Los Angeles would have familiarity, generally speaking, with

16   what are identified to be gangs in Los Angeles; would you

17   agree?

18   *A.*   Some gangs that are localized to Los Angeles alone, yes.

19   Other gangs, such as MS-13 here, or 18th Street, which is also

20   a widespread gang, there may be more of a knowledge based on

21   the amount of investigations connected to that gang, the amount

22   of information, intelligence sharing with law enforcement

23   abroad who also share the same problem.  So some of the gangs

24   that are tied to Los Angeles do have far, outreaching

25   involvement and connections to law enforcement, as a whole.

**Flores - Cross / Philipsborn**

1   **Q.**  Let me ask you something, this is just a question about

2   this area:  Do you know what set or clique is present around

3   Eddy Street between Market and Polk?

4   **A.**  No, sir.

5   **Q.**  How about, can you tell me what 21 ABL is?

6   **A.**  No, sir.

7   **Q.**  How about Back Street?

8   **A.**  No, sir.

9   **Q.**  How about Shotty Block, S-h-o-t-t-y, B-l-o-c-k?

10  **A.**  No, sir.

11  **Q.**  Do you know the difference, I mean, have you heard of the

12  difference between Front Line and Back Street?

13  **A.**  No, sir.

14  **Q.**  Do you know one way or the other if the -- if any of the

15  information I've just asked you about pertains to the City and

16  County of San Francisco?

17  **A.**  No, sir.

18  **Q.**  Is it fair to say that you have never personally taken part

19  in an investigation of a case in the City and County of

20  San Francisco?

21  **A.**  That's correct.

22  **Q.**  Never patrolled in San Francisco?

23  **A.**  That's correct.

24  **Q.**  Generally speaking, when people in your profession discuss

25  their areas of knowledge, except as you just mentioned, matters

**Flores - Cross / Philipsborn**

1  that are known to go out of their jurisdictions, is it fair to

2  say that law enforcement officers tend to develop knowledge and

3  expertise based on their professional experience in the

4  jurisdictions that they come from?

5  *A.*  Generally, based on their jurisdiction, but also factoring

6  in the gang and the connections that the particular gang may

7  have to outlying areas or countries.

8  *Q.*  Now, and I appreciate your indulgence:  This is going to be

9  the last area I'm going to ask you about.

10         You've mentioned that one of the things that has

11  assisted you in your understanding -- in the understandings and

12  opinions that you've shared with us, is that you have a

13  knowledge from your childhood of Spanish, correct?

14  *A.*  Yes, sir.

15  *Q.*  And would you agree that in dealing with persons, suspects,

16  community members, whatever categories of persons you come in

17  contact with, that it -- it has helped you in your profession

18  to have a -- to have a command of Spanish?

19  *A.*  Yes, sir.

20  *Q.*  Okay.

21         And it permits you at times to interact with people

22  whose principal language, or perhaps whose only language, is

23  Spanish?

24  *A.*  Yes, sir.

25  *Q.*  So an officer who, for example, wouldn't have a command of

1   the Spanish language and who's investigating Latino gangs would

2   be at a disadvantage as compared with you?

3          **MR. LEUNG:**  Objection.

4          **THE COURT:**  I think this is just grist for the

5   impeachment mill at trial.

6          Sustained.

7          **MR. PHILIPSBORN:**  Thank you, Your .

8   **BY MR. PHILIPSBORN:**

9   **Q.**  Thank you, Detective.

10         **THE COURT:**  All right, any other defense lawyers

11  wish to examine this witness?

12         **MR. THOMSON:**  No, Your Honor.

13         **THE COURT:**  Is the Government ready to reopen its

14  redirect?

15         **MR. LEUNG:**  Your Honor, the Government has not

16  printed out all the exhibits yet, so we can't cover that

17  portion; however, there are some redirect questions that aren't

18  based on those exhibits.  If we could have the Court's

19  indulgence and proceed with that first?

20         **THE COURT:**  Go ahead.

21         **MR. LEUNG:**  Thank you.

22                    **REDIRECT EXAMINATION**

23  **BY MR. LEUNG:**

24  **Q.**  Detective Flores, do you have in front of you still the

25  declaration from Los Angeles from 2004?

```
1              MR. SABELLI:  Your Honor, I believe I referred to

2     that as Exhibit C; we should probably have it marked at this

3     point since we are going into it again.  It's the gang

4     injunction declaration.

5              THE COURT:  What happened to Exhibits A and B?

6              MR. SABELLI:  I didn't use them.

7              THE COURT:  All right, so this is Exhibit C to what?

8              MR. SABELLI:  It was simply -- for the purposes of

9     organizing today's hearing, I labeled it Exhibit C because I

10    planned to use Exhibits A and B and didn't use them.  We can

11    label this as Defendant's A, if the Court prefers.

12             THE COURT:  We'll stick with C with that

13    explanation.

14                       (Defendant's Exhibit C was marked for

15                        identification.)

16             THE COURT:  So C is what you are referring to?

17             Go ahead.

18    BY MR. LEUNG:

19    Q.  Detective Flores, let me direct your attention to page 7,

20    paragraph 20, again.  And you have previously testified on

21    cross that this statement was in error; could you clarify what

22    this should say?

23    A.  Yes.  The origin of the gang members, the early gang

24    members, did come from El Salvador, primarily, because of the

25    civil war and strife there during the late '70s and '80s, which
```

**Flores - Redirect / Leung**

1     were the basis for the creation of Mara Salvatrucha in

2     Los Angeles.  The origin of the gang was in Los Angeles, is

3     where the gang was created, but the origin of the people that

4     were the members of the gang were people that came from largely

5     El Salvador and Central America as a result of the civil war

6     and strife.

7     *Q.*  In the time period indicated in paragraph 20?

8     *A.*  Yes, sir.

9     *Q.*  All right.

10            On cross-examination you were asked about the number

11    of MS-13 gang members with whom you've spoken during the

12    entirety of your career; is that correct?

13    *A.*  That's correct.

14    *Q.*  Now, on direct, were you asked to distinguish between gang

15    members and suspected gang members?

16    *A.*  Yes.

17    *Q.*  Well, okay, what is the distinction?

18    *A.*  Well, the distinction, if I understand the question, is how

19    each person -- I classify a person as a member or an associate.

20    Generally, the easiest way is if a person during the

21    conversation admits their part to being a member of Mara

22    Salvatrucha, for example, or some other outlying obvious

23    factor, an immediate open tattoo that is immediately visible,

24    so there are some other kind of admissions, or the fact that I

25    catch them involved in a specific crime, say, graffiti, where

```
 1    they are tagging MS-13, where it's obvious that they are a

 2    member of the gang.

 3              Other factors where you have labeled an associate or

 4    suspected member are other outlying factors; they are

 5    associating with the gang, they are dressing, but they are not

 6    openly at a point where they are admitting, or is there is any

 7    other solid information to classify them as an actual member,

 8    so they would be classified as an associate, many of which will

 9    be classified as a member, it's just at which point in time I

10    speak to them.

11    Q.  So you testified on direct that you interviewed several

12    hundred MS-13 members, these were just to admitted members

13    known to you?

14    A.  Correct.

15    Q.  And on cross-examination, when you were asked about the

16    2000 admitted or suspected members, that included both

17    categories?

18    A.  Yes, that would be as a whole.

19    Q.  To your knowledge, is there any academic institution that

20    offers a course on La Mara Salvatrucha?

21    A.  Not that I'm aware of, sir.

22    Q.  To your knowledge, is there any department, an endowed

23    chair, perhaps, on La Mara Salvatrucha?

24    A.  Not that I'm aware of.

25    Q.  Where did you learn your information about La Mara
```

 1   Salvatrucha?

 2   **A.**  My information was learned through my everyday assignment,

 3   the hundreds of hours that I've worked on investigations.  I've

 4   handled radio calls, calls for service, interviews of

 5   witnesses, suspects, victims, in the hundreds of hours I spent

 6   on surveillance or spent on monitoring phone calls or reviewing

 7   phone calls or video, or I've shared -- collaborating with law

 8   enforcement, and not only my department, but police agencies

 9   abroad, as well.

10          So it's come through the process of putting my time

11   in and spending the majority of my time focused on gangs, in

12   general, my assignment, and Mara Salvatrucha, specifically.

13   **Q.**  So are any of the itemized opinions set forth in Exhibit 1,

14   is any opinion based on any one source, any one person, any one

15   investigation?

16   **A.**  No, sir.  I mean, nothing goes back to a singular basis

17   because that would defeat the purpose.  My understanding is to

18   obviously question even, you know, one source to validate it

19   with the totality of what I know, what I've come to learn, what

20   I understand on face value, and take that and compare that or

21   validate that through some process, depending on the type of

22   information that is given to me or that I see.

23   **Q.**  Well, you were asked on cross-examination how you handle

24   informants or debriefings.

25   **A.**  That's correct.

1  **Q.**  Do you take what people tell you in debriefings at face

2  value?

3  **A.**  No, sir.

4  **Q.**  Why not?

5  **A.**  Well, people lie.  Simply put, some people may choose to

6  tell even half the truth or 80 percent of the truth and choose

7  to leave certain factors out that may benefit them.

8          So everything I take with a grain of salt, and I try

9  to validate it or prove or disprove the entirety, or even parts

10  of what that person has told me.

11  **Q.**  Just to be clear:  What sort of methods do you use to prove

12  or disprove what you hear from, say, gang members during a

13  debriefing?

14  **A.**  Well, depending on what information the gang member is

15  giving me.  For example, if they give me the name of their

16  moniker is Spooky, they admit their membership in the gang, and

17  that is obvious because of the tattoos, something I can

18  immediately validate.

19          But then they say, my name is Spooky, well, I can

20  take that at face value, but I choose to, again, try to

21  validate that as best I can through the process of --

22  potentially of probation, parole search, a search warrant, some

23  process that gives me an insight into this person's being.

24          And through that, at times I've recovered

25  photographs where the person's nickname is actually etched over

1    the individual in the photo, which will, again, validate that

2    this person is indeed, Spooky or is not Spooky.

3    *Q.*  Now, you testified concerning the international structure

4    of MS; is that correct?

5    *A.*  That's correct.

6    *Q.*  On cross you indicated, or you were asked on cross whether

7    there were variations.

8    *A.*  Yes, sir.

9    *Q.*  And are there variations?

10   *A.*  Yes, there are.

11   *Q.*  However, is what you testified to the general structure of

12   MS-13?

13   *A.*  That's correct, yes.

14   *Q.*  Is that confined only to LA, or to places outside of LA?

15   *A.*  From my understanding and my experience, it's outside of

16   LA, as well, into Central America, into as far north as Canada.

17   And that's come through my direct dealings with law enforcement

18   and even some of the cross-training we've done.  We've trained

19   them and they've trained us on, obviously, what is going on

20   with the gang area in their area and what's going on with the

21   gang in our area.

22   *Q.*  Have you -- besides being with officers in other areas

23   outside of LA, have you also spoken with gang members in other

24   areas as well?

25   *A.*  Not, per se.  I've interviewed a gang member in another

1   area, but I've talked to and interviewed some gang members that

2   are very well traveled that are in other parts of the United

3   States or other countries that have traveled to and from

4   Los Angeles to some of these other areas.

5   *Q.*  And has all this information confirmed your general

6   conclusions that the structure of MS-13 is relatively

7   consistent with some minor variation?

8   *A.*  Yes.

9                 **MR. SABELLI:**  Your Honor, objection.

10                Assumes a fact not in evidence.  This witness never

11  said the variations were minor.

12                **THE COURT:**  Sustained.  Also leading.

13  *BY MR. LEUNG:*

14  *Q.*  Could you tell us what, if anything, these various sources

15  of information from places outside of LA has led you to

16  conclude about the structure of MS-13, as a whole?

17  *A.*  It is my understanding through my, again, interviews,

18  debriefs and contacts with law enforcement abroad, that MS-13,

19  in general, operates along general lines with, in fact, some

20  small variations, which are factored in with local trends, with

21  the number of persons active in that individual clique, other

22  factors than even in Los Angeles that would affect the

23  individual clique, or the strength of the individual clique.

24  So there is factors that affect that clique, whether it's in

25  Baltimore or in Los Angeles.

**Flores - Redirect / Leung**

1  **Q.**  I think you were asked on cross-examination whether there

2  is a difference -- whether you knew what -- whether you

3  distinguished between custodial interviews and noncustodial

4  interviews; is that correct?

5  **A.**  That's correct.

6  **Q.**  And what is the difference?

7  **A.**  Custodial is somebody who is not free to leave.  I have

8  them detained or arrested.  And in a custodial setting, the

9  person is not free to go on their way.

10  **Q.**  And do you treat information derived from custodial

11  interviews differently from a voluntary interview?

12  **A.**  Yes.

13  **Q.**  And what is that difference?

14  **A.**  Well, depending -- in a custodial setting, if I'm

15  interviewing somebody specifically to a crime that they have

16  committed or I'm talking to them about, in general, the line of

17  my questioning would be more along the lines of the case that

18  I'm investigating, which may touch upon, again, the involvement

19  of other members, the identification of the potential rivals,

20  or any possibility of any connection to that specific crime I'm

21  investigating.  So the questioning would be more kind of

22  catered to that specific crime.

23  **Q.**  What about bias, would you be more skeptical of someone in

24  a custodial setting?

25          **MR. SABELLI:**  Objection.  Leading, Your Honor.

**Flores - Redirect / Leung**

```
 1              THE COURT:  Sustained.

 2   BY MR. LEUNG:

 3   Q.  Do you have any thoughts concerning the role of bias in

 4   either situation?

 5              MR. SABELLI:  Same objection.  He is putting words

 6   in the witness' mouth.

 7              THE COURT:  No, he's not.  Overruled.

 8              Please answer.

 9              THE WITNESS:  No, I weigh the circumstances in each

10   individual encounter.  And I understand that there could be

11   motive or bias behind any encounter, conversation, or statement

12   that I receive.

13              And again, I try to weigh the facts and the

14   information that is provided and try to validate that

15   information, understanding that people are motivated by

16   different things.  And identifying the individual person's

17   motive helps to aid in the reliability of information that they

18   may be giving.

19   BY MR. LEUNG:

20   Q.  And again, why do you validate?  Why do you corroborate?

21   A.  It's to identify the truth from a lie.

22              MR. FRENTZEN:  Could we have one moment, Your Honor?

23              THE COURT:  Sure.

24                  (Co-counsel confer.)

25              MR. LEUNG:  Your Honor, we're having some difficulty
```

```
 1   with the exhibits, they did not print out clearly.

 2              THE COURT:  Is this all that you have to do?

 3              MR. LEUNG:  That's all I have in terms of --

 4              THE COURT:  Why don't we then have the witness come

 5   back, and we'll do this first thing in the morning.  And it

 6   will put us behind schedule, but we only have another hour to

 7   go, anyway.

 8              Can this witness stay over?

 9              MR. LEUNG:  May I confer with the witness?

10              THE COURT:  Can you stay over?

11              THE WITNESS:  Yes, sir.

12              THE COURT:  All right, that's the answer.

13              If you want to give up on it, okay, but I think we

14   got to cover this.

15              MR. LEUNG:  No, Your Honor.  My apologies to

16   Detective Flores' family.

17              THE COURT:  Well, we'll resume here tomorrow

18   morning.  Is there any other business to take up before we

19   break for the day?

20              MR. SABELLI:  No, Your Honor.

21              Just as a point of clarification, do we have a

22   hearing on the 19th?  I think we do not, but I wanted to make

23   sure that is accurate.

24              THE COURT:  Well, hang on a minute.

25                     (Clerk checking schedule.)
```

```
 1              THE CLERK:  It's on your calendar for 2:00 o'clock.

 2              THE COURT:  Yes, we have a hearing on the 19th,

 3   hearing on Velasquez's motions to suppress and further hearing

 4   on Guevara, motion to compel photographic lineup photos.

 5              Right?

 6              MS. NAEGELE:  Yes.

 7              THE COURT:  There are two here; what time is that

 8   for?

 9              THE CLERK:  2:00 o'clock.

10              THE COURT:  So the answer is, yes, we do have

11   hearings on the 19th.

12              MR. SABELLI:  Thank you, Your Honor.

13              THE COURT:  But again, only the movants and their

14   clients need to be here.  We don't have to bring everyone here.

15   Those are individualized motions.

16              All right, any more business today?

17              MR. LEUNG:  Nothing from the Government, Your Honor.

18   Thank you.

19              THE COURT:  Let me use this time to say that you

20   were supposed to meet and confer on the protective order, and

21   Mr. Thomson filed a declaration yesterday indicating that no

22   meet and confer has actually occurred.

23              MR. LEUNG:  My apologies, Your Honor, I've been

24   somewhat tied up with the rest of this case, including today's

25   hearing.
```

```
 1              And, in fact, I realize now that there was a status

 2    report that Mr. Rosenbush and I had agreed upon that I was

 3    supposed to file at noon, as well, but I've been tied up here.

 4         THE COURT:  When, will you promise me your meet and

 5    confer will occur?

 6              MR. LEUNG:  Can I confer with Mr. Thomson tomorrow?

 7              MR. THOMSON:  Fine.

 8         THE COURT:  All right, how about a report on that

 9    first thing in the morning?  And you two talk further so that

10    you can let me know when you're going to -- you don't have to

11    have the meet and confer today, just be in the position to tell

12    me when it will occur.

13              MR. LEUNG:  Will do so, Your Honor.

14              And I will file a joint status report with

15    Mr. Rosenbush as soon as I head back down.

16         THE COURT:  All right.

17              Now, the witness is still on examination, so I don't

18    think he ought to be talking to the Government about the

19    substance of his testimony.

20              MR. LEUNG:  Oh.  Oh, your Honor, can we show him the

21    exhibits that we are going to show him tomorrow?

22         THE COURT:  Are you going to talk to him about them?

23              MR. LEUNG:  We're going to show him.

24         THE COURT:  He can see them, but I don't think he

25    ought to be talking to you about what your questions are going
```

1    to be.

2                    **MR. LEUNG:**  And, Your Honor, he is on redirect

3    again -- or, in fact, he's on direct for this, so it's not

4    like --

5                    **THE COURT:**  Does that matter?

6                    **MR. LEUNG:**  It does, because we aren't supposed to

7    coach him in the middle of cross.

8                    **THE COURT:**  All right, is there any objection to the

9    Government talking to the witness, since he is on direct

10   examination now?

11                   **MR. SABELLI:**  Your Honor, I don't agree that once a

12   witness has -- once questioning has begun that there can be an

13   examination or that kind of discussion, but under these

14   circumstances, I personally don't have an objection.

15                   I don't know if Mr. Philipsborn does or not.

16                   **MR. PHILIPSBORN:**  Your Honor, just an observation,

17   not particular to the issue that the Court is considering, but

18   I know the Court has set aside the time to hold this hearing,

19   and what we are doing is, again, we are showing an officer who

20   hasn't seen evidence before, evidence that was seized or

21   acquired in the course of an investigation that he has no

22   familiarity with and that the Government has said is going to

23   require foundation to be laid by other witnesses, which I admit

24   for an expert would not invalidate, you know, the opinion

25   testimony based on it.

1          But I respectfully request that the Court get an

2   offer of proof about what the Government intends to elicit,

3   which might clarify whether or not there are any problems with

4   the Court's proposed order or not.

5          **MR. LEUNG:**  The offer of proof will be what's stated

6   in Exhibit 1, which is that the exhibits are photographs,

7   generally, which provide examples of what the opinion is.

8          For instance, the opinion lists -- the opinion

9   states that there are certain types of MS-13 gang graffiti, so

10  we intend to show to Detective Flores examples of gang graffiti

11  in the same vein as graffiti that he described, for instance,

12  the MS.

13         **THE COURT:**  I'm not going to require an offer of

14  proof.  We are just going to pick it up here tomorrow.

15         I will allow the witness to confer with counsel, but

16  it's not privileged.  And I'm going to direct the witness to

17  remember everything they say to you so that Mr. Sabelli can

18  bring it out.

19         If they were to say to you, oh, doesn't this look

20  like the Texas A & M or the University of Texas, and they are

21  suggesting things to you, you got to repeat that tomorrow on

22  cross-examination.

23         So, Counsel, proceed with caution because everything

24  you say will be an open book.

25         **MR. LEUNG:**  Thank you, Your Honor.

1          **THE COURT:**  All right.  See you here -- when is it,

2     7:30?

3          **MR. LEUNG:**  7:30.

4          **THE COURT:**  7:30.

5          **THE CLERK:**  Court is in recess.

6               **(Proceedings adjourned at 12:30 p.m.)**

7

8

9                    **---o0o---**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, Sahar McVickar, Official Court Reporter for the
United States Court, Northern District of California, hereby
certify that the foregoing proceedings were reported by me, a
certified shorthand reporter, and were thereafter transcribed
under my direction into typewriting; that the foregoing is a
full, complete and true record of said proceedings as bound by
me at the time of filing.  The validity of the reporter's
certification of said transcript may be void upon disassembly
and/or removal from the court file.

**/s/ Sahar McVickar**
_____

**Sahar McVickar, RPR, CSR No. 12963**

**Tuesday, October 19, 2010**