MARTIN A. SABELLI SBN 164772
149 Natoma, Third Floor
San Francisco, CA 94105
Tel: (415) 284-9806
Fax: (415) 520-5810

Attorney for
GUILLERMO HERRERA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>GUILLERMO HERRERA,<br><br>Defendant. | Case No. CR 08-0730 WHA<br><br>**GUILLERMO HERRERA'S MOTION IN LIMINE RE PORTIONS OF DH 188** |

GUILLERMO HERRERA moves to admit Jonathan Cruz Ramirez's statement that a shotgun he used misfired while attempting to discharge a second round in the weapon's chamber. Mr. Herrera offers the statement for two purposes. First, the statement contradicts – and impeaches – hearsay testimony elicited at trial from Oliver Marota, a jailhouse informant, that Mr. Cruz Ramirez volunteered to him that Mr. Herrera shot a *Niero* on 20th St. and Mission with a shotgun.[1] *In fact, the statement impeaches both Mr. Marota and Mr. Cruz Ramirez as the hearsay declarant*; that is, it impeaches both Mr. Marota's testimony and Mr. Cruz Ramirez's statement to Mr. Marota if indeed it was ever made by Mr. Cruz Ramirez (rather than having been invented by a well-motivated Mr. Marota). Second, the statement

---

[1] The Court has ruled that Mr. Marota's testimony would be limited to Mr. Cruz Ramirez. The government, however, persists in seeking to admit this testimony against all accused and, as recognized by this Court (R.T. at 11165) and the United States Supreme Court, the "practical and human limitations of the jury system" render such limiting instructions ineffective. *See Bruton v. United States*, 391 U.S. 123, 135 (1968). This issue is discussed in greater depth below.

1

corroborates evidence presented at trial suggesting that Mr. Cruz Ramirez – and not Mr. Herrera – committed the Estrada homicide on July 11, 2008.

The statement is admissible on several bases. First, the statement is admissible under Federal Rule of Evidence 106 ("the rule of completeness") because the government omitted the admission from a transcript (offered through Jose Espinal) while submitting other sections from the same recording. According to Mr. Espinal, he was present neither for this portion of the conversation nor for other portions offered by the prosecution.[2]

Second, the statement is also admissible as a statement against penal interest under F.R.E. 804(b)(3) given that the statement reflects the use of a firearm by an undocumented alien who is allegedly a gang-member.

Finally, the statement is independently admissible under the Fifth and Sixth Amendments. The statement has substantial exculpatory value because Mr. Herrera cannot otherwise challenge Mr. Marota's hearsay testimony that Mr. Cruz Ramirez told him that Mr. Herrera committed the murder. Mr. Herrera's right to Due Process, Compulsory Process, and Confrontation compel admission of this critical exculpatory evidence so that he can mount a complete defense to the murder charge and to impeach Mr. Marota's hearsay testimony. Mr. Herrera submits that this issue is of fundamental importance – a fact reflected in the government's characterization of the Marota testimony as "absolutely crucial" to its case. (Docket 4522).

**I.    The Government Introduced a Redacted Transcript That Omits Statements Exculpating Mr. Herrera of The Estrada Homicide**

On June 15, 2011, the government introduced a transcript/translation of a Spanish language recording (164T) into evidence through a cooperating witness, Jose Espinal. Reporter's Transcript of Proceedings ("R.T."), at 10625, 10627. Mr. Espinal testified that he

---

[2] The confidence in, and accuracy of, Mr. Espinal's memory of the *precise moments* of his entries and exits *from a conversation years ago* should be of interest and concern to the Court in performing its gate-keeping function. Determinations of admissibility should take into account the reasonableness of claims, like Mr. Espinal, to recall these facts with confidence.

2

was not present for the entire conversation transcribed in Exhibit 164T. He testified that there were times he left and rejoined the conversation and indicated those absences on the transcript. 164T; R.T. 10625-26. The government sought to admit the redacted exhibit into evidence – including the sections where Mr. Espinal was absent. R.T. at 10627. The Court received into evidence those sections of the transcript where Mr. Espinal was present while reserving its ruling on whether the other sections would be admitted into evidence. R.T. at 10628.

The government's transcript also indicates that certain portions of the recording had been redacted. Those sections do not in any way coincide with Mr. Espinal's absence from the conversations on the recording.[3] One of the omitted sections encompasses approximately eight minutes[4] of a conversation involving SF-1211 (Robert Claros Acosta, AKA "Bad Boy"), Mr. Cruz Ramirez ("Soldado), Cesar Alvarado ("Momia"), and Moris Flores ("Slow").[5]

On June 21, 2011, undersigned counsel, as well as the Court, probed into this missing portion of the transcript:

> THE COURT: Did you ever listen to – did you ever listen to what was on minute 52 to 59?
>
> MR. ESPINAL: No. At no moment in time did I hear it.

---

[3] For example, Mr. Espinal indicated on the transcript that he left ("me fui") at 32:12 and returned ("regrese") at approximately 34:00. 164T at 11, 15. Those intervening pages, where Mr. Espinal concedes his absence, are included in the government's exhibit. Further, the transcript omits a section from 34:40 to 38:00 during which Mr. Espinal was presumably present because he indicated that he returned at around 34:00, immediately preceding the omitted section, and he is present and involved in the conversation after the omitted section. 164T at 15, 17.

[4] Specifically, the transcript indicates that minutes 52:00 to 59:57 have been omitted.

[5] The government represents in its transcripts (which will go to the jury) that the omitted portions are not "pertinent" to its case. For example, at minute 52:00 of the recording, the transcript indicates "END OF PERTINENT PORTION." At minute 59:57 of the recording, the transcript indicates: "START OF PERTINENT PORTION." Contrary to these indications, and as set forth in this pleading, the evidence contained in these missing portions are extremely relevant to the Estrada murder. *In this regard, Mr. Herrera submits that he and the government share an interest in ensuring that the jury be provided with the most comprehensive and reliable evidence upon which to deliberate. See e.g. Berger v. United States*, 295 U.S. 78, 88 (1935).

| | | |
|---|---|---|
| 1 | MR. SABELLI: | Did you ever tell the government to stop at minute 52 because you weren't present after minute 52? |
| 2 | | |
| 3 | MR. ESPINAL: | No.  We would only get to minute 52, and they would be forwarded to minute 59. |
| 4 | | |
| 5 | MR. SABELLI: | Okay.  So it was one of the people from the government that forwarded from 52 to 59.  It wasn't you who said I'm not there for part of the hearing – or the recording.  Is that correct? |
| 6 | | |
| 7 | MR. ESPINAL: | Exactly.  They would forward it. |

R.T. at 10937:7-20.

In those missing eight minutes, Mr. Cruz Ramirez made the following statements:

| Speaker | Spanish Transcription | English Translation |
|---|---|---|
| Cruz Ramirez | ¡Bum! Pero, sonó así como de un mortero grande, loco. Como aquella mierda grande. | Boom!  But it sounded like that, like a big blaster, man.  Like that big shit. |
| CI 1211 | [risita] | [chuckle] |
| Cruz Ramirez | Fuck dije yo. | I said fuck. |
| | [risita] | [chuckle] |
| Cruz Ramirez | Sentí que…y como yo no tengo, yo no tengo, yo no [---] yo no [---] ¡Bum! Sentía que me [-] toda la mano y dije, "Fuck, ¿[-] pedo? Me estuve revisando la mano. Y abro aquella mierda y tenía, tenía los ot-, tenía el otro ahí pero explotado, maje, y no le había salido nada, loco. | I felt like… and since I don't have, I don't have, I don't wa- I don't [---] Boom! I felt like I [-] my whole hand and I thought, "Fuck, [-] thing?"  I was checkin' out my hand. And I open that shit and it had, it had the oth-, it had the other one there but it had exploded, dude, and nothing' had come out, man. |
| CI 1211 | ¿Vas a jugar, vos? | Are you gonna play, man? |

Mr. Cruz Ramirez's admission describes attempting to fire a weapon which misfired inside the weapon's chamber.   Mr. Cruz Ramirez's statement that "the other one" had exploded establishes that the weapon he was referring to was a shotgun – a firearm that typically carries

4

GUILLERMO HERRERA'S MOTION IN LIMINE TO ADMIT JONATHAN CRUZ RAMIREZ STATEMENTS

two shells. Significantly, this conversation occurred less than two weeks after the Estrada homicide, and corroborates other evidence presented at trial:

- Abraham Martinez testified that Cruz Ramirez took credit for the Estrada murder and explained to him in detail the circumstances of the murder. Cruz Ramirez specifically described shooting the *Niero* in the head, and that the weapon he used in that attack was a "piece of crap shotgun" which jammed on him when trying to fire a second shot. R.T. at 2694-95; *see also* R.T. at 2411-12.

- An eyewitness to the Estrada Homicide, Erwin Daniel Urla, testified that he saw the gunman reload after firing the first shot, but that no second shot was fired. R.T. at 4059-60; 4065. Another witness, Erendira Ochoa had informed officers of this fact when interviewed at the scene of the crime, but was unable to recall this fact at trial. R.T. at 4039.

- Walter Palma testified that Mr. Cruz Ramirez admitted killing a *Niero* on Mission and 20th Street with a shotgun. R.T. at 7711; 7880. Before the murder, Mr. Palma "hooked up Mr. Cruz Ramirez with a shotgun" through another individual named "Chino." R.T. at 7894.

In sum, Mr. Cruz Ramirez's statement transcribed in 164T is direct evidence that he, and not Mr. Herrera, committed the Estrada homicide. Cruz-Ramirez's recorded statement also impeaches Mr. Marota's testimony that Mr. Cruz-Ramirez told him that Mr. Herrera committed the murder: Mr. Cruz-Ramirez's recorded statement -- *made to individuals who the prosecution suggests are his close associates* -- is far more probative and reliable than an unrecorded self-serving statement made to Mr. Marota who was at various times a rival and an enemy and who Mr. Cruz Ramirez may have believed to be an informant or potential informant.[6]

/ / /

---

[6] The evidence in this case establishes that 20th Street members were very – even obsessively -- concerned with informants. Considering further that the prevalence of jailhouse informants is common knowledge, it seems unlikely that Mr. Cruz Ramirez would have volunteered this kind of "information" to an enemy/rival whom he had never met before.

**II. Mr. Cruz Ramirez's Statements Are Admissible Under the Rule of Completeness (FRE 106) Because the Government Has Introduced Into Evidence Transcripts Derived From the Same Recording**

As an initial matter, the government may not at this point object to admission of the Cruz-Ramirez recording on foundational grounds. The government has offered the same recording as evidence in its case in chief and thus has waived any arguments regarding authentication of the recording. *Ohler v. United States*, 529 U.S. 753, 755 (2000) *citing* 1 J. Weinstein & M. Berger, Weinstein's Federal Evidence � 103.14, p. 103-30 (2d ed. 2000). Cf. 1 J. Strong, McCormick on Evidence 55, p. 246 (5th ed. 1999)("A party that introduces evidence cannot later argue that the evidence was erroneously admitted.")

Federal Rules of Evidence 106 provides that: "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement *which ought in fairness* to be considered contemporaneously with it." Fed.R.Evid. 106 (emphasis added). Rule 106 codifies the common-sense proposition that if one party introduces as evidence part of a document or recording, the adverse party should be able to use other portions of that same evidence. *Worden v. Tri-State Ins. Co.*, 347 F.2d 336, 341 (10th Cir.1965) ("It is fundamental that one side may introduce only a part of a document or deposition in evidence, but of course it is also well recognized that the other side may later introduce more or the rest of any such document or deposition which was not introduced in evidence"). Thus, Rule 106 "allows the party against whom the document is introduced to place the remainder in evidence *without additional evidentiary foundation."* United States v. Phillips*, 543 F. 3d 1197 (10th Cir. 2008) (emphasis added).

Here, Rule 106 mandates that Mr. Cruz Ramirez's statements be admitted into evidence. The government should not be permitted to pick and choose discreet portions of an audio recording that bolster its case while obscuring other portions that undermine it. The Rule of Completeness therefore mandates the equitable result that Mr. Herrera be able to introduce

6

another portion of the same recording offered by the government: namely, Mr. Cruz Ramirez's statement describing the jammed shotgun.

### III. F.R.E. 804(b)(3), the Due Process Clause and the Right to Confrontation Authorize and Mandate Admission of Mr. Cruz Ramirez's Statement as Exculpatory Evidence and to Impeach the Hearsay Testimony of Mr. Marota.

Independent of the rule of completeness, the Federal Rules of Evidence, specifically F.R.E. 804(b)(3), authorize admission of the statement and, moreover, the United States Constitution requires admission of Mr. Cruz Ramirez's statement.[7] Due Process, the Right to Confrontation, and the Right to Compulsory Process also compel the statement's admission because it is essential to Mr. Herrera's defense. *Crane v. Kentucky*, 476 U.S. 683 (1986) ("Whether rooted directly in the Due Process Clause . . . or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.") (internal citations omitted). Even where there are evidentiary obstacles to admission, Mr. Herrera is entitled to have this type of powerful exonerating and impeaching evidence heard by the jury. *See e.g. Chambers v. Mississippi*, 410 U.S. 284 (1973) (strict application of Mississippi's evidentiary rules deprived defendant of due process under the Fifth Amendment as applied to the States under the Fourteenth Amendment); *Davis v. Alaska*, 415 U.S. 308, 317 (1974) (holding that despite state law prohibiting disclosure of juvenile records, the Sixth Amendment guaranteed that "jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [a witness's] testimony which provided 'a crucial link in the proof . . . of petitioner's act.') citing *Douglas* v. *Alabama,* 380 U.S. 415, 419 (1965).

---

[7] It appears that the government did not permit Mr. Espinal to listen to the portion of the audio recording in which Mr. Cruz Ramirez makes the inculpatory statement. Based on Mr. Espinal's indications on the transcript, however, it appears that he was not present for that portion of the conversation. Mr. Herrera assumes that Mr. Cruz Ramirez and Mr. Flores would both assert their Fifth Amendment privilege if called to testify regarding these statements. Similarly, Mr. Alvarado who has pleaded guilty in this case, still has a pending murder charge in state court and has indicated through counsel that he would refuse to answer any questions if called to testify.

Mr. Cruz Ramirez's statement describing the jamming of the shotgun is critical to Mr. Herrera's defense for two reasons.

First, as discussed above, the statement constitutes direct evidence of third-party culpability which corroborates other evidence presented at trial. It is axiomatic that the more likely it is that someone else committed the Estrada murder, the less likely Mr. Herrera was the shooter. Mr. Cruz Ramirez's statement, captured on an audio recording, ranks among the most probative available statements related to the Estrada homicide. Due Process, Confrontation, and Compulsory Process require its admission. *Holmes v. South Carolina*, 547 U.S. 319, 327 (2006) (characterizing as "widely accepted" the rule that "the accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged" and that such evidence may be excluded only where the "evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial.").

Second, the statement's admission is necessary to impeach (1) Mr. Marota's testimony and (2) Mr. Cruz Ramirez's hearsay statement. Admission is necessary in light of the Court's ruling permitting Mr. Marota's hearsay testimony to stand with only a limiting instruction.[8] In this regard, the Supreme Court in *Bruton* cautioned:

> Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination.

*Bruton*, 391 U.S. at 135. *Bruton* is thus concerned with, not only the practical realities of jurors' limitations, but also with the inherent unreliability of a codefendant's hearsay statements which are then subsequently compounded by the inability to cross-examine him. Here, the unreliability of the Mr. Cruz Ramirez's hearsay statement (offered through Mr.

---

[8] Although the Court rejected Mr. Herrera's *Bruton* argument, the Court acknowledged that limiting instructions can be ineffective in light of the "practical and human limitations of the jury system." R.T. at 11165; *Bruton v. United States*, 391 U.S. 123, 135 (1968).

Marota) is plainly established by Mr. Cruz Ramirez's inconsistent and significantly more inculpatory statement on the audio recording.[9] Left unchallenged by Mr. Cruz Ramirez's recorded statement, Mr. Marota's hearsay testimony would be "intolerably compounded" by Mr. Herrera's inability to confront it.

In essence, admission of Mr. Cruz Ramirez's statement describing the jammed shotgun is the sole means currently available through which Mr. Herrera can effectively rebut Mr. Marota's hearsay testimony that Mr. Cruz Ramirez told him that Mr. Herrera committed the Estrada murder.[10] Depriving Mr. Herrera of the opportunity to challenge this evidence – characterized by the government as "an absolutely crucial piece of evidence" (Docket 4522) – would be fundamentally unfair and ultimately "call[] into question the fact-finding process." *See Chambers v. Mississippi*, 410 U.S. 284, 295 (1973) (denial or significant diminution of a defendant's right to challenge the evidence against him "calls into question the ultimate integrity of the fact-finding process").

## **CONCLUSION**

The prosecution has offered, and the Court has received, a transcript of an audio recording that omits a critical statement by Mr. Cruz Ramirez describing the use and misfiring of a shotgun. This statement, considered in conjunction with other evidence at trial, solidifies

---

[9] The circumstances under which both statements were made also support the conclusion that the statement on the audio recording is a far more reliable variety of hearsay than the one made in the jail. Mr. Cruz Ramirez's statement on the recording, made amongst friends, hanging out in a park, prior to his arrest, stands in stark contrast to the self-serving, post-arrest statement to an anonymous member of a rival/enemy gang in a jail cell, especially considering the overwhelming concern with "snitches" at this point among 20th Street members. It would unfair to allow a possible perpetrator to plant exculpatory statements in the record through potential jailhouse informants.

[10] *Assuming* that Mr. Cruz Ramirez made the "Sparky" statement to Mr. Marota, the prosecution failed to memorialize Mr. Marota's pre-trial discussion of this statement in any ICE or FBI report or disclosure. The fact that no pre-trial record exists exacerbates the importance of Mr. Cruz Ramirez's statement as impeachment evidence. For this reason, Mr. Herrera was unable to confront this testimony by demonstrating the inevitable contradictions associated with fabrication and/or exaggeration.

Mr. Herrera's third-party culpability defense the Estrada killing.  More importantly, the statement constitutes critical impeachment of (1) Mr. Marota's hearsay testimony that Mr. Cruz Ramirez told him that Mr. Herrera committed the Estrada homicide and (2) Mr. Cruz Ramirez's statement to Mr. Marota if, indeed it was ever made.

The statement is derived from the same audio recording used by the prosecution to prepare transcripts offered and received as evidence in this case and, therefore, the statement is admissible under Federal Rule of Evidence 106, the rule of completeness.  The statement is also a statement against interest admissible under F.R.E. 804(b)(3).  Finally, due to the statement's importance to Mr. Herrera's defense, exclusion would violate Mr. Herrera's Due Process, Compulsory Process and Confrontation Rights.

DATED:  July 4, 2011                                    Respectfully submitted,

By:         /s/
MARTIN A. SABELLI
Attorney for
GUILLERMO HERRERA